## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

\* \* \* \* \*

| | |
|---|---|
| In re:<br><br>Jack A. Glasser,<br><br>          Debtor. | Case No: BK-22-30244<br><br>Chapter 7 |
| Messiahic, Inc. d/b/a PayJunction<br><br>          Plaintiff,<br><br>vs.<br><br>Jack A. Glasser,<br><br>          Defendant. | Adversary Proceeding No. |

## COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT
## (11 U.S.C. §§ 523(A)(2)(A) AND 523(A)(6))

Pursuant to Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule") 4007, and 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6), Plaintiff Messiahic, Inc., d/b/a PayJunction ("PayJunction"), by and through its undersigned counsel, brings this action against Jack A. Glasser (the "Debtor" or "Glasser"), and alleges upon information and belief as follows:

### JURISDICTION AND VENUE

1.      PayJunction brings this action pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6) on the grounds that PayJunction's claim against the Debtor is nondischargeable for the reasons set forth herein.

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (O).

3.      Venue is proper in this district under 28 U.S.C. § 1409.

145607445.4

## <u>INTRODUCTION</u>

4.      PayJunction provided credit card processing services for Glasser Images, LLC ("<u>Glasser Images</u>" or the "<u>Company</u>") pursuant to a Merchant Services Agreement.  The Debtor owned and operated Glasser Images, a Bismarck-based company that provided wedding photography and videography services and had personally guaranteed the Company's obligations under the Merchant Services Agreement.

5.      Glasser and his domestic partner, Jace Schacher ("<u>Schacher</u>"), ran Glasser Images for their personal benefit, and did not observe corporate formalities.  Rather, Glasser and Schacher treated Glasser Images as their personal piggybank and took fictitious loans from the Company to fund their lavish lifestyle.  Although Glasser failed to adequately capitalize Glasser Images, and knew that Glasser Images was insolvent, Glasser implemented a business model for Glasser Images that required customers to prepay for services by making advanced credit card payments for services to be rendered in the future.  The card payments were processed by PayJunction.

6.      At all relevant times herein, Glasser was attempting to prop up Glasser Images with loans from financial institutions, friends, and family.  Glasser knew that Glasser Images did not generate sufficient revenue to fund operations, and that Glasser Images would not be able to fulfill its obligations to customers without incurring further debt – which Glasser Images lacked the ability to repay.

7.      Glasser knew that Glasser Images' failure to deliver on its promise to provide wedding photography and videography services in accordance with Glasser Images' customer contracts without having the ability to issue refunds, would result in credit card chargeback claims for which PayJunction would be liable. As Glasser's scheme began to unravel, he caused Glasser Images to greedily take payment from customers knowing that it would not perform, thereby

2

145607445

shifting Glasser Images' liability to customers onto PayJunction.

8.    Under Glasser's direction and control, and due to Glasser's desperation for cash to fund business and personal expenses, Glasser caused Glasser Images to aggressively collect advanced card payments from customers at a time when Glasser Images was insolvent, which practice continued through the date Glasser caused Glasser Images to close its doors.

9.    After reading news reports that Glasser Images had closed its doors, and received more than 500 customer complaints in North Dakota, South Dakota, Minnesota, Colorado and other states, and that Glasser Images was under investigation by the North Dakota Attorney General's Office, PayJunction began experiencing chargeback claims at an alarming rate. PayJunction immediately reached out to Glasser to provide information and assistance to determine whether the chargeback claims could be challenged in whole or in part – advising Glasser that Glasser Images' failure to timely challenge an improper or excessive chargeback claim (usually at least seven (7) business days from the notification) would result in a valid claim that could not later be challenged.  However, Glasser ignored PayJunction's requests and refused to provide assistance to PayJunction.

10.    Shortly thereafter, PayJunction filed a complaint against Glasser Images and Glasser in the United Stated District Court for the Middle District of Georgia and obtained an injunction ordering Glasser and Glasser Images to cooperate with PayJunction.  Glasser failed to comply with the injunction, resulting in increased chargeback claims – which could not be challenged.

11.    Ultimately, on March 3, 2022, the District Court entered judgment in favor of PayJunction against Glasser and Glasser Images in the amount of not less than $977,241.14, and converted the preliminary injunction into a permanent injunction, which judgment was

145607445

subsequently registered by the Clerk of the Morton County District Court, Mandan, North Dakota, on March 22, 2022 (the "Judgment").

12.     As more particularly set forth herein, PayJunction alleges that Glasser incurred and caused his business Glasser Images to incur debt owed to PayJunction of at least $977,241.14, plus post-judgment interest, attorney's fees and processing fees (the exact amount to be proven at trial) by, among other things: (1) soliciting large advance payments from customers to take and provide primarily wedding photography and videography services with the knowledge and intent that such products, services, or refunds would not be provided, delivered, or made to Glasser Images' customers; (2) soliciting large advance payments from customers without disclosing that it was undercapitalized and had been undercapitalized for years before its closure; (3) soliciting large advance payments from customers without disclosing that Glasser and Schacher were spending Glasser Images' funds for personal expenses and to fund their lavish lifestyle; (4) knowingly and willfully failing to provide products, services, or refunds to customers that Glasser Images advertised and promised to customers who had made payment therefor; and (5) accepting advanced card payments from customers with the knowledge that PayJunction would be legally obligated to return credit card payments to customers for photography or videography services that Glasser Images could not and would not deliver.

13.     As discussed *infra*, the North Dakota Attorney General commenced an action against Glasser, Schacher and Glasser Images (collectively, the "Glasser Defendants") alleging, among other things, that the Glasser Defendants violated North Dakota's consumer fraud law and N.D.C.C. § 51-15-02, engaged in deceptive acts or practices and directly or indirectly made false statements, false promises, or misrepresentations with the intent that others rely thereon, in violation of N.D.C.C. § 51-15-02, while engaging in the sale or advertisement of photography services or any

145607445

other merchandise.

14.     Ultimately, the Glasser Defendants including Glasser entered into a Consent Judgment (defined below) admitting to the Attorney General's fraud allegations and agreeing to stipulate to the entry of a non-dischargeable judgment based on the Glasser Defendants' fraud under 11 U.S.C. §§ 523(a)(2)(A) and (a)(7).  Shortly thereafter, the Bankruptcy Court entered stipulated judgments against Glasser and Schacher determining that such claims were non-dischargeable.

15.     As more particularly described herein, PayJunction's claims are based on the same transaction or occurrence and common nucleus of operative facts that Glasser has admitted, and the District Court has found, violated North Dakota's consumer fraud statutes. PayJunction has paid $402,885.17 in Chargebacks to approximately 31.6% of the individuals listed as victims of Glasser Images in the claims asserted by the North Dakota Attorney General, representing approximately 43% of the amount of total Chargebacks paid by PayJunction, which this Court has determined to be nondischargeable pursuant to the Consent Judgment.

16.     Glasser fraudulently induced customers of Glasser Images to prepay for goods and services with their credit cards at a time when Glasser knew that Glasser Images could not or would not perform. Glasser's acts and omissions further defrauded PayJunction by enabling Glasser Images to accept customer card payments, often for Glasser's and Schacher's personal enrichment, knowing that PayJunction would be liable for customer chargebacks. Accordingly, the Judgment is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).  In addition, Glasser ignored PayJunction's repeated requests for assistance and information needed to timely challenge chargeback claims as ordered by the United States District Court for the District of Georgia.  Glasser's acts and omissions were done willfully and maliciously and with the intent to injure PayJunction.  Accordingly, the Judgment is non-dischargeable under 11 U.S.C. § 523(a)(6).

145607445

## PARTIES

17.        PayJunction is a California corporation with a principal place of business at 1903 State Street, Santa Barbara, California 93101.

18.        Debtor Jack A. Glasser is an individual and a resident of Bismarck, North Dakota. As of the Petition Date, Glasser's residence was located at 817 14th Street SE, Mandan, North Dakota 58554.

19.        Jace Schacher is an individual and a resident of Bismarck, North Dakota.  As of the Petition Date, Schacher's residence was located at 817 14th Street SE, Mandan, North Dakota 58554. At all relevant times, Schacher was an employee of Glasser Images and a domestic partner of Glasser.

20.        Glasser Images was at all relevant times a North Dakota limited liability company with a principal place of business at 510 E. Main Avenue, Suite 3A, Bismarck, North Dakota 58501-4411.

21.        Debtor Jack A. Glasser at all relevant times was the owner, officer, or principal of, directed, controlled, managed, participated in, or supervised the activities of, or in the course of his business, vocation, or occupation, engaged in the business and transactions of Glasser Images, LLC, including the acts and practices described herein.

## GENERAL ALLEGATIONS

### A.  Debtor's Ownership and Operation of Glasser Images, LLC

22.        On or about March 25, 2008, Glasser formed Glasser Images. Glasser Images advertised that it provided wedding photography, wedding video, commercial photography, commercial video, senior pictures, family portraits, newborn photography, and business headshots.

23.        At all relevant times, Glasser was the owner and sole member of Glasser Images.

6

145607445

24.     Glasser Images operated until it closed its doors on October 7, 2021.

**B. Merchant Services Agreement and Personal Guaranty**

25.     PayJunction provides merchant card payment processing services to various merchant entities across the country including Glasser Images.

26.     Glasser, individually and on behalf of Glasser Images, executed a merchant application and guaranty with PayJunction on October 12, 2013.

27.     On December 4, 2017, Glasser, on behalf of Glasser Images, executed a new Merchant Application ("Application") in connection with a rate review which incorporated certain Terms & Conditions ("T&Cs") (collectively, the "Merchant Services Agreement"). A true and correct copy of the Application is attached hereto as **Exhibit "A."** A true and correct copy of the T&Cs are attached hereto as **Exhibit "B."**

28.     As he did with the previous merchant application, Glasser also executed a personal guaranty (the "Guaranty") under which he guaranteed payment of all obligations of Glasser Images under the Merchant Services Agreement. *Id.*

29.     Under the Merchant Services Agreement, PayJunction, as the payment processor and independent sales organization ("ISO"), provided payment processing services to Glasser Images.

30.     Under Section 15 of the T&Cs, to the extent that PayJunction has paid or may become liable for a chargeback, Glasser Images is obligated to reimburse PayJunction for any sums paid by PayJunction or for which PayJunction is liable.  In addition, PayJunction has all of the rights and remedies of the cardholders. PayJunction may also assert any claim on behalf of a credit cardholder individually or on behalf of all cardholders as a class.

145607445

### 1. *The Chargeback Process*

31.     Cardholder customers who enter into credit card transactions with a merchant are entitled to dispute, or question, a charge when a product or service is not properly delivered as promised.

32.     Cardholder customers can question or dispute a transaction with a merchant in two ways: retrievals and chargebacks.

33.     To dispute a transaction through retrievals, the cardholder questions a merchant charge and "retrieves information" on the transaction. The cardholder's issuing bank or association will submit the query to the merchant on behalf of the cardholder.  The merchant can respond to the inquiry and perhaps avoid a future chargeback.  The merchant's failure to respond to a retrieval request will generally result in the submission of a chargeback by the issuing bank/association.

34.     To dispute a transaction through a chargeback, the cardholder states either that the transaction is unauthorized, or the product/service has not been rendered. The cardholder's issuing bank/association will submit a chargeback on behalf of the cardholder against the merchant. The merchant's account is immediately debited for the amount.  If there are insufficient funds in the merchant's account, the sponsor bank will debit the ISO's account.

35.     The merchant receives notifications for both chargebacks and retrievals in the mail.  The merchant's response timeframe is usually at least seven (7) business days from the notification.

36.     A merchant has the right to respond to a chargeback should the merchant believe it was submitted in error and that the merchant can prove the product/service has been (or will be) provided.   If sufficient evidence is provided by the merchant that the product/service has been (or will be) provided within the response timeframe, the chargeback can be reversed, meaning that the

145607445

merchant will have the chargeback amount credited back to its merchant account. The merchant's failure to respond within the response timeframe will render the chargeback as valid, causing the debit to the merchant's account (or ISO's account, if the merchant's account had insufficient funds) to remain with no further option to later reverse such chargeback even if the merchant presents evidence that the product/service has been, or will be, provided.

### 2. *Merchant Services Agreement Termination*

37.       In the first week of October 2021, it was reported that Glasser Images went out of business, closed its doors, and defaulted on its obligations to many of its customers that had contracted for wedding photography and videography services. Upon information and belief, Glasser sent Glasser Images' customers a letter announcing that the company was closing, no refunds would be given to any customer, and blaming the pandemic for its financial misfortunes. At the time, it was reported that over 500 complaints had been received from customers of Glasser Images in North Dakota, South Dakota, Minnesota, Colorado and other states, and that Glasser Images was under investigation by the North Dakota Attorney General's Office.

38.       On October 14, 2021, PayJunction sent a Notice of Termination of Merchant Services Agreement ("Termination Notice") and Notice of Default and Demand for Payment Under Personal Guaranty ("Guaranty Demand") to Glasser Images and Glasser via email and overnight mail.  PayJunction thereafter terminated the Merchant Services Agreement.

### 3. *Glasser Images' Chargebacks*

39.       Since Glasser Images discontinued business operations on or about October 7, 2021, Glasser and Glasser Images have incurred not less than $934,046.85 in unresolved chargeback liability with PayJunction.

9

145607445

40.    As of the date of filing this Complaint, PayJunction has paid $934,046.85 in refunds to return 552 credit card payments to customers of Glasser Images (the "<u>Chargebacks</u>"). Attached hereto as **<u>Exhibit "1"</u>** and incorporated herein by this reference is a summary of all the Chargebacks identifying the transaction dates, chargeback dates and chargeback amounts.[1]

41.    All but three of the Chargebacks were based on credit card transactions that took place in 2020 and 2021, with more than 85.5% of the Chargebacks relating to credit card transactions that occurred in 2021 – the year that Glasser Images closed its doors.  The following is a summary of the Chargebacks by transaction year:

- 2019 – 3 credit card transactions.

- 2020 – 98 credit card transactions.

- Q1 2021 – 98 credit card transactions.

- Q2 2022 – 120 credit card transactions.

- Q3 2021 – 222 credit card transactions.

- Q4 2021 – 11 credit card transactions (between October 1-7, 2021).

42.    Pursuant to the Operating Rules (referenced in the Merchant Services Agreement), Glasser Images had a limited timeframe set by the issuing banks, which is generally seven (7) business days from receipt of a chargeback letter from a cardholder, to respond to a chargeback dispute. If Glasser Images did not respond within this period, the chargeback was deemed valid, regardless of whether the chargeback was valid or accurate.

43.    Upon information and belief, Glasser Images' merchant account had insufficient funds to cover these Chargebacks, and PayJunction, as the ISO, became liable for the chargeback

---

[1] PayJunction has omitted the names of each of the customers in an abundance of caution to protect their privacy rights. PayJunction reserves the right to file a motion under seal in the event that the Court determines that PayJunction is required to disclose customer names or any other personally identifiable information.

145607445

amounts without the possibility of a chargeback reversal due to Glasser Images' failure and refusal to respond.

### 4. *Judgment Against Glasser and Glasser Images*

44.     On or about November 12, 2021, after numerous unsuccessful efforts to obtain information and cooperation from Glasser Images and Glasser concerning Chargebacks, PayJunction filed a verified complaint against Glasser Images and Glasser (the "<u>Glasser Images Action</u>") in the United States District Court for the Middle District of Georgia (the "<u>Georgia District Court</u>"), and an Emergency Motion for Preliminary Injunction ("<u>Emergency Motion</u>").

45.     On November 19, 2021, the Georgia District Court granted the Emergency Motion and issued a preliminary injunction in PayJunction's favor, which required Glasser to:

    a.  [P]reserve any and all electronic or other data that Defendants have in their possession, custody, or control, that may be used to identify customers, customer agreements, payments made to either of the Defendants, deadlines and delivery requirements of the Defendants as well as websites controlled by the Defendants, and customers expected to receive products or services from any vendors of Glasser Images.

    b.  [D]eliver to PayJunction within five (5) days access to its database or other storage device of customers and the information described above in Section 1, including customer agreements for all customers for which the Defendants have taken a deposit for since January 1, 2019 (the likely beginning of when deposits may have been taken for weddings delayed by COVID-19); and

    c.  [R]espond to all chargebacks and retrievals when received from the cardholders' issuing bank or financial institution before the response date noted in each notice. If Glasser continues to fail to respond to chargebacks and retrievals, PayJunction may file a motion for authorization to permit PayJunction to respond to chargebacks and retrievals or otherwise respond on Glasser's behalf.

46.     On March 3, 2022, the Georgia District Court entered judgment in PayJunction's favor against Glasser and Glasser Images in the amount of $977,241.14, which judgment was subsequently registered by the Clerk of the Morton County District Court, Mandan, North Dakota, on March 22, 2022.   Pursuant to the Judgment, the Georgia District Court converted the

145607445

preliminary injunction to a permanent injunction. PayJunction holds a claim against Glasser and Glasser Images in an amount of not less than $977,241.14 plus interest, attorney's fees, service fees and other damages (the "PayJunction Claim"), which PayJunction asserts is non-dischargeable.

**B.      Chapter 7 Bankruptcy Filings**

47.      On August 14, 2022 (the "Petition Date"), Glasser filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code.  On the same day, Schacher filed a separate voluntary chapter 7 bankruptcy petition.

48.      Gene W. Doeling was appointed as the chapter 7 trustee of the estates of Glasser and Schacher and continues to serve in that capacity.

**C.      North Dakota Attorney General Complaint**

49.      On May 3, 2022, the North Dakota Attorney General commenced an action entitled *State of North Dakota Ex Rel. Drew H. Wrigley, Attorney General vs. Glasser Images, LLC, et al.*, Case No. 08-2022-CV-00969 in the District Court for the South-Central Judicial District (the "Attorney General Complaint") alleging the following claims and requesting the following relief against the Glasser Defendants:

    a.   violating the consumer fraud law and N.D.C.C. § 51-15-02;

    b.   issuance of a permanent injunction and from engaging in deceptive acts or practices and from directly or indirectly making false statements, false promises, or misrepresentations with the intent that others rely thereon, in violation of N.D.C.C. § 51-15-02, while engaging in the sale or advertisement of photography services or any other merchandise as defined by N.D.C.C. § 51-15-01(3), within the State of North Dakota;

    c.   issuance of a permanent injunction and from engaging in the sale of merchandise as defined by N.D.C.C. § 51-15-01(3);

    d.   issuance of a permanent injunction from providing photography or videography services within North Dakota pursuant to N.D.C.C. § 51-15-07;

    e.   issuance of a permanent injunction from operating a photography or videography

145607445

business under a trade name, requiring licensure under N.D.C.C. ch. 47-25, and from operating, participating, or engaging in any photography business in North Dakota;

f.  issuance of a permanent injunction from soliciting or accepting from consumers advance payments or consumer deposits in connection with any sale of merchandise, as defined by N.D.C.C. § 51-15-01(3), pursuant to N.D.C.C. § 51-15-07;

g.  assessment of civil penalties of $5,000 for each violation of N.D.C.C. § 51-15-02 pursuant to N.D.C.C. § 51-15-11;

h.  an order requiring the payment of costs, expenses, and attorney's fees incurred by the Attorney General in the investigation and prosecution of the Attorney General Complaint;

i.  an order requiring the defendants to pay restitution to all consumers, which have suffered any ascertainable loss, and to restore to any person in interest any moneys or property, real or personal, which may have been acquired by the defendants by means of any practice declared to be unlawful pursuant to N.D.C.C. § 51-15-02;

j.  an order requiring defendants to pay restitution to all consumers, which have suffered any ascertainable loss, and to restore to any person in interest any moneys or property, real or personal, which may have been acquired by defendants by means of any practice declared to be unlawful under N.D.C.C. § 51-15-02;

k.  a determination that pursuant to N.D.C.C. § 51-15-07, an award of restitution is inadequate to compensate for the harm caused by Defendants' deceptive acts or practices and order specific performance, including by ordering delivery of photographs and video to any impacted person; and

l.  involuntary dissolution of Glasser Images.

**D.    Fraud Judgment Against the Glasser Defendants**

50.    On January 27, 2023, the District Court entered a consent judgment (the "Consent Judgment") in favor of the State of North Dakota against the Glasser Defendants concluding, among other things, that:

a.  The Glasser Defendants are adjudged in violation of the consumer fraud law, N.D.C.C. § 51-15-02, for engaging in deceptive acts or practices, fraud, false pretense, false promise, or misrepresentations;

b.  The Glasser Defendants admitted that with the intent that others rely, they engaged in acts or practices constituting violations of the consumer fraud law, N.D.C.C. § 51-15-02;

13

c. The Glasser Defendants are permanently enjoined and restrained from directly or indirectly engaging in acts or practices in violation of N.D.C.C. § 51-15-02 in connection with the advertisement or sale of merchandise, as defined by N.D.C.C. § 51-15-01(3), including while engaged in the business of, or acting in the capacity of, a photographer or videographer in the State of North Dakota;

d. Pursuant to N.D.C.C. § 51-15-07, the Glasser Defendants are restrained and enjoined from engaging in the business or acting in the capacity of a photographer or videographer in North Dakota for a period of fifteen years, and unless or until: (1) Glasser Defendants have paid in full all restitution owed to consumers pursuant to the entry of the Consent Agreement; (2) the Glasser Defendants have paid in full restitution to all aggrieved consumers, whether subject to this Judgment or other consumer judgments independently obtained; 3) the Glasser Defendants have paid in full all amounts owed to the Attorney General pursuant to the entry of the Consent Agreement; and (4) the Glasser Defendants have otherwise fully complied with the terms of the Consent Agreement;

e. Pursuant to N.D.C.C. § 51-15-11, Jack Glasser and Glasser Images agreed to the entry of a $25,000 judgment for civil penalties, which shall be non-dischargeable under 11 U.S.C. § 523(a)(7);

f. Pursuant to N.D.C.C. § 51-15-11, Schacher agreed to the entry of a $5,000 judgment for civil penalties, which shall be non-dischargeable under 11 U.S.C. § 523(a)(7);

g. Glasser and Glasser Images agreed to the entry of a monetary judgment against them in the amount of $767,188 as restitution for work not completed or performed and unpaid amounts owed to independent contractors;

h. Schacher agreed to the entry of a monetary judgment against him in the amount of $40,000 as restitution for work not completed or performed and unpaid amounts owed to independent contractors;

i. The Glasser Defendants expressly agreed that consumer restitution and corresponding judgment awarded to the State of North Dakota shall be considered non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and/or 523(a)(7); and

j. The Glasser Defendants agreed to execute a stipulation in their respective adversary proceedings commenced in the bankruptcy cases expressly agreeing that consumer restitution and the corresponding judgment awarded to the State of North Dakota shall be considered non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and/or 523(a)(7).

A true and correct copy of the Consent Judgment is attached hereto as **Exhibit C.**

51.    The PayJunction Claim is based on a common nucleus of facts, or the same transactions or occurrences alleged by the Attorney General against the Glasser Defendants in the

14

Attorney General Complaint. Specifically, Glasser admitted that he engaged in deceptive acts or practices, fraud, false pretenses, false promises, or misrepresentations that the District Court determined violated the consumer fraud law, N.D.C.C. § 51-15-02, and that he intended that others rely on such deceptive acts or practices constituting violations of the consumer fraud law.

52.      Indeed, according to PayJunction's records, PayJunction has paid chargebacks to approximately 31.6% of the individuals that the Attorney General asserted are victims of the Glasser Defendants' fraud in the restitution claims, representing approximately 43% of the amount of total Chargebacks paid by PayJunction, which Glasser and Schacher stipulated are nondischargeable under sections 523(a)(2)(A) and 523(a)(7) of the Bankruptcy Code.

53.      PayJunction, standing in the shoes of the defrauded consumers under the Merchant Services Agreement, was similarly defrauded by the Glasser Defendants.

54.      Glasser intended that PayJunction rely on the Glasser Defendants' deceptive acts or practices, fraud, false pretenses, false promises, and/or misrepresentations each time the Glasser Defendants accepted payment from Glasser Images' customers on their credit cards.

**E.      Entry of Nondischargeable Judgment in Attorney General Adversary Proceedings**

55.      Pursuant to the Consent Judgment, Glasser and Schacher stipulated to entry of judgments of nondischargeability under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(7).

56.      On January 26, 2023, Glasser and Schacher filed motions to approve the stipulations embodied in the Consent Judgment as nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(7).

57.      On February 17, 2023, the Bankruptcy Court entered judgments of nondischargeability against Glasser in the amount of $767,188 for restitution, and against Schacher in the amount of $40,000 for restitution, under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(7) pursuant

15

to the Consent Judgment.

58.     Because PayJunction's nondischargeability claim overlaps with approximately 31.6% of the restitution claims (representing approximately 43% of the amount of total Chargebacks) paid by PayJunction that are subject to the stipulated judgment against the Glasser Defendants, the PayJunction Claim against Glasser should be given *res judicata* effect, and this Court's and the District Court's judgment and associated stipulation of consumer fraud should be given collateral estoppel effect, for purposes of section 523(a)(2)(A).

### F.     Glasser Images' false representations to customers

59.     In addition, Glasser Images made the following categories of false representations to customers:

    a.  Glasser Images falsely represented that it would provide products or services to customers, but knowingly and willfully failed to do so;

    b.  Glasser Images falsely represented that it would provide two photographers for client weddings but often only provided one;

    c.  Glasser Images falsely represented it would provide highly skilled photographers, videographers, and editors, but often did not do so; and

    d.  Glasser Images issued inaccurate invoices, including "past due invoices" that were not past due with the intent to induce customers to make payments prior to the due dates.

60.     Glasser Images advertised its services to consumers on its website, other websites, and on social media.

61.     Glasser Images' customer contracts contained the same basic terms: In exchange for monetary consideration, Glasser Images promised to provide photography and videography services and edited photographs and videos.

62.     Glasser Images required customers to pay in advance.  Glasser Images' standard customer contract required the customer to "pay a non-refundable retainer on the date and equal to the amount" specified in the contract.

145607445

63.     Upon information and belief, Glasser Images contracted with hundreds of customers to provide wedding photography and videography services between 2019 and 2021.

64.     Glasser Images solicited and accepted advance payments from hundreds of customers for services to be provided on a future date.  In some instances, customers made advanced payments for wedding photography or videography services to be provided up to a year or more after the customer agreements were executed and payments had been made.

65.     Upon information and belief, Glasser Images deposited client advance payments into its general operating account and did not segregate or escrow customer payments.

66.     Glasser Images took advanced payments from customers in various amounts including: (a) the full contract amount; (b) a percentage of the total contract amount; or (c) a down payment followed by monthly payments.

67.     At all relevant times, Glasser caused Glasser Images to take steps to secure more funds by, among other things, soliciting payments in full of clients in exchange for a discount.

68.     On October 7, 2021, Glasser announced the abrupt closure of Glasser Images. When Glasser communicated the Company's closure to customers, he stated that Glasser Images would not provide refunds.  Glasser knew that Glasser Images' customers who did not receive refunds would make chargeback claims, and that PayJunction would become liable for the total amount disputed by Glasser Images' customers. – essentially shifting Glasser Images' responsibility for payment from Glasser Images to PayJunction.

69.     At the time of Glasser Images' closure, hundreds of customers from whom Glasser Images had solicited advance payments had not received the photography and videography services and/or edited photographs or videos they bargained for.

70.     Glasser Images did not provide refunds to customers who did not receive the promised

17

services.

71.     Glasser Images falsely represented to customers that it would provide products and services in exchange for customer payments but failed do so.

72.     Even when Glasser Images ostensibly provided the products and services it promised, it did not always do so. For example, Glasser Images advertised that it provided two photographers to photograph customer weddings, and routinely contracted to provide a "primary shooter" and a "second shooter" at weddings.

73.     However, despite its multiple promises to provide two photographers, Glasser Images did not always do so.

74.     As part of its business, Glasser Images issued invoices to customers representing an amount owed on or by a specific date. However, Glasser Images' invoices were not always accurate. Upon information and belief, to generate income including for Glasser's and Schacher's personal use, Glasser Images at times issued invoices to customers identified as "past due invoice."

75.     In some cases, Glasser Images issued "past due invoices" to customers whose payments were not past due. Glasser Images falsely represented to customers that they had missed a payment to Glasser Images, which representations Glasser Images knew were false at the time made. Glasser knew the representations were false at the time he caused Glasser Images to make the representations.

76.     Glasser also instructed his staff to push for payment of invoices that were not past due, or offered discounts for early payment, in the week or two before Glasser Images closed. Glasser knew at the time that Glasser Images solicited these payments from customers that Glasser Images would not be able to provide services to these customers in the absence of a $1.5 million loan modification from the Small Business Administration which was declined on October 4, 2021.

18

G.      **Glasser Images' undercapitalization and insolvency**

77.      Since at least 2018, Glasser Images was undercapitalized. Upon information and belief, and as more particularly described in the Attorney General's complaint, between 2018 and 2021, Glasser obtained numerous business and personal loans for Glasser Images totaling at least $4.4 million.

78.      In addition to the foregoing loans, Glasser applied for or requested loans from friends, family members, other financial institutions, and the government, most of which were denied.

79.      Glasser frequently requested credit from Bravera Bank ("Bravera"), where his personal and business accounts were located.

80.      Glasser also frequently requested credit from First Western Bank & Trust ("First Western") from whom he obtained loans totaling approximately $1.2 million.

81.      At all relevant times, Glasser knew that Glasser Images was seriously undercapitalized and could not survive without borrowing even more money.  For example, in a January 4, 2019, e-mail, First Western advised Glasser against taking on additional debt, particularly debt with high interest, saying, "if we just keep throwing debt at this you may not get your head above water in regards to cash flow."  In response, Glasser emailed First Western on January 10, 2019, admitting that Glasser Images' checking account "did dip negative . . . today," and that it was "just squeezing by but barely." Glasser disclosed to First Western that Glasser Images' "[a]ctual bank balance today is -$4500 due to some of last [sic] payroll's checks still clearing. If all cleared, we'd now be at -$10k."

82.      Desperate for money, Glasser suggested: "We just need to catch up from December, which isn't going to happen fast enough to keep up with regular expenses." Glasser inquired what options were available.  In response, the First Western representative noted that he would not be able to get

145607445

anything before Glasser Images' next payroll became due and asked whether Glasser had "something [First Western] could use for collateral for something else quick until then." The First Western representative rejected Glasser's suggestion of using Glasser's house as collateral, noting that "[t]here is not enough equity in it" and that First Western "already took all the business assets" as collateral.

83.     On January 11, 2019, Bravera advised Glasser that the Glasser Images checking account had been overdrawn for four days and, if the account was not credited sufficiently, the bank would begin refusing payment. Glasser was further advised that the bank had paid "39 items since the 4th quarter of 2018 through [January 11, 2019]. That is becoming too frequent." Bravera's representative further stated: "I know we have talked about it before but once these overdrafts start to become a habit our leash gets shorter. If this continues at this rate we will have to start returning everything if there aren't credits coming in to cover them that same day."

84.     On June 6, 2019, Bravera told Glasser that Glasser Images' account "has been essentially negative for a week and $21k is far too large of an amount for [the bank] to carry. The items in question hit the account yesterday so they have to be returned this morning."

85.     On March 19, 2020, Glasser advised First Western that Glasser Images was on the verge of failure, saying:

> ***We will not be able to make it for 60 days, let alone into next week. I need working capital ASAP.*** If not, I will need to shut down our apps needed for operations (our booking system for scheduling and invoicing, editing software, album design app, file storage, and so much more that require monthly payments), I will not be able to pay rent or equipment leases ***I will not be able to make payroll, we will not have people to fulfill weddings this summer, etc etc. SBA will take too long***, we will need to stop advertising (which will cease the inquiries we have been getting). Why can't we consolidate now? We have been talking about this for months. And now, more than ever, we need to consolidate and get additional capital to move forward. This is dire. I am not sure what I will do.

(Emphasis added).

145607445

86.     On April 28, 2020, First Western explained to Glasser that Glasser Images did not qualify for the COVID-19 PACE Recovery Program because the business was unable to pay its debts prior to the COVID-19 pandemic:

> "I would agree that this could work but there is one big issue. ***The business was not spinning off enough cash to make its debt payments prior to this event. [Bank of North Dakota] requires that for this program***." (Emphasis added).  First Western further advised Glasser: "***Adding additional debt, regardless of the terms is not going to help the business cash flow as it is a struggle at best currently***."

(Emphasis added).

87.     On September 2, 2020 (more than one year before Glasser closed Glasser Images), Glasser requested additional credit from First Western for Glasser Images, saying: "I know you are taking the [$1.2 million] consolidation of just the First Western loans to the committee. But that will not do us any good. That will not be enough. We need the [$1.6 million]. The credit cards and PayPal are sucking all of the cash out of the business." He continued: "***What's $400,000 when we already have [$1.2 million]," and said, "Without it, we cannot survive***."  (Emphasis added).

88.     On September 4, 2020, during continued requests for credit from First Western, Glasser grew frustrated with the bank's denial of additional credit: "***Does the bank not understand that we will not cash flow without additional cash? We will run out of cash. We will not be able to operate***." (Emphasis added).

89.     On September 15, 2020, Glasser again requested credit from First Western acknowledging that Glasser Images was "just skirting by and barely keeping the checking account positive." Glasser asked First Western if it had "an immediate solution for [Glasser Images'] cash position," which he described as "not good."

90.     On November 9, 2020, a year before Glasser closed Glasser Images, Glasser's accountant told him that the business had "too much debt and not enough cash flow," and suggested that

145607445

Glasser consult with a bankruptcy attorney:

> Hi Jack,
>
> I spent some time going through this and ***I don't have any real good suggestions for you. There is just too much debt and not enough cash flow. Even with the projections you have if everything goes right you might be able to make your current payments but would not make any progress on payroll liabilities or AP***. If I am reading everything correctly you have approximately $300K a year of debt payments before AP/Payroll Liabilities and misc. ***So, you need to make about $400K per year just to keep your head above water before taking on any more debt. I just don't see any bank or investor willing to do anything because even with these projections you would not be able to pay them back***.
>
> ***I don't know what you have for collateral on these loans but it might be time to talk with a bankruptcy attorney about your options, I know that's not what you want to hear but I just don't see any way to get out from under this debt given the projections you have***.
>
> Let me know if you want to discuss it more.

(Emphasis added).

91.     In response to the accountant's suggestion that Glasser consult with a bankruptcy attorney, Glasser stated that "[a]fter being in business for 15 years, it certainly is not something I want to hear and will do everything I can to avoid it, but what does bankruptcy even look like?" Glasser's accountant responded that "there are various types of ways to go and one is a reorganization with 'bankruptcy' which would give you time to get some things worked out while keeping creditors from forcing things on you."  He again suggested that Glasser "get an initial consultation with a bankruptcy attorney and see what he suggests."  There is no indication that Glasser heeded his accountant's advice to consult with a bankruptcy lawyer.

92.     A week later, Glasser inquired with his accountant whether he could take money from employees who might be interested in investing in the Company as "a way to raise more equity without taking on more debt".  In response, the accountant inquired how the employees would "get any return on their money if all of the profits are needed to pay debt payments, plus as owners they would be potentially

145607445

liable for some of the debts of the company."   Glasser responded that "[i]t would have to be a long-term benefit for them (or anyone who would invest) as we climb out of this hole."

93.      On June 29, 2021, Glasser contacted Bravera when Glasser Images' account was once again overdrawn because he wanted to know if declined transactions would clear if he made a deposit. In response, Bravera told him:

> We will not be re-running or honoring any checks until you get this account positive. This account has had 235 NSF items since it was opened, which is unacceptable. You have had 10 items in just the last month.
>
> ***I want to make this clear: the management of this account is unacceptable, and we will not honor checks if you have no funds. If this kind of account management continues we will be closing the account***.

(Emphasis added).

94.      Despite having been advised by his accountant on November 9, 2020, to consult with a bankruptcy attorney due to Glasser Images' poor financial condition, Glasser waited until the Small Business Administration ("SBA") declined a $1.5 million loan modification on October 4, 2021, to finally close Glasser Images.

95.      In the nearly one-year period after Glasser's accountant advised Glasser to consult with a bankruptcy lawyer due to Glasser Images' dire financial condition, Glasser continued to accept advanced payments from customers for future wedding photography and videography services.  Indeed, Glasser continued to go deeper in debt, knowing that his own accountant advised him that there was too much debt, not enough cash flow to stay "above water before taking on any more debt," and that even with overly sanguine projections, Glasser Images would not be able to repay investors. There is no indication that Glasser caused Glasser Images to materially reduce expenses and exercise caution to stop or slow its practice of accepting advanced deposits from customers until Glasser Images was able to fulfill its obligations to existing customers.  To the contrary, Glasser conducted business as usual,

145607445

continuing to take money from customers without having the ability to provide the photography or videography services promised to customers.

96.    After consulting with a bankruptcy attorney in or around October 2021, and making an initial payment of $1,000, Glasser waited until August 14, 2022, to file his chapter 7 bankruptcy petition.

97.    Glasser Images continued to take advance payments from customers in 2020 and 2021 knowing the entire time that it was on the brink of failure and that Glasser Images' failure meant it could not deliver the products, services, or refunds it promised.

98.    Although Glasser was aware that Glasser Images was under severe financial distress in 2019, 2020 and 2021, at no time did Glasser disclose to customers that Glasser Images was applying for loans to keep the company operating, or the risk that the Company could fail and that customers might not receive services for which they had made advanced payments.

99.    Indeed, Glasser's balance sheets reflect Glasser Images' poor financial condition. As far back as October 15, 2018, Glasser Images' balance sheet reflected retained earnings of $177,490.33. By September 6, 2021, Glasser Images' retained earnings had ballooned to $2,284.885.06. Glasser Images' retained earnings also included amounts moved by Glasser from its "loan to Jack" line item to retained earnings.

100.    Glasser, as the owner and sole member of Glasser Images, was fully aware of, and responsible for, Glasser Images' financial condition.

101.    Although Glasser Images had more customers, year-over-year since 2018, Glasser Images laid off approximately one-half of its staff in October 2020.

102.    To accommodate the greater number of contracted clients, Glasser Images retained approximately 150 independent contractors to photograph and video record weddings, and to edit the raw photographs and videos. However, Glasser Images did not always pay its independent

24

145607445

contractors according to the agreed payment terms.  Glasser Images was unable to retain the services of a sufficient number of photographers to provide both a primary and second shooter to each customer it promised. Glasser, as the owner and sole member of Glasser Images, was fully aware of Glasser Images' inability to provide both a primary and second shooter to each client it promised.

103.    Glasser testified that Glasser Images did not provide any training to these independent contractors as opposed to employees – many of whom were photographers that were laid off by Glasser Images.

104.    Despite advertising its services using the photography of its most skilled photographers and editors, Glasser knew that Glasser Images could not provide all its clients with highly skilled or "amazing" photographers.  Indeed, Glasser Images did not require that its independent contractors had a specific amount of experience.

105.    Glasser testified that Glasser Images maintained a spreadsheet of its photographers and editors with an assessment of their skill level.  According to Glasser, notes indicated that some of the subcontractors were not very good, and that others should be removed after Glasser Images hired more people because the photographer either did not have much training or did not satisfy Glasser Images' standards.

106.    Glasser, as the owner and sole member of Glasser Images was fully aware of Glasser Images' inability to provide the high-quality photography it represented in its advertising.

107.    Glasser Images further issued inaccurate invoices to customers to generate more funds, more quickly.  Upon information and belief, Glasser Images issued "past due" invoices to customers even though such invoices were not past due.

108.    Glasser Images continued to accept payment from other customers through October 7,

145607445

2021, for services that Glasser knew Glasser Images would not provide.

### H. Glasser Images' representations were made with the intention of deceiving its customers

109.     Upon information and belief, Glasser's deceptive conduct included, among other things: (1) using business funds for personal expenditures; (2) concealing his use of business funds for personal expenditures by manipulating his financial records (as well as directly representing otherwise); (3) providing false financial records to creditors; (4) providing false information to government agencies to obtain pandemic relief funds; (5) not paying independent contractors; (6) obtaining funds by falsely claiming he would imminently receive government funds; and (7) issuing inaccurate invoices to clients.

110.     Additionally, Glasser failed to respond to credit card disputes filed by customers despite the issuance of a preliminary injunction by the Georgia District Court on November 19, 2021, which was converted into a preliminary injunction pursuant to the Judgment entered by the Georgia District Court on March 3, 2022, thereby knowingly and willfully causing injury to PayJunction.

111.     Glasser, as the owner and sole member of Glasser Images, intended Glasser Images to deceive its customers because Glasser and Schacher used Glasser Images' funds to live an extravagant lifestyle funded by the business to the expense and detriment of the customers and PayJunction.

112.     Glasser used the Company's debit or credit card and/or business funds to pay for his and Schacher's personal expenses including luxury vehicles, personal travel, fine dining, mortgage payments, personal care, and various miscellaneous expenditures. They also paid personal expenses after transferring funds to their personal account from Glasser Images' account.

145607445

### 5. *Luxury vehicles*

113.    On March 17, 2021, approximately two months after receiving the second disbursement of $257,500 through the Paycheck Protection Program, Glasser entered into a 36-month lease for a 2021 Mercedes-Benz GLE450W4 for $1,631.97 per month.

114.    On April 22, 2021, Glasser and Schacher entered into a lease for a 2021 Audi S5 Quattro for $2,059.35 per month.

115.    Though the Audi was ostensibly paid for using Glasser's and Schacher's personal checking account, the payments were covered by funds transferred to their personal checking account from Glasser Images' account on at least three occasions in 2021.

116.    In addition to leasing luxury vehicles with funds from Glasser Images, Glasser and Schacher regularly used business funds to have their vehicles detailed.

### 6. *Personal travel*

117.    Glasser also used business funds to pay for personal travel. For example, on November 15, 2018, Glasser contacted Bravera because he and Schacher were traveling to Hawaii: "[Schacher] and I will be traveling to Hawaii the end [sic] November. We leave 11/23 and fly back 12/1. Please put a note on the Glasser Images debit cards . . .."

118.    Glasser also requested that Bravera increase "the ATM limit . . ., daily limit . . ., and point-of-sale limit . . ." on each of Glasser's and Schacher's business debit cards.  As Glasser noted:  "I have so much run through on mine with auto pay for the business, I don't want anything to get stopped while I am gone. Plus, not sure how much the hotel will pre-auth. Please confirm when done."

119.    Upon information and belief, Glasser and Schacher used Glasser Images' credit card and/or business funds to pay for personal, non-business-related travel to Wyoming, South

27

Dakota, Minneapolis and elsewhere between 2018 and 2021.

### 7. *Fine Dining*

120.    On a regular basis, Glasser and Schacher used Glasser Images funds to pay for meals and drinks at upscale restaurants.  These weekly meals cost Glasser Images hundreds of dollars per week.

121.    For example, according to the Glasser Images' credit card statements, between May 15, 2020, and June 15, 2020, Glasser and Schacher used business funds to pay for meals at Pirogue Grill 13 times and Butterhorn four times.

122.    Between May 16, 2021, and June 15, 2021, Glasser and Schacher used business funds to pay for food and alcohol at Pirogue Grill, Butterhorn, Stage Stop Liquors, and Autumn Hills Liquors.

### 8. *Mortgage Payments*

123.    Upon information and belief, Glasser and Schacher regularly paid their mortgage by transferring business funds to their personal checking account to cover their mortgage payment in 2020 and 2021.

### 9. *Personal Care*

124.    Upon information and belief, Glasser and Schacher used business funds to pay for their frequent haircuts and hair care products in 2020 and 2021.

### 10. *Miscellaneous Expenditures*

125.    Upon information and belief, Glasser and Schacher used business funds to pay large amounts for plants. For example, between May 16, 2021, and June 15, 2021, they used business funds to purchase plants for themselves, spending at least $1,296.25.

28

145607445

126.     Glasser and Schacher used business funds to pay for a variety of subscription services for themselves, including for meal kits, smoothie kits, and alcohol kits.

### 11. Bank Transfers

127.     Glasser Images subsidized other purchases and payments Glasser and Schacher made using their personal account.  According to Glasser's testimony at the meeting of creditors, Glasser and Schacher transferred funds from the Glasser Images account into their personal account to pay personal expenses, and allegedly accounted for these payments on QuickBooks. These personal expenses included, among other things, the foregoing subscription services.

128.     Upon information and belief, notwithstanding Glasser's use of business funds to pay for personal expenditures, he did not report the funds taken from Glasser Images as income on his personal tax returns.

129.     Glasser also testified that he stopped receiving a distribution or draw from Glasser Images in 2017 or 2018, after which he began receiving "loans" from Glasser Images which were not repaid.   However, Glasser Images did not take any formal steps to approve loans made to him.

130.     Glasser concealed his use of business funds to pay personal expenditures from his banks by manipulating his financial records.  For example, Glasser's personal expenditures were wrongfully recorded as legitimate "meals and entertainment" purchases by the business.   His personal expenditures were also categorized in accounting software as a "loan" purportedly given to Glasser by the business, though the business never approved the "loan."

131.     As of December 31, 2020, Glasser Images' "loan to Jack" totaled $499,111.02.

132.     Rather than taking an appropriate "draw," Glasser and Schacher spent Glasser Images' funds at whim.

133.     According to Glasser Images' bookkeeper, Sierra Hall, Glasser Images' financial

145607445

condition was apparent prior to COVID as Glasser Images had not been paying subcontractors on time as a result.

### I.      Unsuccessful efforts to hide assets

134.      Upon information and belief, in the year prior to Glasser Images' closure, Glasser and Schacher were looking to purchase land in the Black Hills of South Dakota (the "Black Hills Land") for at least $750,000.  On June 24, 2020, Glasser inquired with his accountant whether he could buy the Black Hills Land with business funds from company cash flow, while ensuring that ownership could not be easily determined.  Glasser stated in an email:

> . . . the land would be for personal use BUT it would be paid for with business cash flow – our salaries couldn't support the payments. Does that make a difference? **Could I just do a loan to myself like I have been with any other personal expenses?**
>
> **Any downside or upside for it being just me OR me and Jace [Schacher].** (Unless, with the question above, it now does make sense for it to be done through Glasser Images?)
>
> **What about from a privacy's sake – if I didn't want people know we owned it. Would a separate company make sense then?**

(Emphasis added).

135.      In response to Glasser's inquiry, Glasser's accountant stated:

> No that doesn't make a difference. **You could put it in the business name you just have to be careful not to deduct any of those expenses and all of the loan payments would have to come out as personal draws**.
>
> Whether you put in your name personally or both of your names is really more of an estate planning question should something happen to one of you.
>
> **You could put it in an [sic] new entity if you don't want people to know who the owners are**, again you would just make sure not to deduct anything from a tax standpoint within that entity.

(Emphasis added).

136.      Although Glasser testified that he and Schacher never consummated the purchase

of the Black Hills Property, Glasser and Schacher were looking for ways strip Glasser Images of its assets by taking fictitious loans from Glasser Images, and using the loan proceeds for their personal benefit including to purchase real property in their personal names or the name of an entity in which they retained an ownership interest in order to prevent "people [from] know[ing] we owned it."

    **J.**    **Glasser and Glasser Images knowingly imposed their obligations to customers on PayJunction**

137.    On December 4, 2017, Glasser, on behalf of Glasser Images, entered into a Merchant Services Agreement with PayJunction. Glasser personally guaranteed all obligations of his business to PayJunction.

138.    After Glasser abruptly closed Glasser Images on October 7, 2021, many of Glasser Images' customers disputed earlier credit card payments made to Glasser Images for goods or services that they did not, or would not, receive.

139.    At the time he closed his business, Glasser Images had insufficient funds in its merchant account to cover client credit card disputes.

140.    Glasser and Glasser Images failed to respond to customer credit card disputes in violation of the preliminary and permanent injunctions issued by the Georgia District Court.

141.    Based on Glasser's acts and omissions, including his practice of directing Glasser Images to accept advanced credit card deposits from customers even though Glasser knew that Glasser Images was unable or unwilling to perform the contractual obligations owed to its customers, PayJunction became liable for the total amount disputed by Glasser Images' customers.

142.    On or about November 12, 2021, PayJunction sued Debtor and the Glasser Images in the Glasser Images Action seeking an "affirmative injunction requiring Glasser Images to timely and properly respond to each chargeback from Glasser Images' customers and cooperate with

PayJunction regarding the ongoing and accruing chargeback liability."

143.    At the time PayJunction sued Glasser and Glasser Images, PayJunction's liability exceeded $720,000.

144.    Subsequently, PayJunction sought and obtained from the Georgia District Court a preliminary injunction (and later a permanent injunction) requiring Glasser and Glasser Images to, among other things, "respond to all chargebacks and retrievals when received from the cardholders' issuing bank or financial institution before the response date noted in each notice."

145.    Glasser failed to comply with the court's order requiring him to respond to disputes filed by his customers and, as a result, knowingly and willfully transferred the Company's liabilities to its customers to PayJunction.

146.    Through deliberate nonaction, Glasser knowingly and willfully transferred his financial obligations to PayJunction.

### K.     False representations as to PayJunction

147.    Glasser Images made ongoing representations under the Merchant Services Agreement each time it submitted a credit transaction including, but not limited to, the following:

   a.   The Transaction is genuine and arises from a bona fide sale of merchandise or services by Merchant, represents a valid obligation for the amount shown on the Transaction Receipt and does not involve the use of the Card for any other purpose.

   b.   The Transaction is not subject to any dispute, set-off or counterclaim; and

   c.   Each statement on the Transaction Receipt is true, and Merchant has no knowledge of facts that would impair the validity or collectability of the amount of the Transaction.

148.    Each time that Glasser Images accepted an advanced credit card payment from customers who initiated the Chargebacks as identified on Exhibit 1, Glasser made a representation to PayJunction that, among other things: (a) the Transaction was genuine and arises from a bona

32

145607445

fide sale of merchandise or services by Merchant, represents a valid obligation for the amount shown on the Transaction Receipt and does not involve the use of the Card for any other purpose; (b) the Transaction is not subject to any dispute, set-off or counterclaim; and (c) each statement on the Transaction Receipt is true, and Merchant has no knowledge of facts that would impair the validity or collectability of the amount of the Transaction.

149.    Glasser made these representations knowing that they were false at the time the representations were made.

150.    Glasser deliberately made these false representations for the purpose of deceiving PayJunction each time he caused Glasser Images to accept credit card payments from customers and utilized customer payments for his and Schacher's personal benefit.

151.    PayJunction justifiably relied on Glasser's false representations that Glasser Images would comply with the terms of the Merchant Services Agreement every time a new credit or debit card transaction was processed when PayJunction permitted Glasser Images to continue to utilize PayJunction's payment processing services.  Had PayJunction known that Glasser Images was accepting advanced payments from customers without intending to provide goods or services to its customers, PayJunction would have terminated the Merchant Services Agreement, thereby avoiding chargeback liability arising from these representations that Glasser knew were false at the time they were made.

152.    Glasser's false representations, made either directly by Glasser or through agents of Glasser Images (including Schacher) as more particularly described herein, proximately caused damages to PayJunction.

### L.    Glasser Images' customers justifiably relied on its representations

153.    Glasser Images' customers relied on its contractual promises because its contracts

required reliance by prohibiting customers from retaining the services of another photographer.

154.    Glasser Images required customers to agree that it "shall be the exclusive photographer retained by Client for the purpose of photographing the wedding day," and "it is understood that [Glasser Images] is the exclusive official photographer retained to perform services outlined in [the] contract."

155.    Customers justifiably relied on Glasser Images' representations that it would provide two photographers to photograph their wedding.

156.    Customers justifiably relied on Glasser Images' representations that it would provide the high quality represented in its advertising.

157.    At all relevant times, Glasser and Schacher knew that Glasser Images could not fully comply with these contractual obligations at the time these representations were made.

**M.    PayJunction was damaged as a proximate cause of Glasser's false representations**

158.    Glasser Images' false representations to its customers, made by Glasser and Schacher in his capacity as an agent for Glasser Images, were the proximate cause of PayJunction's damages.

159.    As a result of Glasser's and Schacher's false representations regarding Glasser Images' intention and ability to provide wedding photography and videography services to Glasser Images' customers, and sudden closure, hundreds of customers were impacted in at least four different ways:

   a.   Some customers who paid advance payments to Glasser Images received nothing, including a refund from Glasser Images.

   b.   Some customers who paid advance payments to Glasser Images had photographs taken and video recorded but did not or have not received from Glasser Images their photographs or video recording, whether edited or unedited.

     c.    Some customers who paid advance payments to Glasser Images, had photographs taken and video recorded, but only received unedited photographs or video recording from Glasser Images' independent contractors, and not the promised edited photographs or video recording by Glasser Images.

     d.    Some customers who paid advance payments to Glasser Images obtained their photographs or video recording (edited or unedited) only after paying their photographer or videographer (who Glasser Images did not pay), or another third party, effectively paying twice.

160.    PayJunction suffered damages as a result of Glasser's and/or Schacher's false representations and Glasser Images' acceptance of customer deposits while harboring the intent to defraud customers by, among other things, having to refund customer deposits based on Chargebacks received by PayJunction.

161.    As a result of Glasser's failure to respond to customer disputes (in violation of the preliminary and permanent injunctions), Glasser caused Glasser Images to transfer the debt Glasser Images owed to its customers onto PayJunction.

162.    Upon information and belief, Schacher was an agent of Glasser Images and personally benefitted from Glasser's wrongful acts and omissions described herein.

### ALTER-EGO, PIERCING CORPORATE VEIL, AND IMPUTED LIABILITY

163.    Glasser, on behalf of Glasser Images, engaged in various acts or omissions that necessitate the piercing of Glasser Images' corporate veil including: (a) insufficient capitalization for the purposes of the corporate undertaking; (b) failure to observe corporate formalities; (c) nonpayment of dividends; (d) insolvency of Glasser Images at the time of the transactions in question; (e) siphoning off funds by Glasser and Schacher; (f) lack of any other functioning officers and directors; (g) absence of records including minutes or resolutions; and (h) the existence of Glasser Images as a facade for Glasser's and Schacher's personal dealings.  Based on the

35

foregoing, it would be unjust, inequitable, and fundamentally unfair to recognize the separate existence of Glasser Images.

164.    Glasser testified at the meeting of creditors that he transferred money from Glasser Images bank accounts to his personal bank accounts, and that he used those funds to pay for his and Schacher's personal expenses.

165.    Glasser Images is an alter ego of Glasser in that there is such a unity of interest and ownership between Glasser and Glasser Images that the separate personalities of Glasser and Glasser Images do not exist, and it would be inequitable if the acts in question are treated as those of Glasser Images alone.  Furthermore, Glasser Images was in fact a mere instrumentality or alter ego of Glasser.  Under oath, Glasser testified there was a "blurred line" regarding the business: "I was the business, the business was me, you know?" Accordingly, the actions undertaken by Glasser Images can be imputed to Glasser and vice-versa.

166.    In addition, Glasser testified that Glasser Images does not have an operating agreement, and that he assumed that the Company was manager managed, though there was not an official board.

167.    Glasser further testified that there was no formal process for making business decisions including the decision to close its doors on October 7, 2021.

168.    Schacher and Glasser, in addition to running Glasser Images for their own benefit, are domestic partners of one another, and ran Glasser Images as an alter-ego and mere instrumentality.  Accordingly, the actions undertaken by Glasser Images and Glasser can be imputed on Schacher and vice-versa.

36

145607445

## FIRST CLAIM FOR RELIEF

### (NON-DISCHARGEABILITY UNDER 11 U.SC. § 523(a)(2)(A))

169.    The allegations made in paragraphs 1-168 above are incorporated by reference as if fully set forth herein.

170.    Bankruptcy Code § 523(a)(2)(A) provides, in relevant part, that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

(A) false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ....

171.    All or part of the debt owed to PayJunction, as evidenced by the Judgment entered against Glasser and Glasser Images, is non-dischargeable as it is a debt for money, property, services, or an extension, renewal, or refinancing of credit, that was obtained by false pretenses, false representations and/or actual fraud within the meaning of Bankruptcy Code § 523(a)(2)(A).

172.    In addition, the stipulated judgment in favor of the Attorney General against Glasser and Schacher for restitution should be accorded collateral estoppel and *res judicata* effect as approximately 31.6% of the customers who Glasser and Schacher stipulated that Glasser Images defrauded, representing approximately 43% of the amount of total Chargebacks paid by PayJunction, and whose claims this Court and the District Court have already determined in a final judgment to be nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

## SECOND CLAIM FOR RELIEF

### (NON-DISCHARGEABILITY UNDER 11 U.SC. § 523(a)(6))

173.    The allegations made in paragraphs 1-168 above are incorporated by reference as if fully set forth herein.

37

145607445

174.    Bankruptcy Code § 523(a)(6) provides, in relevant part, that:

> A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—
>  . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . ..

175.    On November 19, 2021, shortly after Glasser caused Glasser Images to close its doors, the Georgia District Court granted the Emergency Motion and issued a preliminary injunction in PayJunction's favor, which required Glasser and Glasser Images to, among other things, "respond to all chargebacks and retrievals when received from the cardholders' issuing bank or financial institution before the response date noted in each notice. . .."  On March 3, 2022, the Georgia District Court entered the Judgment, which, among other things, converted the preliminary injunction to a permanent injunction.

176.    Glasser ignored, and caused Glasser Images to ignore, PayJunction's repeated requests for assistance and information needed to timely challenge chargeback claims as ordered by the Georgia District Court.

177.    Glasser's refusal to cooperate and fully comply with the Georgia District Court's injunction was done willfully and maliciously as Glasser knew that his failure to fully comply with the injunction and to timely respond to all chargebacks and retrievals as and when received from customers was certain or almost certain to cause financial harm to PayJunction.

178.    Accordingly, all or part of the debt owed to PayJunction, as evidenced by the Judgment entered against Glasser and Glasser Images, is non-dischargeable as it is a debt for willful and malicious injury caused by Glasser within the meaning of 11 U.S.C. § 523(a)(6).

## ALL CLAIMS FOR RELIEF

179.    The allegations made in paragraphs 1-178 above are incorporated by reference as if fully

38

145607445

set forth herein.

180.    PayJunction respectfully requests this Court enter an order and judgment in favor of

PayJunction and against Defendant as follows:

a.   Determining that the entirety of the PayJunction Claim is nondischargeable under 11

U.S.C. §§ 523(a)(2)(A) and 523(a)(6);

b.   Awarding all attorney's fees pursuant to statute and contract, costs, and disbursements

in pursuing this action;

c.   Allowing PayJunction to assert different and additional claims as discovery and further

investigation warrant; and

d.   Further relief as this Court may deem equitable, just, and proper.

Dated this 12th day of May 2023.                    Respectfully submitted,

/s/ Berly D. Nelson
Berly D. Nelson (ND #05903)
SERKLAND LAW FIRM
10 Roberts St. N. | PO Box 6017
Fargo, ND 58108-6017
Phone: (701) 232-8957
Fax: (701) 237-4049
bnelson@serklandlaw.com

-and-

/s/ Robert F. Elgidely
Robert F. Elgidely (pro hac vice forthcoming)
FOX ROTHSCHILD LLP
2 South Biscayne Boulevard, Suite 2750
Miami, Florida 33131
Phone: 305-442-6543
Fax:  305-442-6541

-and-

145607445

_/s/_ Keith C. Owens

Keith C. Owens (pro hac vice forthcoming)
FOX ROTHSCHILD LLP
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067
Phone: (424) 285-7056
Fax: (310) 556-9828
KOwens@foxrothschild.com

**_Attorneys for Plaintiff Messiahic, Inc.,
d/b/a PayJunction_**

40