# <u>Exhibit 1</u>

*Deposition Transcript of Jack A. Glasser*

Page 1

```
 1            UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF NORTH DAKOTA
 2
                     Case No.:  BK-22-30244
 3                    Chapter 7
 4   In re:
 5   Jack A. Glasser,
 6                 Debtor.
 7   _____
 8         Adversary Proceeding No.:  23-07006
 9   Messiahic, Inc. d/b/a
     PayJunction,
10
                  Plaintiff,
11   vs.
12   Jack A. Glasser,
13                 Defendant.
     _____
14
15                   DEPOSITION OF
16                  JACK A. GLASSER
17
18            Friday, April 12, 2024
              9:30 a.m. - 12:16 p.m.
19             Remote Proceedings
20
21
22
23
24         Stenographically Reported By:
            Gina Rodriguez, RPR, CRR
25
```

Page 2

1 APPEARANCES:
2 On behalf of Plaintiff Messiahic, Inc. d/b/a
PayJunction:
3
    FOX ROTHSCHILD LLP
4   Two South Biscayne Boulevard
    Suite 2750
5   Miami, Florida 33131
    (786)501-7381
6   BY: ROBERT F. ELGIDELY, ESQUIRE
    relgidely@foxrothschild.com
7
8 On behalf of Debtor/Defendant Jack A. Glasser:
9   O'KEEFFE O'BRIEN LYSON LTD
    720 Main Avenue
10  Fargo, North Dakota 58103
    (701)235-8000
11  BY: TIMOTHY O'KEEFFE, ESQUIRE
    tim@okeeffeattorneys.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           I N D E X
2
  Examination                    Page
3
  JACK A. GLASSER
4 Direct        By Mr. Elgidely      4
5        E X H I B I T S
6 No.                         Page
7 Exhibit 1   Merchant application      51
8 Exhibit 2   Merchant Card Processing    52
           Agreement
9
  Exhibit 3   List of chargeback claims   79
10
  Exhibit 4   Exhibit C to Complaint     95
11
  Exhibit 5   Judgment             100
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2 Thereupon:
3           JACK A. GLASSER,
4 having been first duly sworn, was examined and
5 testified as follows:
6           DIRECT EXAMINATION
7 BY MR. ELGIDELY:
8   Q.  Please state your name for the record.
9   A.  Jack Glasser.
10  Q.  Good morning, Mr. Glasser.
11  A.  Morning.
12  Q.  My name is Robert Elgidely.  I am the
13 attorney for PayJunction in this action.  Do you
14 understand that?
15  A.  Yes.
16  Q.  Okay.  Do you have some photo
17 identification that you could present to the court
18 reporter this morning to confirm your identity?
19  A.  Yeah, I can.
20  Q.  Normally that's one of the questions that's
21 asked, but let's cover that now.
22       Can you hold it up to the camera, please?
23  A.  Yep.
24  Q.  Mr. Glasser, have you been deposed before?
25  A.  Yes.

Page 5

1   Q.  Approximately, how many times?
2   A.  Just once.
3   Q.  And when was the last time you were
4 deposed?
5   A.  Well, that would have been when I met with
6 the North Dakota Attorney General.
7   Q.  And the meeting with the North Dakota
8 Attorney General was a -- in connection with the
9 operations or finances of Glasser Images, as I
10 understand it?
11  A.  Yes.
12  Q.  And in connection with the deposition,
13 there are some ground rules that are intended to make
14 this process as painless as possible, and I'll go
15 over those with you now.
16      As you know from your sworn statement with
17 the North Dakota Attorney General, I am going to ask
18 you some questions under oath, and the court
19 reporter is going to record your responses.
20      In order for her to do so, you must give
21 verbal responses because she does not have a button
22 on her machine for a nod of the head or a shrug of
23 the shoulders.  And we want the record to be -- to
24 accurately reflect your responses.  Do you
25 understand that?

2 (Pages 2 - 5)

Page 6

1   A.  Yes.
2   Q.  Okay.  Please wait for me to finish my
3 question before you begin to respond so that the
4 court reporter can take down my full question and
5 your full response, okay?
6   A.  Okay.
7   Q.  If you don't understand the question I am
8 asking, please tell me, and I'll be happy to rephrase
9 it.  It is important that you understand my questions
10 and give me answers that are responsive to the
11 questions during this deposition, okay?
12   A.  Okay.
13   Q.  From time to time your counsel may make
14 objections to the form of certain of the questions
15 that I am asking, and those objections are intended
16 to preserve the objections for later proceedings in
17 this case.  They are not a basis for you to refuse or
18 fail to provide an answer to my question, do you
19 understand that?
20   A.  Yes.
21   Q.  Okay.  The only time that you are not
22 required to answer one of my questions is if the
23 answer or, I'm sorry, if the question would elicit a
24 response that's protected from disclosure by the
25 attorney-client privilege.  And in those instances,

Page 7

1 Mr. O'Keeffe will instruct you not to answer the
2 question.  Do you understand that?
3   A.  Yes.
4   Q.  Okay.  Mr. Glasser, where are you
5 physically located this morning?
6   A.  At home.
7   Q.  And where is home?
8   A.  Would you like the specific address or?
9   Q.  I would.
10   A.  1350 Canterbury Road, Winter Park, Florida.
11   Q.  Who is the owner of that residence?
12   A.  We're renting.
13   Q.  Who are you renting from?
14   A.  Justin Bowen.
15   Q.  Is that B-O-W-E-N?
16   A.  Correct.
17   Q.  Okay.  How do you know Mr. Bowen?
18   A.  Actually, stayed at an Airbnb of his for
19 some time being while we were transitioning into this
20 home.
21   Q.  And how long have you lived in that home?
22   A.  Since January.
23   Q.  January of 2024?
24   A.  Correct.
25   Q.  And do you have a written lease agreement

Page 8

1 with Mr. Bowen?
2   A.  We do.
3   Q.  Is it a month-to-month lease or is it an
4 annual lease?
5   A.  Currently, it's annual.
6   Q.  Who are the lessees that are listed on that
7 lease?
8   A.  Myself, Jace Schacher, and my mother
9 Joan Glasser.
10   Q.  What is the monthly rent that's payable
11 under that lease?
12   A.  4150.
13   Q.  $4,150?
14   A.  Correct.
15   Q.  How much of that rent do you contribute on
16 a monthly basis?
17   A.  None.
18   Q.  How much of the rent does your mother
19 contribute on a monthly basis?
20   A.  Most of it.  She's covering most of it
21 currently.
22   Q.  And is Mr. Schacher covering the balance?
23   A.  Yes, he contributes some.
24   Q.  Okay.
25     In the room that you're located, are there

Page 9

1 any other people present with you?
2   A.  No.
3   Q.  I'm going to ask you, Mr. Glasser, not to
4 communicate with anyone during your deposition,
5 whether that's in person, by text, email, or in any
6 other matter.  Do you understand that?
7   A.  Yes.
8   Q.  If at any time you need to take a bathroom
9 break, please let me know.  I am happy to accommodate
10 you as long as there's not a question pending, okay?
11   A.  Okay.
12   Q.  And what did you do to prepare for your
13 deposition today?
14   A.  I met with my attorney and, you know, just
15 reviewed a few documents and thoughts and whatnot.
16   Q.  When did you meet with your attorney?
17   A.  Earlier this week, I believe it was.
18   Q.  Are you referring to Mr. O'Keeffe?
19   A.  Correct.
20   Q.  Did you meet with Mr. O'Keeffe in person?
21   A.  No.
22   Q.  How did you meet with him?
23   A.  Over the phone.
24   Q.  Was anybody else present during that
25 meeting?

3 (Pages 6 - 9)

Page 10

1    A.   Well, Jace and I both met with
2 Mr. O'Keeffe.  Correct, yeah.
3    Q.   And how long did you meet with
4 Mr. O'Keeffe?
5    A.   Oh, I think it was just 15 to 30 minutes,
6 probably.
7    Q.   You mentioned that you also reviewed some
8 documents.  What documents did you review?
9    A.   The transcript from the North Dakota
10 Attorney General's deposition just to refresh my
11 memory on a few things, but that was about it.
12    Q.   Did you review any of the exhibits that
13 were marked during that deposition?
14    A.   Possibly.  I mean, I don't recall exactly
15 what exhibits there were, but, yeah, like I said, I
16 reviewed some of the documents, yes.
17    Q.   Did you review any of the documents that
18 you had collected and produced to the North Dakota
19 Attorney General?
20    A.   Nothing really specific, no.  Again, just
21 flipped through a few things just to kind of refresh
22 my memory on some things.
23    Q.   Okay.  What is your educational background,
24 Mr. Glasser?
25    A.   I have a high school diploma, and I went to

Page 11

1 college for two years.
2    Q.   Where did you get your high school diploma?
3    A.   St. Mary's Central High School in Bismarck.
4    Q.   What year was that?
5    A.   Graduated in 2007.
6    Q.   Is that the same high school that
7 Mr. Schacher attended?
8    A.   No.
9    Q.   And what is your age, sir?
10    A.   34.
11    Q.   You mentioned you attended some college?
12    A.   Correct.
13    Q.   Which college did you attend?
14    A.   University of Mary in Bismarck.
15    Q.   Good school.  Go off the record just for a
16 second.
17       (Discussion off the record.)
18 BY MR. ELGIDELY:
19    Q.   So how long did you attend University of
20 Mary?
21    A.   Two years.
22    Q.   And did you receive an associate's degree
23 after or before your time at University of Mary?
24    A.   No.
25    Q.   What was your area of study at University

Page 12

1 of Mary?
2    A.   Business.
3    Q.   You didn't take any photography or
4 videography classes while you were either in high
5 school or university at Mary?
6    A.   Yes, I did take a course in photography at
7 University of Mary.
8    Q.   Is that a semester-long course?
9    A.   I don't recall specifically, but probably
10 yes.
11    Q.   Did you have any other training in the
12 photography or videography fields?
13    A.   No, completely self-taught.
14    Q.   How much experience do you have as a
15 photographer?
16    A.   Well, I was shooting professionally for
17 about ten years, I think.
18    Q.   What years?
19    A.   Well, it started in 2005.  Started taking
20 pictures, though, before that, for the high school
21 yearbook and newspaper.  And I believe it was around
22 2015, 2016 when I started to focus completely on
23 running the business side of things.  I don't recall
24 the specific years, but that's approximately what I
25 think.

Page 13

1    Q.   Okay.  When you say you shot professionally
2 for ten years, was this with a camera, or are you
3 talking videography as well?
4    A.   Camera.
5    Q.   Okay.  Did you receive any type of training
6 whatsoever in the photography or videography fields,
7 other than the semester-long course you took at
8 university at Mary?
9    A.   Nope.  Like I said, completely self-taught
10 and taught by experience.
11    Q.   Did you work for any companies as a
12 professional photographer in the ten years or so that
13 you were -- were providing photography services?
14    A.   As an employee, no.  I mean, we did have
15 companies that hired us to do commercial photography,
16 but, no, I never worked as an employee for -- for a
17 company.
18    Q.   When you say they hired us, are you talking
19 about Glasser Images?
20    A.   Correct.
21    Q.   Okay.  So did you personally provide
22 services through Glasser Images to third parties,
23 either photography or videography?
24    A.   Yes, of course.
25    Q.   Okay.  And what years was that?

4 (Pages 10 - 13)

Page 14

1    A.   Are you talking in the context of being a
2  photographer or the company itself?
3    Q.   What I'm trying to get at, sir, is what,
4  if any, work did you do for wages or profit, you
5  know, remuneration in exchange for your photography
6  or videography work.  Do you understand that?
7    A.   Yes, me personally shooting for the company
8  or . . .
9    Q.   Directly or indirectly?
10   A.   Yes, so I had Glasser Images from 2005 to
11 2021.
12   Q.   Okay.  And during that period of time, did
13 you provide photography and vide- -- or videography
14 services through Glasser Images to third parties?
15   A.   Yes.
16   Q.   Okay.  And you were paid for that work,
17 correct?
18   A.   Yes.
19   Q.   Okay.  Did you ever perform photography or
20 videography services outside of your work for
21 Glasser Images for remuneration?
22   A.   No.
23   Q.   How much of your time at Glasser Images did
24 you spend providing photography or videography
25 services?

Page 15

1    A.   Well, as the company, or are you referring
2  to me shooting, myself?
3    Q.   You -- either you using the camera or, you
4  know, video recording, for the company?
5    A.   For me personally, again, it was about
6  ten years from 2005 to 2015, or 16.  The company in
7  its entirety, 2005 to 2021.
8    Q.   Okay.  How many other photographers or
9  videographers did Glasser Images have in that
10 ten-year time span of 2005 to 2015?
11   A.   I don't recall the specifics without going
12 back on employee records, but initially I hired one
13 or two photographers to help me out, and then that
14 grew to, I believe, five or six, and we continued to
15 grow from there.
16   Q.   Okay.  How much of your time was devoted to
17 providing directly photography or videography
18 services, let's say, 2005 through 2010?
19   A.   I mean, I would say 50 percent of the time.
20 And that's just kind of a guess.  I'm not sure
21 exactly.  Running a business, there's a lot of
22 things.
23   Q.   Sure.  Was the other 50 percent in that
24 five-year time span spent to running the business?
25   A.   Correct.

Page 16

1    Q.   More paperwork/administrative type work?
2    A.   Yes.
3    Q.   Okay.  And how about from 2010 through
4  2015, approximately, what percentage of your time was
5  spent, you know, yourself taking pictures or shooting
6  videos?
7    A.   From what period of time?
8    Q.   2010 through 2015.
9    A.   Well, again, I mean, the business was
10 growing so -- you know, and I was, you know, shooting
11 less because we had more photographers on staff.  So,
12 again, just to guess, I would say maybe 25 percent me
13 personally taking pictures.  75 percent working on
14 other things.
15   Q.   And, okay.  And the other things would
16 include administrative work, paperwork for the
17 business of Glasser Images?
18   A.   Correct.
19   Q.   During the period 2005 through 2015, where
20 were Glasser Images offices located?
21   A.   So from 2005 to 2009, I was working out of
22 my parents' home.  2009, we had a studio office in
23 South Bismarck, and then -- I don't recall the
24 specific year, but then we did move downtown -- to
25 Downtown Bismarck into a larger office.

Page 17

1    Q.   Do you know, approximately, what years you
2  had that prior location before you went Downtown?
3    A.   I don't recall, specifically.  No, I'd have
4  to go back and look at lease agreements.
5    Q.   Approximately, just approximately, best
6  guess.
7    A.   If I had to guess, I think we were in
8  South Bismarck from 2009 to 2019.  I believe we were
9  there for about ten years.  It could just be seven.
10 I'd have to look.  And then moving forward we were in
11 Downtown Bismarck.
12   Q.   When you say "could be seven," are you
13 saying could be seven years, could have been up to
14 2016 as opposed to 2019?
15   A.   Yeah, it was somewhere between 2016 and
16 2019 that we moved.
17   Q.   You moved to South Bismarck?
18   A.   Nope, we moved from South Bismarck to
19 Downtown Bismarck.
20   Q.   Got it.  Thank you.
21      And what was the reason that you left, you
22 know, started working in South Bismarck or started
23 providing services from an office in South Bismarck?
24   A.   To establish a physical location that
25 wasn't inside of a home.  You know, to be able to

5 (Pages 14 - 17)

Page 18

1 work with our employees in an office.
2     Q.   In the location in South Bismarck, did you
3 own that location, did you rent it?  What was the
4 situation there?
5     A.   We rented.
6     Q.   And how about the location in
7 Downtown Bismarck, did you rent or own that location?
8     A.   Rented.
9     Q.   And the landlord in Downtown Bismarck, was
10 that the same landlord that was at South Bismarck?
11     A.   No.
12     Q.   Okay.  Do you have any licenses or
13 certifications, Mr Glasser?
14     A.   No.
15     Q.   Bear with me for one second.
16         Why did you file bankruptcy on August 14,
17 2022?
18     A.   Pardon me?
19     Q.   Why did you file bankruptcy on August 14,
20 2022?
21     A.   I had closed the company and there was a
22 significant amount of debt.
23     Q.   Well, according to my records, the company
24 was closed on October 6th or 7 of 2021.  Why was the
25 date August 14, 2022 selected as the date for your

Page 19

1 bankruptcy filing?
2     A.   Between closing and filing, we certainly
3 had many things going on, many things to deal with,
4 including the North Dakota Attorney General,
5 including our focus on getting clients their photos
6 and video files in the capacity that we could.  Many,
7 many things going on so we were first focused on
8 that.
9     Q.   Were there any events or things that
10 triggered your bankruptcy filing on that particular
11 date of August 14, 2022?
12     A.   No, none that I can recall specifically,
13 no.
14     Q.   What, if any, consideration was given to
15 file any bankruptcy for Glasser Images?
16     A.   For the company versus us personally?  Is
17 that what you're saying?
18     Q.   Yes.
19     A.   I mean, what really -- I don't specifically
20 recall why there wasn't consideration.  You know, it
21 was a couple of years now, but, you know, there
22 wasn't any assets left.  There wasn't anything --
23 anything there as far as I can recall, yeah.
24     Q.   Okay. Do you recall in your testimony with
25 a North Dakota Attorney General that you had stated

Page 20

1 there were tangible, personal property owned by
2 Glasser Images consisting of, you know, desks, office
3 furniture and the like, and you had valued it at
4 $300,000?
5     A.   I don't recall, specifically, but, I mean,
6 if that's what I testified to, then, yeah, sure.
7     Q.   Let me pull up the transcript of your
8 testimony to help refresh your recollection.
9         Okay.  Bear with me for one second.  I'm
10 going to share my screen.  I was much better at this
11 yesterday.  There we go.
12         Okay.  Mr. Glasser, I put the transcript
13 of your testimony before the North Dakota Attorney
14 General on the screen.  Can you see it?
15     A.   Yes.
16     Q.   Okay.  And at Page 21, Lines 5 and 6,
17 Mr. Card inquires whether Glasser Images currently
18 has any assets, and you replied "yes" at Line 7,
19 correct?
20     A.   Yes.
21     Q.   You then explain for Lines 9 through 11
22 that the assets include various equipment, cameras,
23 computers, furniture, and miscellaneous office type
24 assets, correct?
25     A.   Yes.

Page 21

1     Q.   And in response to Mr. Card's question
2 about the value of the assets, you reply at Lines 20
3 and 21 that the assets were around $300,000, correct?
4     A.   Yeah, that was -- you know, as I said
5 before, I didn't know the specific amount so that was
6 an approximation, I guess, of sorts.
7     Q.   Okay.  But at the time Glasser Images
8 closed, which was shortly before -- your testimony
9 before the North Dakota Attorney General, that it had
10 assets that were valued in the approximate amount of
11 $300,000, correct?
12     A.   Without looking at those statements or --
13 or, you know, seeing an inventory list, specifically,
14 yeah, that was -- that was my approximate guess.
15     Q.   Okay.  And what happened to those assets?
16     A.   The bank acquired several items.  We
17 actually had some employees who never returned
18 several camera- -- cameras and computers and the
19 like, yeah.
20     Q.   Okay.  Did you ever demand the return of
21 Glasser Images property from anyone?
22     A.   Yes, we did.
23     Q.   So when you testified that the reason you
24 didn't file bankruptcy for Glasser Images was because
25 it did not have any assets, that testimony is not

6 (Pages 18 - 21)

Page 22

1  really accurate, correct, because you could see here,
2  at the time it closed, it had some assets that were
3  worth somewhere in the six figures, correct?
4      A.   Well, again, I'm not really sure.  You
5  know, I don't recall why we didn't file bankruptcy
6  specifically for Glasser Images.  And, again, the
7  amount of assets was something that I wasn't
8  completely sure.  And -- and like I said, the bank
9  took several of those assets, most of those assets,
10  and we couldn't recover the rest of the assets from
11  employees.
12     Q.   Okay.  What did the bank take?
13     A.   All the cameras from the studio, furniture,
14  computers, you know, those sorts of things.
15     Q.   What bank took those things?
16     A.   First Western International -- or, excuse
17  me, First Western Bank & Trust.  First Western Bank &
18  Trust.
19     Q.   Why did First Western Bank & Trust take
20  those assets?
21     A.   We had a loan with them.
22     Q.   How much was the loan?
23     A.   I don't recall the specific amount, but it
24  was around a million, a million dollars.
25     Q.   What was your objective in filing

Page 23

1  bankruptcy on August 14, 2022?
2      A.   We had so much debt and no ability to repay
3  it.
4      Q.   And what would a bankruptcy filing
5  accomplish in that situation?
6      A.   The discharge of debt.
7      Q.   Was one of your objectives discharging your
8  personal guarantee liability to creditors?
9      A.   Yes, I suppose it would be, yes.
10     Q.   Including the debt owed to my client,
11  PayJunction, correct?
12     A.   Yes.
13     Q.   What is your relationship with Jace
14  Schacher?
15     A.   He's my significant other.
16     Q.   When did you two meet?
17     A.   It was November 2009.
18     Q.   How did you meet?
19     A.   Through a mutual friend.
20     Q.   Who was that friend?
21     A.   His name was Roy.
22     Q.   Roy.  What's Roy's last name?
23     A.   Chiles.
24     Q.   Can you spell that for me, please?
25     A.   I believe it's C-H-I-L-E-S.

Page 24

1      Q.   And when did you and Mr. Schacher start
2  dating?
3      A.   I believe it was December of 2009.
4      Q.   When did you first start residing together?
5      A.   I believe it was May of 2010.
6      Q.   Have you resided with each other
7  continuously since May of 2010?
8      A.   Yes.
9      Q.   And before you were employed by
10  Glasser Images in 2005, where did you work?
11     A.   That was when I was a junior in high
12  school, so I had just a few miscellaneous jobs before
13  then.  I worked for Hellman Brothers Men's Clothing
14  for a couple months.  Before that, I mowed a family
15  friend business lawn for the summer.  So just some
16  summer jobs.
17     Q.   Okay.  Between yourself and Mr. Schacher,
18  who would you say has been the breadwinner in the
19  relationship, meaning who earns more income?
20     A.   Up until closing, I would say myself.
21     Q.   How much were you making at Glasser Images
22  per year from, let's say, 2020 and 2021?
23     A.   I don't recall the specific number without
24  looking it up, but I want to say it was maybe around
25  70 or 80,000 a year in salary.

Page 25

1      Q.   Were you a W-2 employee of Glasser Images?
2      A.   I think, technically, yes.  Yeah, I would
3  have to confirm that, but I'm -- I'm pretty sure,
4  yes, that was the case, the structure of it.
5      Q.   You don't recall receiving a 1099 in any of
6  the years you worked for Glasser Images?
7      A.   No, definitely not a 1099.
8      Q.   Okay.  Was Glasser Images a -- was it taxed
9  as a C or an S corp?
10     A.   An S corp.
11     Q.   Was it disregarded entity for tax purposes,
12  meaning it would not file its own tax return, it
13  would be reflected on your tax return, its revenue?
14     A.   I don't know.  I don't recall that
15  specifically without, you know, discussing it with my
16  CPA.  I'm not sure.
17     Q.   Bear with me for a second.
18          Did Glasser Images file tax returns each
19  of the years it was in operation?
20     A.   Yes.
21     Q.   And would Stephanie Thorp have been the
22  accountant that prepared each of those annual
23  returns?
24     A.   Yes.
25     Q.   Great.  In addition to the salary that you

7 (Pages 22 - 25)

Page 26

1 drew from Glasser Images, you received -- strike
2 that.
3         In addition to the salary that you drew
4 from Glasser Images, you charged personal expenses
5 to the business's account, correct?
6    A.  On occasion, yes.
7    Q.  Okay.  And those business expenses were
8 recorded as loans in the books and records of the
9 company, correct?
10    A.  Correct.
11    Q.  Is there any reason, Mr. Glasser, that you
12 could not have paid all of your personal expenses
13 with the income that you and your domestic partner
14 Mr. Schacher were drawn from Glasser Images?
15    A.  I'm not sure I understand the question.
16    Q.  Yeah.  I mean, isn't it normal for an
17 employee to live on the income that they earn for the
18 services that they render as opposed to using that
19 income to live on, plus their business' income?
20         Do you understand the question, or do you
21 want me to rephrase it?
22    A.  If you could rephrase it, that would be
23 great.
24    Q.  Okay.  Sure.
25         You could have, could you not, paid all of

Page 27

1 your personal expenses just from the salary that you
2 were drawing from Glasser Images?
3    A.  I guess I'm not sure without -- I'm not
4 sure.
5    Q.  Okay.  Would you say it's -- in your
6 experience, you said you're 35 years of age or 34,
7 I'm sorry.
8    A.  34.
9    Q.  34.  In your experience, isn't it normal
10 for people to pay for their living and personal
11 expenses from their salary?
12    A.  Sure, yes.
13    Q.  And you could have done that, right?  You
14 could have said, okay, I'm making 70-, 80,000 dollars
15 per year.  This is what I have to live on.  And this
16 is what -- this is -- I'm just going to -- if -- if I
17 could afford it, then I'll use my income to pay for
18 it.  If I can't afford it, I'm just not going to buy
19 it.
20    A.  I suppose, yes.
21    Q.  Okay.  But instead you not only supported
22 your lifestyle with the income that you were drawing
23 from Glasser Images, you supplemented that with
24 charges to the business, correct?
25    A.  On occasion, I suppose, yes.

Page 28

1    Q.  Frequently you did that, correct?
2    A.  I guess it depends on the definition of
3 frequently.  But, yeah, I mean, yes, on occasion,
4 yes, we did that several times to help bridge the
5 gap.
6    Q.  Okay.  Well, you could have given --
7 instead of taking loans from the company, you could
8 have given yourself and Mr. Schacher a raise, right,
9 so you would have more salary?
10    A.  We could have, yes.
11    Q.  Right.
12         But rather than give yourself a higher
13 salary, you took loans from the company to
14 supplement your personal expenses, correct?
15    A.  Yes.
16    Q.  Between yourself and Mr. Schacher, who
17 primarily handled your personal finances, your
18 household's personal finances?
19    A.  I did.
20    Q.  When did you and Mr. Schacher first open a
21 joint bank account?
22    A.  I don't recall the specific date by any
23 means.  Yeah, I don't recall the specific date.
24    Q.  Have you always, as far back as you could
25 remember, have had a joint bank account with

Page 29

1 Mr. Schacher?
2    A.  I believe so, yes.  Yeah, it's been a
3 while.
4    Q.  Did you or Mr. Schacher, to your knowledge,
5 have separate bank accounts while you were domestic
6 partners?
7    A.  Yes, yes, we did.
8    Q.  Why?
9    A.  I don't know.  We really didn't use them,
10 so I'm not sure why we had them.  We primarily used
11 the joint account.
12    Q.  Was there a perception that you guys
13 couldn't trust each other fully?
14    A.  No, not at all.
15    Q.  Was -- to your knowledge, was all of
16 Mr. Schacher's income deposited into your joint bank
17 account?
18    A.  Yes.
19    Q.  Okay.  And was all of your income deposited
20 into your joint bank account?
21    A.  Yes.
22    Q.  When you obtained loans from the company,
23 just to clarify, these loans were not funds that the
24 company directly transferred into your bank account,
25 correct?

8 (Pages 26 - 29)

Page 30

1    A.   I don't recall the specifics.  There might
2  have -- you know, I'm not sure without looking.
3    Q.   Well, typically you were using the
4  company's card, right, the Glasser Images credit card
5  or debit card to pay personal expenses, right?  So
6  you were charging the company's credit card and debit
7  card for personal expenses and then recording those
8  personal expenses as loans on the company's books and
9  records, correct?
10    A.   Yes, I believe we did that, yes.
11    Q.   Okay.  That was more common than the
12  situation where you actually withdrew money from the
13  company's bank account and then deposited that money
14  into your personal bank account, correct?
15    A.   I believe so, yes.
16    Q.   According to my notes, Glasser Images was
17  formed on March 25, 2008.  But earlier you testified
18  2005 was when you started doing business as
19  Glasser Images.  Can you explain the discrepancy?
20    A.   The LLC was formed on that 2008 date.
21    Q.   Did you use the fictitious name or the
22  d/b/a name, Glasser Images, prior to March 25th,
23  2008?
24    A.   I know when I first started it, you know, I
25  was the sole proprietor.  I don't recall specifically

Page 31

1  when the name Glasser Images began being used.
2    Q.   Okay.  But, nevertheless, it was formed in
3  North Dakota on March 25, 2008?
4    A.   Correct.
5    Q.   Okay.  And what was nature of
6  Glasser Images business after it was formed?
7    A.   Photography.
8    Q.   What type of photography?
9    A.   At that point we were primarily doing
10  senior graduation portraits and family portraits and
11  commercial photography before later expansion into
12  wedding photography.
13    Q.   Okay.  I'm sorry, you spoke too fast there.
14  So you said you were primarily doing senior
15  graduation portraits?
16    A.   Correct.
17    Q.   And then what else?
18    A.   Family portraits.
19    Q.   Okay.
20    A.   And commercial photography.
21    Q.   Go on.
22    A.   Before -- I just have -- continue to say,
23  before we expanded later into wedding photography.
24    Q.   Would you say that the sessions, these
25  photography sessions that Glasser Images provided to

Page 32

1  its customers were for monumental occasions?
2    A.   Yes, I would, yeah.
3    Q.   Because a senior graduation is an important
4  occasion in someone's life, correct?
5    A.   Typically.
6    Q.   Okay.  And family portraits, that's
7  important to a family to have nice portraits
8  together, correct?
9    A.   Yes.
10    Q.   Wedding photography, I think that goes
11  without saying, that's a monumental occasion,
12  correct?
13    A.   Correct.
14    Q.   Okay.  Are you and Mr. Schacher married?
15    A.   No.
16    Q.   Are you engaged?
17    A.   No.
18    Q.   Do you have plans to get engaged or
19  married?
20    A.   I don't know.
21    Q.   In terms of the wedding photography, when
22  customers contracted with Glasser Images for wedding
23  photography or videography, how -- what was the lead
24  time to that event?  Was it was a day, a month, a
25  week, a year?  I mean, what was the typical, sort of,

Page 33

1  lead time between contracting and provision of the --
2  of the photography or videography services?
3    A.   Typically I believe it was six months to a
4  year.  Obviously there were outliers of two years or
5  a day.
6    Q.   But on average you would say six to
7  twelve months between contract and actual rendition
8  of the services?
9    A.   Correct.
10    Q.   And by "rendition of services," I mean the
11  actual wedding.  Do you understand that?
12    A.   Yes.
13    Q.   Okay.  And what was your job title with
14  Glasser Images from, let's say, 2018 through 2021?
15    A.   I believe it was presented as founder and
16  owner.  You know, officially president of the
17  company.
18    Q.   Anything else?
19    A.   No.
20    Q.   Since this was a limited liability company,
21  were you the manager of the company?  And that's a
22  formal title for a limited liability company, as you
23  may know.
24    A.   Yes.
25    Q.   Did you hold that role?

9 (Pages 30 - 33)

Page 34

1   A.   Yes.
2   Q.   And who managed the company, actually
3 managed it from 2018 to 2021?
4   A.   I did.
5   Q.   Who handled the banking?
6   A.   I did with the assistance of Sierra Hall,
7 our internal bookkeeper.
8   Q.   And who were the authorized signers on the
9 company's bank accounts from 2018 through 2021?
10   A.   Myself.
11   Q.   Only you?
12   A.   Correct.
13   Q.   Okay.  What were your duties between 2018
14 to 2021?
15   A.   Various duties.  I mean, I was running the
16 company, so I was, you know, overseeing all aspects
17 from sales to marketing to finances to leading the
18 team.  I mean, yeah, all aspects.
19   Q.   What percentage of your day-to-day duties
20 from 2018 through 2021 included direct interface with
21 customers?
22   A.   Between which dates did you say?
23   Q.   2018 through 2021.
24   A.   I typically didn't get involved with
25 customers unless there was a need for me to.  You

Page 35

1 know, all the other employees typically handled the
2 customer-facing aspects.
3   Q.   Did your team have authority to make
4 important decisions in their contracts with customers
5 and contracting on behalf of Glasser Images with
6 customers?
7   A.   What do you mean by "important decisions"?
8 Can you give an example or?
9   Q.   Yeah, pricing.
10   A.   No, I mean, I oversaw the pricing.  Those
11 decisions were decisions that I primarily made.
12   Q.   Did you have a pricing sheet that your team
13 used?
14   A.   Yes.
15   Q.   Okay.  And was that something that the
16 customer -- when a customer came in, a Glasser Images
17 employee would know if they want a wedding package,
18 this is what it's going to cost.  They didn't have to
19 come bother you with those details.  Is that how it
20 worked?
21   A.   Correct.
22   Q.   Okay.  And did the same hold true with
23 regard to the other events for which Glasser Images
24 provided photography and videography services?
25   A.   Correct.

Page 36

1   Q.   These were fixed -- there was fixed pricing
2 during that 2018 through 2021 timeframe?
3   A.   Yeah, with some flexibility.  But, yes, a
4 standardized pricing for sure.
5   Q.   And during your testimony with a
6 North Dakota Attorney General, you testified that
7 there was a template for the contract with customers,
8 correct?
9   A.   Correct.
10   Q.   Okay.  And who prepared that template?
11   A.   I did consult with an attorney.  You know,
12 an attorney reviewed the contract.
13   Q.   Okay.  So the template contract that was
14 used was something that you had created with the
15 assistance of counsel?
16   A.   Yeah, I believe the contract template came
17 from SHEQ, which was their, kind of, customer
18 management software.  They had provided a template
19 that one could edit.  So I believe we made
20 adjustments to it, and, yes, had an attorney review
21 it.
22   Q.   Okay.  But the version that your staff used
23 in entering into contracts with customers, that
24 version was the version that you had created in
25 consultation with counsel, correct?

Page 37

1   A.   Yes.
2   Q.   Okay.  Were your employees or teammates
3 authorized to change the terms of the contract
4 template?
5   A.   No.  I mean, on occasion a client maybe had
6 a specific request, such as they didn't want their
7 photos used in marketing, you know, so we'd add a
8 clause in there that we wouldn't use their photos.
9 But that was a very, very rare occasion.  So, yeah,
10 no, there was no authorization to adjust the
11 contracts.
12   Q.   Okay.  So when your clients are -- or when
13 customers are coming into Glasser Images, and they're
14 going to enter into a contract with the company, your
15 employees or your team could take the template
16 contract and sort of fill in the blanks without going
17 back to you on each of the blanks for authority; is
18 that right?
19   A.   What do you -- what do you mean by
20 "blanks"?
21   Q.   Let's talk about the deposit, okay?
22 That -- the amount of the deposit would vary from
23 customer to customer, correct?
24   A.   Correct, yes.  So the -- the system would
25 auto-populate their name, their contact information,

10 (Pages 34 - 37)

Page 38

1 the wedding date, the deposit, yeah. The system
2 would put that in.
3     Q. Okay. So the system would determine the
4 amount of the deposit, or would that deposit be
5 something that's negotiated between the company and
6 the customer?
7     A. Well, the deposit was standardized, and
8 what I mean -- what I -- what I meant by saying the
9 system would put it in, the system would
10 auto-populate. The staff wasn't physically writing
11 it. And the system would -- you know, as they're
12 going through the booking process, if they clicked on
13 that package, then it would auto-populate with the
14 specific information. So, yeah, and, like I said,
15 the deposit was pretty standardized.
16     Q. Okay. Well, according to the testimony
17 that I've reviewed with the North Dakota Attorney
18 General, both yours and Mr. Schacher's, as well as
19 some of the other materials, it appeared that the
20 amount of the deposit differed based upon what the
21 client was able to pay. And I believe you testified
22 that if they would pay, like, 50 bucks, if they could
23 afford 50 bucks, that's what they could afford, you
24 would, you know, enter into a contract with them
25 providing for a $50 monthly payment.

Page 39

1     Do you recall that testimony with a
2 North Dakota Attorney General?
3     A. Yes, we had different standardized deposit
4 options. Some people paid a third, some people paid
5 half, some people were on a payment plan, some people
6 paid for everything upfront, yes.
7 BY MR. ELGIDELY:
8     Q. Okay. So that wasn't something that was
9 fixed by the system, correct? That was something
10 that was a topic of discussion with the customer and
11 ultimately negotiation, correct?
12     A. Well, the client had those options to
13 choose which they wanted to do, yes.
14     Q. Okay. And, in addition to one-half,
15 one-third, the customer would also be given the
16 option by Glasser Images to pay in full in exchange
17 for a discount, correct?
18     A. Yes, many companies offer, you know,
19 something similar. We did the same, yes.
20     Q. Okay. And do you recall what range the
21 discount percentage was in from, say, 2020 to 2021?
22     A. I don't recall specifically, no.
23     Q. Okay. Mr. Schacher testified that from
24 time to time, after the pandemic and before
25 Glasser Images closed, there would be promotions, you

Page 40

1 know, promoting that a customer could pay in full in
2 exchange for a discount. Do you recall those
3 promotions?
4     A. Yeah, we had various promotions. And,
5 yeah, I believe that was one of them.
6     Q. Okay. And you have no idea what percentage
7 discount was offered to customers in exchange for
8 agreeing to pay for the package in full?
9     A. I don't recall. I'd have to go back and
10 look, but I don't recall off the top of my mind.
11     Q. Okay. Do you recall testifying with a
12 North Dakota Attorney General that towards -- strike
13 that.
14     Do you recall testifying with a
15 North Dakota Attorney General that as Glasser Images
16 experienced financial difficulties, you made -- your
17 company made a bigger effort to get payment in full
18 in the form of a deposit. Do you recall that?
19     A. I mean, if that's what I said, that's what
20 I said. I don't recall specifically without . . .
21 BY MR. ELGIDELY:
22     Q. Let me try to pull up that page.
23 Bear with me for a second.
24     All right. Bear with me. I'm sorry. I
25 am just going through the transcript to make it the

Page 41

1 least painful for you.
2     Okay. Let me share my screen.
3 Mr. Glasser, I am referring to the North Dakota AG
4 testimony at Page 73, starting with Line 20 --
5 Line 18.
6     Mr. Card inquires whether Glasser Images
7 took any steps to generate more income such as, for
8 example, soliciting payments in full from clients.
9     And you responded at Lines 20 through 22:
10 "Yeah, we did. Um, but that's something we'd always
11 done for, you know, the 16 years is offered at, um,
12 that discount if someone were to pay in full."
13     Did I read that correctly?
14     A. Yes.
15     Q. Okay. The deposits that customers made,
16 those were specified in the contract as
17 "nonrefundable deposits," correct?
18     A. Yes.
19     Q. And what, if any -- well, strike that.
20     The deposits were then put into the
21 company's general operating account, correct, the
22 funds?
23     A. Yes.
24     Q. What, if any, legal advice did you receive
25 about that practice about putting deposits from

11 (Pages 38 - 41)

Page 42

1 customers into your -- or into the Glasser Images
2 operating account?
3     A.   As far as I understood, there was no
4 requirement to do otherwise.
5     Q.   And do you know what an escrow account is,
6 sir?
7     A.   Yes.
8     Q.   What is your understanding of an escrow
9 account?
10     A.   Monies put into said account to be held in
11 escrow for later use.
12     Q.   Okay.  And is that a way of protecting the
13 funds from dissipation in the event that the later
14 use does not occur?
15     A.   Yes.
16     Q.   It's a way of preserving the funds and
17 protecting the funds for a later date, correct?
18     A.   Correct.
19     Q.   And my understanding is the nonrefundable
20 deposits that Glasser Images obtained from customers
21 was -- were not put into an escrow or trust account
22 at any time, correct?
23     A.   Correct.  There's no regulation for us
24 to do so, no necessary requirements.
25     Q.   Not to -- not to your knowledge, correct?

Page 43

1     A.   Correct.
2     Q.   Okay.  And by putting the nonrefundable
3 deposits into Glasser Images operating account, those
4 funds were immediately available for general business
5 operation, correct?
6     A.   Correct.
7     Q.   And those funds were also available for
8 personal expenses that you and Mr. Schacher charged
9 to the business, correct?
10     A.   Correct, but mainly used for business
11 operations.
12     Q.   Okay.  But my question is, sir, I'm not
13 drawing a main or minor distinction here, I'm saying
14 just generally.  When the nonrefundable deposits were
15 deposited into the operating account, they were
16 immediately available for business operations,
17 correct?
18     A.   Correct.
19     Q.   And they were used for business operations,
20 correct?
21     A.   Correct.
22     Q.   Okay.  And when you deposited nonrefundable
23 deposits or when the business deposited nonrefundable
24 deposits into its operating account, those funds were
25 immediately available for personal expenses that you

Page 44

1 and Mr. Schacher charged to the operating account,
2 correct?
3     A.   Correct.
4     Q.   Okay.  And, in fact, you and Mr. Schacher
5 did charge personal expenses from time to time to the
6 Glasser Images operating account, correct?
7     A.   Correct.
8     Q.   In 2021, who were the individuals at
9 Glasser Images that were authorized to sign contracts
10 with customers?
11     A.   Jace, McLauryn, Rachel.  I mean, any -- any
12 of our -- any of our team who was booking weddings or
13 portraits or commercial shoots were signing those
14 contracts on behalf of the company.
15     Q.   How many individuals in the, let's say,
16 January 2021 through October 21 timeframe, how many
17 people were authorized to sign contracts with
18 customers on behalf of Glasser Images?
19     A.   Can you repeat the dates?
20     Q.   January 2021 through October 2021.
21     A.   I don't know the specific number, or I
22 don't recall the specific number, but maybe six, give
23 or take.
24     Q.   Okay.  You mentioned Mr. Schacher was one
25 of those six, correct?

Page 45

1     A.   Correct.
2     Q.   You mentioned McLauryn, which is
3 M-C-L-A-U-R-Y-N.  Is that McLauryn Alexander?
4     A.   Correct.
5     Q.   And you mentioned Rachel.  Do you remember
6 Rachel's last name?
7     A.   Jones, J-O-N-E-S.
8     Q.   Okay.  So now we're up to three of the six.
9 Anybody else?
10     A.   Sierra Hall, I believe booked portraits on
11 occasion.  I can't recall if some of the other staff,
12 you know, were booking shoots or -- or not, but if
13 they were, they would have been authorized to sign
14 those contracts.  Some of the other staff's
15 responsibilities were less booking and more other
16 things.  But if they, you know, booked photo shoots
17 or weddings or -- or other things on occasion, I
18 can't recall, specifically.
19     Q.   Okay.  Historically, how soon after a
20 contract was signed with a customer did you become
21 aware of that contract?
22     A.   I mean, it could have been immediately, it
23 could have been a couple days.  It just depends.
24     Q.   Okay.  So what was the process after a
25 client signed a contract with the business, what

12 (Pages 42 - 45)

Page 46

1 would -- where would that contract go, or would it
2 trigger anything in your emails? How did that work?
3     A. Yeah, so the client would get a
4 confirmation email where they could go online and
5 sign their contract, pay their deposit, and view the
6 event details, make sure the date is correct,
7 et cetera. And then our general email inbox would
8 receive an email -- an internal email notifying of
9 the company booking.
10    Q. Okay. And how would you be notified of
11 that booking?
12    A. If I looked at the company email.
13    Q. And how often did you look at the company
14 email?
15    A. I mean, it varied depending on my schedule
16 and how busy I was. Daily, every couple days. Yeah,
17 it would just depend.
18    Q. So there would be a couple-of-day periods
19 where you didn't look at the company email?
20    A. If I was very busy, yes. Rarely, but, you
21 know, if I was out of town or had a busy schedule
22 or -- it might be a day before I would check it.
23    Q. Was it more often that you were looking at
24 the company email every day as opposed to every
25 two days? What would be more --

Page 47

1     A. I would say -- in general, I mean, yes, in
2 general I would -- I would be reviewing the company
3 email daily, yeah.
4     Q. Did you get a copy of the comp- -- the
5 emails that went to the company to your specific
6 email account, your own email account?
7     A. I don't believe I did.
8        Again, that was two and a half years now,
9 but I don't believe I did.
10    Q. Okay. Could a customer enter into a
11 contract with Glasser Images without your knowledge?
12 I mean, could they just go online and enter into a
13 contract or would they have to, you know, deal with
14 somebody like a wedding client consultant in order to
15 get a contract signed?
16    A. Yeah, they would have to deal with someone.
17    Q. Okay. So you -- like, you just can't go
18 online like I would order something from Amazon and
19 just do it myself, right?
20    A. Correct.
21    Q. Somebody from the company would have to be
22 involved in that contracting process, correct?
23    A. Correct.
24    Q. Did you ever tell anybody at the company,
25 "Stop entering into contracts with customers"?

Page 48

1     A. No. I mean, not until we closed.
2     Q. Okay. So when you closed, you told
3 everybody, "Stop entering into contracts with
4 customers"?
5     A. No. When we closed, the employees were all
6 let go. I never specifically said to stop.
7     Q. Well, a client that -- or, I'm sorry,
8 strike that.
9        An employee that was let go would have no
10 incentive to enter into a contract after they've
11 been let go with a customer.
12    A. Correct.
13    Q. I believe your testimony earlier was that
14 you were paid a salary from Glasser Images; is that
15 right?
16    A. Correct.
17    Q. According to Mr. Schacher, you have not
18 been employed since October 2021; is that correct?
19    A. Correct.
20    Q. Why not?
21    A. Well, closing the company was certainly a
22 huge ordeal, lots of things to deal with and handle
23 and go through. After having the company for
24 16 years, more than half of my life, at the time it
25 was obviously very emotional and a very difficult

Page 49

1 thing to do. And I had been busy, you know, figuring
2 out what that next step is going to be.
3     Q. Okay. That's -- you would agree that
4 that's a long time, right? We're almost going on
5 three years since Glasser Images closed its --
6 probably two and a half years since Glasser Images
7 closed. Are you still -- you're still trying to
8 figure things out, Mr. Glasser?
9     A. Yes, I am.
10    Q. Are you suffering from any physical or
11 mental impairment that prevents you from working?
12    A. No.
13    Q. Have you done any freelance work, you know,
14 photography, videography or anything for
15 compensation?
16    A. No.
17    Q. Is it your testimony under oath, sir, that
18 you've done nothing for compensation since
19 October 2021?
20    A. Correct.
21    Q. Are you receiving any public assistance?
22    A. No.
23    Q. From any governmental programs?
24    A. No.
25    Q. Do you drive a vehicle?

13 (Pages 46 - 49)

Page 50

1    A.  Yes, I do drive a vehicle, yes.
2    Q.  What vehicle do you drive?
3    A.  Jace and I share a Honda.
4    Q.  What year?
5    A.  2023.
6    Q.  Okay.  And is that owned or leased?
7    A.  Owned.
8    Q.  Who is on the title?
9    A.  Jace's cousins.  He's -- his cousin's
10  husband is technically on the title.  They helped us
11  with the vehicle.
12    Q.  Okay.  And the monthly payments for the
13  vehicle, who is making those?
14    A.  Jace is.
15    Q.  Just looking through my notes, bear with me
16  for a moment, please.
17        How did customers pay the nonrefundable
18  deposit to Glasser Images?  What form of payment?
19    A.  We accepted credit cards, check,
20  occasionally had cash payments.  Mainly credit cards.
21    Q.  And what percentage of the business of
22  Glasser Images was attributable to credit card
23  payments from, let's say, 2018 through 2021?
24    A.  Oh, I don't know the exact percentage, but
25  if I had to throw a number out and guess, I would say

Page 51

1  90 percent.
2    Q.  Okay.  And bear with me for a second.
3        The customers that paid by credit card,
4  Glasser Images was able to facilitate that payment
5  method by virtue of its contract with my client,
6  PayJunction, correct?
7    A.  Correct.
8        (Thereupon, marked as Exhibit 1.)
9  BY MR. ELGIDELY:
10    Q.  Okay.  I'm going to mark a document as
11  Exhibit 1.  Bear with me for one second.
12        Mr. Glasser, I am putting on the screen a
13  document that I've marked as Exhibit 1.  Do you
14  recognize this document?
15    A.  Yes, I believe I do.
16    Q.  Okay.  And what do you recognize it to be?
17    A.  I think it's our application for
18  PayJunction.
19    Q.  Let me just -- excuse me.  Let me scroll
20  through this application so you can -- you can see
21  what it -- information it contains.
22        Are you able to see as I scroll through
23  this Exhibit 1, sir?
24    A.  Yes.
25    Q.  And does the second page here, it says,

Page 52

1  "Page 1 of 2," but I believe it's the second page,
2  reflect your signature, Mr. Glasser, on December 4,
3  2017?
4    A.  Yes.
5    Q.  How about on the next page, sir?  Does that
6  reflect your signature also on December 4th, 2017?
7    A.  Yes.
8    Q.  And at the bottom of that page, 2 of 2?
9    A.  Yes.
10    Q.  Okay.  We're going to go to page -- I'm
11  sorry, Exhibit 2.
12        Exhibit 2 I put on the screen.  Can you
13  see this document, sir.
14    A.  Yes.
15        (Thereupon, marked as Exhibit 2.)
16  BY MR. ELGIDELY:
17    Q.  Okay.  Do you recognize it?
18    A.  Yes.
19    Q.  What do you recognize it to be?
20    A.  The Merchant Agreement.
21    Q.  And I want to direct your attention to
22  Section 15 of Exhibit 2, which you described as the
23  Merchant Agreement.
24        You see Section 15 titled "Customer
25  Claims"?

Page 53

1    A.  Yes.
2    Q.  That section states: "To the extent that
3  ISO or Member Bank has paid or may become liable for
4  a Chargeback or Credit Transaction Receipt, Merchant
5  will be obligated to reimburse ISO and Member Bank
6  for any sums ISO or Member Bank pays or for which ISO
7  or Member Bank is liable."  Did I read that first
8  sentence correctly?
9    A.  Yes.
10    Q.  And merchant would be Glasser Images in
11  this case, correct?
12    A.  Correct.
13    Q.  Okay.  And the next sentence says:  "If
14  Merchant does not reimburse ISO or Member Bank, ISO
15  and Member Bank will have all of the rights and
16  remedies of Cardholders, including the Cardholders'
17  rights under 11 U.S.C Section 507(a)(6)." Did I read
18  that correctly?
19    A.  Yes.
20    Q.  And Cardholders would be the actual
21  customers of Glasser Images, correct?
22    A.  Correct.
23    Q.  The last sentence says:  "ISO and Member
24  Bank may assert any claim on behalf of a Cardholder
25  individually or on behalf of all Cardholders as a

14 (Pages 50 - 53)

Page 54

1  class." Did I read that correctly?
2      A.  Yes.
3      Q.  Okay.  And isn't it true, sir, that you
4  understood, or you do understand sitting here today,
5  that PayJunction is asserting claims against you in
6  this action on behalf of Cardholder customers of
7  Glasser Images?
8      A.  Yes.
9      Q.  And you don't dispute that they have that
10  right to proceed against you on behalf of the
11  customers of Glasser Images, pursuant to Exhibit 2,
12  which is the Merchant Agreement, correct?
13      A.  Correct.
14      Q.  And you personally guaranteed
15  Glasser Images' obligations under the Merchant
16  Agreement in favor of PayJunction, my client,
17  correct?
18      A.  I believe I did, yes.
19      Q.  Let's go back to Exhibit 1.
20          Do you see the section which says
21  "Signatures," and you see that there -- in there it
22  refers to a guaranty?  You see here, "general
23  absolute and unconditional continuing guaranty by
24  the undersigned is for the benefit of DBA
25  PayJunction."

Page 55

1          Do you see that they're each a guaranty
2  party, collectively the guaranty parties?
3      A.  No, the screen isn't being shared.
4      Q.  Oh, geez, I'm so sorry.  I apologize.  I do
5  that from time to time.  All right.  Bear with me for
6  one second.  Okay.
7          Do you -- can you see it now?
8      A.  Yes.
9      Q.  All right, great.  Sorry about that.  Under
10  Section 10 where it says "Signatures," do you see
11  where it refers to "Guaranty," and it refers to
12  "Guaranty Parties" and then your signature is below
13  that, sir?
14      A.  Yes.  Some letters are missing on that,
15  but, yes, I do see that.
16      Q.  Okay.  Because here you see the section
17  that says "Merchant Signature," correct?  And you
18  signed on behalf of the merchant, right?
19  Glasser Images.
20      A.  Correct.
21      Q.  Okay.  As opposed to Section 10, which
22  references "guaranty" with some choppy language here.
23  I guess it's a bad copy.  But you see you signed
24  there.  It's not a signature on behalf of the
25  merchant, it's a signature as the guarantor, correct?

Page 56

1      A.  Correct.
2      Q.  And then there's another section for
3  "Merchant Signature" below that.
4          Okay.  Let's take that off the screen.
5          And, sir, you know the difference between
6  retrievals and chargebacks, correct?
7      A.  I believe so, generally, yes.
8      Q.  What do you understand a chargeback to be?
9      A.  The customer files a claim with the credit
10  card, and the card is charged back.
11      Q.  And so, yeah, it -- would it be fair to say
12  that a chargeback is when can customer disputes a
13  charge to their credit card?
14      A.  Yes.
15      Q.  Okay.  And they dispute it because they
16  either paid something, they didn't get a refund, or
17  paid for something and they didn't get the product or
18  service, correct?
19      A.  Correct.
20      Q.  Okay.  And in the event -- well, strike
21  that.
22          When that occurs, sir, isn't it true that
23  the merchant is given a period of time to address a
24  chargebacks by a customer, correct?
25      A.  Yes.

Page 57

1      Q.  Okay.  There's a limited period of time to
2  respond to chargebacks by a customer, correct?
3      A.  Correct.
4      Q.  Okay.  And if the merchant does not reply
5  within that timeframe, at some point the chargebacks
6  is deemed to be valid by the customer, correct?
7      A.  Correct.
8      Q.  And if it's deemed to be valid, the credit
9  card processing company could either -- well, would
10  typically look to the merchant's bank account to
11  debit the chargebacks amount from the merchant for
12  either not refunding the money that the customer paid
13  or not delivering the product or service, correct?
14      A.  Correct.
15      Q.  Okay.  And what happens if there's no money
16  in the merchant's account?  What happens with that
17  chargeback, to your knowledge?
18          Let me rephrase it.  If a customer makes a
19  chargebacks because a merchant either did not refund
20  the amount that was paid by the customer or did not
21  deliver the product or service, and there's no money
22  in the merchant's account to cover that chargeback,
23  what happens to the chargebacks?  How is it paid?
24      A.  I believe the chargeback still goes
25  through.  The credit card covers it as part of their

15 (Pages 54 - 57)

Page 58

1  agreement with their cardholder.  I'm not sure,
2  specifically, but that's how I vaguely understand it.
3     Q.  Okay.  Well, you understood, sir, when you
4  were utilizing PayJunction's credit card processing
5  services from 2017 to 2021, that if a customer made a
6  chargeback and there was no money in Glasser Images'
7  account, that my client would have to come
8  out-of-pocket to pay for that chargeback, correct?
9     A.  Between which dates did you say?
10    Q.  2017, the date of the Merchant Services
11 Agreement, which was December 4, 2017, and we'll talk
12 about, through October 7 of 2021.
13        You knew during that timeframe that every
14 time a customer transacted with Glasser Images by
15 credit card, that if Glasser Images did not refund
16 the money, did not deliver the product or services
17 that was promised and did not have money in its bank
18 account, that my client would be liable to pay that
19 customer?
20    A.  I don't know if I did understand exactly
21 the specifics of how that would work in the instance
22 of the merchant not having money in their bank
23 account between 2017 and October of 2021.  I don't
24 believe I would have understood.  What I -- during
25 that time, I don't think I knew what would happen if

Page 59

1  we didn't have money in the bank account.
2     Q.  Okay.  Well, you read the agreement before
3  you signed it, did you not?
4     A.  I mean, yes, but, you know, the intricacies
5  of that, I, you know, possibly did not understand
6  exactly what would transpire if the merchant didn't
7  have money in the bank account.
8     Q.  Well, you understood somebody had to
9  reimburse a customer if there was either -- neither a
10 refund nor a product or service provided to that
11 customer.  You knew somebody would have to pay for
12 that.
13    A.  I assume so, yes.  I wouldn't know how that
14 would work, though, or didn't know how that would
15 work.
16    Q.  Well, you knew that if a customer paid for
17 services to Glasser Images, that that customer should
18 either receive the money back or should receive the
19 services from Glasser Images, correct?
20    A.  Correct.
21    Q.  Okay.  And if that customer paid for
22 services from Glasser Images and neither received a
23 refund, nor received the services, what did you
24 expect to be done with a customer's money?
25    A.  Can you -- can you repeat the question?

Page 60

1  I'm not sure exactly what you're asking.
2     Q.  Yeah.  What I'm asking is that if a
3  customer paid money to Glasser Images for services,
4  and they neither received the services nor the money,
5  who would -- how would that be reconciled with the
6  customer?
7     A.  Well, now I understand it to be, you know,
8  the customers did chargebacks, which is how that was
9  reconciled in some instances.
10    Q.  Yeah, and chargebacks means that my
11 cust- -- my client came out-of-pocket and paid
12 customers that did not receive refunds, and did not
13 receive services from Glasser Images, correct?
14    A.  Correct.
15    Q.  Why don't we just take a five-minute break
16 at this time.  We've been going for about an hour and
17 a half.  So the time here is 10:57 a.m.  We'll go off
18 until 11:02 a.m.  Is that okay with you, Mr. Glasser?
19    A.  Yep, yes.
20    Q.  Okay.  Thank you.
21 (Recess was held from 10:57 a.m. until 11:02 a.m.)
22 BY MR. ELGIDELY:
23    Q.  Mr. Glasser, before we had taken a break,
24 you had expressed some confusion about how it would
25 work with regard to chargebacks and who would

Page 61

1  ultimately be liable to reimburse a customer.  Do I
2  have that right?
3     A.  Yes, at the time that you described, yes,
4  correct.
5     Q.  Okay.  But during the time that we
6  discussed, which was the time from the date you
7  signed the Merchant Services Agreement to the date
8  that Glasser Images closed in October of 2021, you
9  knew that if a customer paid Glasser Images by credit
10 card, and if Glasser Images failed to provide
11 services to the customer or refund the money, that
12 that customer would have the right to initiate a
13 chargeback, correct?
14    A.  Correct.
15    Q.  Okay.  Have you ever initiated a
16 chargeback?
17    A.  No, not that I recall.
18    Q.  Okay.  You never contested a charge on your
19 credit card?
20    A.  No.
21    Q.  Okay.  Do you know if Mr. Schacher has?
22    A.  I don't believe he has, no.
23    Q.  Do you ever ask him?
24    A.  No.
25    Q.  When did you first realize that

16 (Pages 58 - 61)

Page 62

1  Glasser Images -- well, strike that.
2          When did you first believe that
3  Glasser Images was experiencing financial
4  difficulties?
5      A.  I mean, the pandemic certainly put a huge
6  pressure on our company, just like it did many
7  others, yeah.
8      Q.  What's the date?
9      A.  I don't have a specific date.  You know, we
10 were growing, we were expanding, we were, you know,
11 trying to do everything we always, you know, have
12 done by growing and moving forward just like any
13 entrepreneur hopes to do.  I don't know the specific
14 date.
15     Q.  Okay.  Isn't it true that it was a struggle
16 for Glasser Images to stay in the black, meaning stay
17 positive, from 2019 through 2021?
18     A.  I mean, we were -- like I said, we were
19 growing.  You know, we were doing what we thought was
20 best to keep the company moving forward and growing.
21 I don't -- like I said, I don't recall the specific
22 dates or whatnot.
23     Q.  Well, isn't it true that you were notified
24 of several overdrafts in the company bank accounts by
25 bank personnel, repeatedly?

Page 63

1      A.  I believe, yeah, there were on occasion
2  instances of the sort.
3      Q.  Okay.  And when you say "instances of the
4  sort," you are talking about items, checks, that have
5  attempted to clear the business account, but there
6  were not sufficient funds in the business account to
7  pay those checks at the time they were presented,
8  correct?
9      A.  Correct.
10     Q.  And there was a time where you had
11 attempted to implement direct deposit for staff wages
12 or staff payroll at Glasser Images, correct?
13     A.  Yes, correct.
14     Q.  And because of the cash flow issues that
15 Glasser Images was experiencing, you decided to
16 switch to paper checks, correct?
17     A.  Yes.
18     Q.  Okay.  And the reason you decided to switch
19 to paper checks was because in a direct deposit
20 situation, you would have to transmit the funds that
21 represent the total payroll to the company that was
22 doing the direct deposit.  But with paper checks you
23 could have a several day delay before all of that
24 money was charged against the company's bank account,
25 correct?

Page 64

1      A.  Correct.
2      Q.  Okay.  You -- you thought that you could
3  control the timing of items clearing the company's
4  bank account better by issuing payroll checks through
5  paper checks as opposed to direct deposit, correct?
6      A.  Correct.
7      Q.  Okay.  And there were a number of times
8  where employees -- employees checks bounced, correct?
9      A.  There were a few occasions.  I mean,
10 payroll was our largest expense by far.  And, yeah,
11 there were a few occasions when that had happened due
12 to us not anticipating -- or us anticipating
13 something was going to come in and it didn't or -- or
14 whatever the case might have been.
15     Q.  Okay.  The checks bounced, though, on
16 occasion, correct?
17     A.  On a few occasions, yes.
18     Q.  Okay.  And there was an occasion where you
19 asked Mr. Schacher to hold his check and not to
20 negotiate or cash it for several days because the
21 company did not have enough money in its account to
22 pay that check, correct?
23     A.  Correct.
24     Q.  Now, the personal expenses that you and
25 Mr. Schacher charged to the company's business

Page 65

1  account, those personal expenses served to reduce the
2  balance in the company's business account, correct?
3      A.  Yes.
4      Q.  Okay.  And had you not charged your --
5  those personal expenses to the company's business
6  account, the company would have that money for
7  general business operations, correct?
8      A.  It would have slightly more money, but not
9  necessarily all the money that would have been
10 necessary to cover certain things, like our vast
11 payroll.
12     Q.  I'm being very specific here, sir.  Let's
13 say that you and Mr. Schacher -- I'm going to use a
14 hypothetical -- spent $8,000 on a cabin in Wyoming so
15 you go through Yellowstone National Park.  If that
16 $8,000 in my hypothetical was not charged to the
17 company's business account, the company would have
18 $8,000 more for business expenses, correct?
19     A.  Correct.
20     Q.  And the company owed
21 First Western Bank & Trust about a million dollars
22 you testified earlier, correct?
23     A.  Correct.
24     Q.  And it had credit card debts, correct?
25     A.  Correct.

17 (Pages 62 - 65)

Page 66

1    Q.   It had high-interest, short-term loans,
2  correct?
3    A.   Correct.
4    Q.   It had merchant cash advances, correct?
5    A.   Correct.
6    Q.   It had friends and family loans, correct?
7    A.   Correct.
8    Q.   And it had significant payroll tax
9  liabilities, correct?
10   A.   Correct.
11   Q.   And the company received $500,000 in EIDL
12  loans from the federal government, correct?
13   A.   Correct.
14   Q.   And the company received a PPP loan of
15  $500,000 from the federal government, correct?
16   A.   Correct. I don't -- I don't recall the
17  specific amounts of either one of those. I feel like
18  maybe it wasn't around 500. It was around that, but
19  I don't know the specific amount. Definitely around
20  that, but I don't know if those were the specific
21  numbers. I can't recall correctly.
22   Q.   Okay. And bear with me for one second.
23  Hold on. Okay.
24        So not withstanding the receipt of the
25  government loans, the company ultimately did not

Page 67

1  have enough money to refund payments made by
2  numerous customers, correct?
3    A.   Correct.
4    Q.   Would it be fair to say that Glasser Images
5  was heavily dependent on loans during the period of
6  its operations from 2018 through 2021?
7    A.   Yes, as we were growing.
8    Q.   Now, has the IRS asserted a claim against
9  you personally for responsible party payroll tax
10  liability?
11   A.   Yes.
12   Q.   How much is that claim?
13   A.   I would have to review the specific
14  numbers. It's about a $120,000.
15   Q.   Okay. Do you recall an email exchange with
16  First Western Bank in the period -- well, in 2020
17  where you said that the company was on the verge of
18  failure?
19   A.   I don't recall the specific conversation.
20  I'm sure there was a conversation, especially during
21  the year of 2020.
22   Q.   Okay. Let me share my screen. I put a
23  document on the screen, Mr. Glasser. Can you see it?
24   A.   Yes.
25   Q.   Okay. In the complaint that we filed,

Page 68

1  we -- the PayJunction has filed against you in this
2  action, at Paragraph 85, it says: "On March 19,
3  2020, Glasser advised First Western that
4  Glasser Images was on the verge of failure saying:
5  'We will not be able to make it for 60 days, let
6  alone into next week. I need working capital as soon
7  as possible.'" And then you went on to say: "I will
8  not be able to pay rent or equipment leases. I will
9  not be able to make payroll. We will not have people
10  to fulfill weddings this summer, et cetera,
11  et cetera. SBA will take too long."
12        Did I read that accurately?
13   A.   Yes.
14   Q.   And that speaks to a pretty dire situation
15  at Glasser Images as of March 19, 2020, correct?
16   A.   Correct, at the height of the pandemic I
17  believe it was.
18   Q.   That was the start of the pandemic,
19  actually, right? That was the beginning of the
20  pandemic, right? The stay-at-home orders were early
21  March of 2020, correct?
22   A.   Correct. And we saw it coming, yeah, very,
23  very quickly, yes. I would say that there was --
24   Q.   Well, there's not a question pending,
25  Mr. Glasser. Let me move on.

Page 69

1        You then say: "Why can't we consolidate
2  now? We've been talking about this for months and
3  now more than I -- more than ever, we need to
4  consolidate and get additional capital to move
5  forward -- to move forward. This is dire. I am not
6  sure what I will do."
7        Did I read that correctly?
8    A.   Yes.
9    Q.   Okay. You don't dispute sending this email
10  to First Western on March 19, 2020, do you?
11   A.   No.
12   Q.   Okay. And then First Western in an email
13  back on April 28, 2020, said that Glasser Images did
14  not qualify for the COVID-19 pace recovery program
15  because the business was unable to pay its debts even
16  before the COVID-19 pandemic saying: "I would agree
17  that this could work, but there's one big issue. The
18  business was not spinning off enough cash to make its
19  debt payments prior to this event.
20  Bank of North Dakota requires that for this program.
21  First Western further advised you that adding
22  additional debt, regardless of the terms, is not
23  going to help the business cash flow as it is a
24  struggle at best currently."
25        Did I read that correctly?

18 (Pages 66 - 69)

Page 70

1    A.  Yes.
2    Q.  Okay. And then on September 2, 2020, you
3  request additional credit from First Western for
4  Glasser Images.  And then in that request, you say:
5  "I know you are taking the $1.2 million consolidation
6  of just the First Western loans to the committee, but
7  that will not do us any good.  That will not be
8  enough.  We need the 1.6 million.  The credit cards
9  and PayPal are sucking all of the cash out of the
10  business."  And then you continued:  "What's 400,000
11  when we already have 1.2 million?"  And you said:
12  "Without it, we cannot survive."
13        Did I read that correctly?
14    A.  Yes.
15    Q.  In connection with this timeframe,
16  March 2020 through September 2020, did you at any
17  time implement safeguards for customer deposits, such
18  as by putting them in escrow accounts?
19    A.  No.
20    Q.  Okay.  What, if any, reserve did you set
21  aside for Glasser Images business during this
22  timeframe?  Financial reserves?
23    A.  I don't believe we did.  We were using
24  everything for operations and to continue to keep the
25  business afloat.

Page 71

1    Q.  And then on September 4, 2020, you say to
2  First Western:  "Does the bank not understand that we
3  will not cash flow without additional cash.  We will
4  run out of cash.  We will not be able to operate."
5  Did I read that correctly?
6    A.  Yes.
7    Q.  And your accountant on November 9, 2020,
8  advised you to consult a bankruptcy attorney,
9  correct?
10    A.  Correct.
11    Q.  And I had asked you earlier about NSF items
12  in the Glasser Images account.  Do you recall on
13  June 29, 2021 you contacted Bravera about the
14  company's overdrawn account?  And the bank told you:
15  "I want to make this clear, the management of this
16  account is unacceptable, and we will not honor checks
17  if you have no funds.  If this kind of account
18  management continues, we will be closing the
19  account."  Correct?
20    A.  Correct.
21    Q.  And, ultimately, the bank did close
22  Glasser Images' account, correct, involuntarily?
23    A.  Correct.
24    Q.  The bank sent you a letter that they were
25  closing Glasser Images' account because your account

Page 72

1  management did -- was not consistent with the account
2  holder agreement, correct?
3    A.  Correct.
4    Q.  Do you recall when you received that
5  notification from the bank that the account was being
6  closed?
7    A.  I don't recall the specific date, no.
8    Q.  Do you know the approximate date?
9    A.  I don't recall, no.
10    Q.  Do you recall if it was in the days before
11  Glasser Images was closed, or do you believe it was
12  months before?
13    A.  It certainly wasn't months before that they
14  closed the account, no.  I -- I don't recall if it
15  was closed -- if the account was closed before we
16  closed or after we closed.  I'm not -- I'm not sure.
17    Q.  Okay.  But, nevertheless, it was closed
18  because there were too many overdrafts in the
19  account, correct?
20    A.  I don't recall the specifics of why it was
21  closed, if it was because of the overdrafts or if it
22  was after we closed the business and there was just
23  no more money coming in.
24    Q.  Okay.  Despite the financial condition of
25  the company starting in March of 2020, according to

Page 73

1  the email that we talked about, about the dire
2  situation, Glasser Images continued to take
3  nonrefundable deposits from customers, correct?
4    A.  Yes, we can -- yes.
5    Q.  Isn't it true that whenever there was a gap
6  between the revenue generated by Glasser Images and
7  its expenses, you looked for loans to fill that gap?
8    A.  Yes, we always looked for a solution.
9    Q.  Okay.  But the solution typically included
10  loans, correct?
11    A.  Not always.  I mean, we looked to cut
12  expenses.  At one point we restructured the company
13  and let out half of our full-time staff.  It wasn't
14  always loans, no.
15    Q.  Okay.  You let off 13 staff members,
16  correct?
17    A.  Yes, correct.
18    Q.  And at some point Chantel Limaye,
19  Mr. Schacher's cousin, provided a $10,000 loan to the
20  company, correct?
21    A.  Correct.
22    Q.  And at one point in time Mr. Schacher had
23  to obtain a loan from Upstart of $30,000 in order to
24  infuse that into the company, correct?
25    A.  Correct.

19 (Pages 70 - 73)

Page 74

1    Q.   And, nevertheless, during this period of
2 time, you were driving a high-end Mercedes, correct?
3    A.   Yes, we leased a Mercedes.
4    Q.   When you say "we leased a Mercedes," who
5 are you referring to?
6    A.   Well, I don't recall the specifics of the
7 lease document, if it was just me, if it was the
8 company, if it was me and Jace.
9    Q.   Okay.  But the lease was for a 2021
10 Mercedes Benz GLE 450.  And the lease payments were
11 $1,631.97 per month, correct?
12    A.   Correct.
13    Q.   And that lease payments were made by
14 Glasser Images from its operating account, correct?
15    A.   Yes, correct.
16    Q.   And that's during the period of time it was
17 struggling to stay afloat, correct?
18    A.   Correct.  We had that lease, yep.
19    Q.   And why didn't you get sort of a
20 middle-of-the-road car, a Chevy Impala or a, you
21 know, a lesser expensive car to ease the monthly
22 burden on the company?
23       You could've, right?  You could've --  you
24 could've gotten a middle-of-the-road car, you
25 could've gotten a Hyundai, a Kia, a car that would

Page 75

1 have been much more -- much less expensive than the
2 Mercedes, correct?
3    A.   Could have, yes, correct.
4    Q.   And had you done so, the business would
5 have only had to pay for that lower monthly payment
6 as opposed to the $1,600 a month that the company was
7 paying for the Mercedes, correct?
8    A.   Yes, correct.
9    Q.   And during this period of time,
10 Mr. Schacher also had a pretty nice car, correct?
11    A.   Correct.
12    Q.   He was driving a 2021 Audi S5 Quattro,
13 right?
14    A.   Correct.
15    Q.   And then we talked about my hypothetical
16 earlier, that wasn't really a hypothetical, though,
17 was it?  You did rent a cabin in Wyoming for $8,000
18 with Mr. Schacher, correct?
19    A.   Yes, correct.
20    Q.   Okay.  And that 8,000 was charged to the
21 company, correct?
22    A.   I believe so, correct.
23    Q.   And you also -- you and Mr. Schacher
24 charged the company for meals at Pirogue and
25 Butterhorn, correct?

Page 76

1    A.   Correct.
2    Q.   There were charges for meal and smoothie
3 kits, correct?  Charges to the business account for
4 your personal meals and smoothie kits?
5    A.   I -- yes, I believe so, correct.
6    Q.   Okay.  And the company was charged to
7 detail your vehicles once or twice every -- every
8 month, correct?
9    A.   Correct.
10    Q.   And the company paid for your haircuts and
11 your hair product, correct?
12    A.   On occasion, yes, correct.
13    Q.   Why couldn't you use your salary to pay for
14 these things, sir?  Why couldn't you use your salary
15 to make car payments?  You could have, right?
16    A.   Well, I think the car payments, you know,
17 in particular, was, I don't know, it was the way that
18 the accountant had recommended that we do it or what,
19 but, you know, for the car payment specifically,
20 yeah, I don't know.
21    Q.   Okay.  How about the cabin in Wyoming?  Why
22 couldn't you use your own personal funds, your
23 salary, to pay for your vacation?
24    A.   I don't recall why we used the business
25 account versus our personal funds.

Page 77

1    Q.   Okay.  Why can't you use your personal
2 funds to pay for your meals at Pirogue and
3 Butterhorn?
4    A.   Again, I don't -- I don't recall the
5 logistics of why we started doing that or what,
6 but --
7    Q.   But you could have.  You had personal
8 funds, did you not?
9    A.   Some of those meals were business meals.
10 Many of them were.
11    Q.   Okay.  But you were getting a salary from
12 the business, right?
13    A.   Yes, I was getting a salary.
14    Q.   Most people live on their salary, don't
15 they?
16    A.   Yes.
17    Q.   How about the meal kits and smoothie
18 kits, could you have used your salary to pay for
19 those as opposed to charging them to the business?
20    A.   Probably.
21    Q.   How about your haircuts and your hair
22 product?  Could you have used your salary to pay for
23 those as opposed to charging them to the business?
24    A.   Probably, yes.
25    Q.   Okay.  Mr. Schacher yesterday acknowledged

20 (Pages 74 - 77)

Page 78

1 that more actions were taken to address the
2 business -- I'm sorry, to address the business'
3 financial challenges than to address your personal
4 lifestyle requirements.  Do you understand my
5 question?
6    A.  No.
7    Q.  Okay.  So do you understand the phrase,
8 "tighten the belt."  That means like cutting
9 expenses, right?
10    A.  Yes, we very much do.
11    Q.  Okay.  So Mr. Schacher testified that the
12 business tightened its belt including by what you
13 mentioned earlier, terminating half the staff, the 13
14 employees, but your lifestyle did not change markedly
15 when the business was tightening its belt.  That you
16 continued to live basically the same lifestyle that
17 you lived before.  Do you agree with that?
18    A.  I mean, I definitely think that we made
19 changes overall, especially during the pandemic, you
20 know, to lessen expenses in -- in any way that we
21 could while still keeping the optimistic approach
22 that we were going to get through it, and find a way
23 through as we always had done.
24    Q.  But isn't it true that the Mercedes lease
25 was renewed in 2021?  Or, I'm sorry, you got a new

Page 79

1 lease in 2021, correct?
2    A.  Yes, because the old lease was over, so I
3 had to get a new lease.
4    Q.  Okay.  But you could have got a lease on a
5 Hyundai or a less expensive car, could you not have?
6    A.  Could have, yes.
7    Q.  Right.  But, sir, my question is:  You did
8 not -- as opposed to getting a lease for a less
9 expensive car during the period of time the company
10 had financial hardship, you nevertheless chose to get
11 a lease on a Mercedes for $1,600 a month that was
12 charged to the business, correct?
13    A.  Yes.
14    Q.  And the trip to Wyoming with the cabin for
15 $8,000, that was after the start of the pandemic,
16 correct?
17    A.  Yes.
18    Q.  And some of those dinners at the
19 restaurants I mentioned, those were dinners after the
20 start of the pandemic, correct?
21    A.  Yes.
22    Q.  Bear with me.  I'm looking at my notes.
23 Okay.  I'm going to be marking another document here.
24 Bear with me.
25       (Thereupon, marked as Exhibit 3.)

Page 80

1    MR. ELGIDELY:  I think we're up to 3, Madam
2 Court Reporter.
3    THE COURT REPORTER:  Yes.
4    MR. ELGIDELY:  Okay.  Thank you.
5 BY MR. ELGIDELY:
6    Q.  Mr. Glasser I put on the screen a document
7 that's list- -- entitled Exhibit 1 which we're
8 marking as Exhibit 3.  It's a list of chargeback
9 claims that my client PayJunction has paid to
10 customers of Glasser Images.  Do you understand that?
11    A.  Yes.
12    Q.  And do you recall that this was attached to
13 the complaint filed against you on this action?
14    A.  Yes.
15    Q.  And the document consists of 15 pages, and
16 it has three columns on it.  It has a column for
17 transaction date, chargeback amount, and chargeback
18 date.  Do you see that there?
19    A.  Yes.
20    Q.  And what do you understand transaction date
21 to be?
22    A.  The original date of the charge.
23    Q.  Okay.  And what do you understand the
24 amount to be?
25    A.  The amount that was charged back.

Page 81

1    Q.  Okay.  And what do you understand
2 chargeback to be?
3    A.  The date that was charged back.
4    Q.  Okay.  I will represent to you, sir, that
5 all of these chargebacks are dated after the date
6 that you testified that Glasser Images closed.  But
7 I'm happy to scroll through it, but I will represent
8 to you that that is the case.  Do you understand
9 that?
10    A.  Yes.
11    Q.  Okay.  All right.  Let me go to Page 15.
12 Will you see that in the period October 2021 through
13 September of 2022, my client paid 552 chargebacks for
14 a total of 934,046.85?  You see that on this exhibit?
15    A.  Yes.
16    Q.  Do you have any reason to dispute the
17 number of chargebacks that my client paid?
18    A.  I don't believe so, no.
19    Q.  Do you have any reason to dispute the
20 amount of money my client paid to former customers of
21 Glasser Images?
22    A.  I don't believe so, no.
23    Q.  What was the date that Glasser Images
24 closed?
25    A.  October 7th.

21 (Pages 78 - 81)

Page 82

1    Q.  Okay.  Do you recall testifying with the
2  North Dakota Attorney General that the closure
3  occurred over a period of two days?
4    A.  Well, yes, we -- well, we had not made the
5  final decision to close until the evening of
6  October 7th, but had some discussions with employees
7  about not being able to make payroll.  Not sure what
8  was going to happen on the 6th.
9    Q.  Okay.  Do you recall testifying that the
10 decision to close was made on October 6th?
11   A.  I don't recall.
12   Q.  Okay.  Let me refresh your recollection.
13      Mr. Schacher, I put the deposition
14 transcript, North Dakota Attorney General, on the
15 screen.  Do you see that?
16   A.  Yes.
17   Q.  At Lines 12 and 13 of Page 141, Mr. Card
18 inquires: "What date did Glasser Images discontinue
19 operation?"
20      And you respond: "It was October 6th and
21 7th.  You know, it kind of flowed into two days,
22 really."
23      Did I read that correctly?
24   A.  Yes.
25   Q.  And was that accurate testimony at the time

Page 83

1  you provided it?
2    A.  Yeah, like I said, we had conversations
3  with employees on the 6th about not making payroll
4  and not sure what exactly was going to happen.  And
5  that official decision to close and the announcement
6  to do so came the evening of the 7th.
7    Q.  Okay.  Let's go to Page 143.  And, so, this
8  deposition with the North Dakota Attorney General was
9  approximately a month after Glasser Images closed,
10 correct?
11      You see the first page on the date,
12 November 23rd, 2021?
13   A.  Yes.
14   Q.  Okay.  And, so, that's -- your memory of
15 events that occurred in October of 2021 are better on
16 November 23rd, 2021, than they are today on
17 April 12th, 2024, correct?
18   A.  I suppose they could have been, yes, maybe.
19 It was a very hectic time.
20   Q.  Okay.  Well, let's go to Page 143 of your
21 transcript, and I want to direct your attention to
22 Lines 4 through 21.
23      And Mr. Card inquired: "When were
24 employees told that Glasser Images would cease
25 operations?"

Page 84

1      And you responded: "Well, this all
2  happened very fast.  I mean, this wasn't something,
3  again, I thought would happen.  And, so, on
4  October 6th, I, personally, with some people working
5  from home, but I personally went to every single
6  employee, cause I wanted to do this face-to-face and
7  tell them in person and not over some email or phone
8  call, and wanted to tell them that, you know, hey,
9  we weren't -- we're not gonna be able to make
10 payroll.  I don't know what's going to happen next.
11 Cause at that time, I didn't.  The hopeful, positive
12 person that I am thought, well, maybe something
13 would pull through.  And as the day went on and as
14 it turned into the next day, that became apparent
15 that that wasn't going to happen.  So the reality of
16 it almost began to sink in, you know, more and more
17 as the days went on and the hours went on through
18 the 6th and into the 7th.  And it all kind, you
19 know, again, began to snowball and solidify that
20 decision that had been, you know, made on the 6th."
21      So Mr. Card asked: "So you told the
22 employees on the 6th?"
23      And you said: "Yes."
24      And then he asked you: "When did you tell
25 the clients?"

Page 85

1      And you said: "On the 7th."
2      Do you see that there, sir?
3    A.  Yes.  I told the employees on the 6th about
4  payroll as I referred into the -- you know, the
5  paragraph before, that we weren't going to be able to
6  make payroll and wasn't sure what was going to happen
7  next.  That's what I told the employees on the 6th.
8  And then we made the decision to close on the 7th.
9    Q.  Okay.  And I read -- when I was reading
10 from the transcript, I read what was on the page
11 accurately, correct?
12   A.  Yes.  What you read was correct.
13   Q.  Okay.  And in your testimony with the
14 attorney general, you testified that the average
15 wedding package, it was $2,800, correct?
16   A.  Correct.
17   Q.  I'm going pull up Exhibit 3 again.  We look
18 at Exhibit 3, sir.  Just run a search for October to
19 see -- I don't know if I could do it that way.  I
20 guess we can do it this way.  There are a number of
21 charges on the days before or the day of the closure
22 of Glasser Images.  Let me just show you a couple of
23 them.  The right column here.  The left column, I
24 mean.
25      I was hoping this would be easier if I

22 (Pages 82 - 85)

Page 86

1 just ran a search, but we'll just go through it
2 manually here.
3         If you look at Page 1 of Exhibit 3, we'll
4 see that there's a charge.  None of them on
5 Exhibit 1, not on Page 1, sorry.  On Page 2.
6         See a charge on Page 2, on Line 22, for
7 1554.  Correct?
8     A.  Yes.
9     Q.  That's a few weeks before Glasser Images
10 closed, correct?
11    A.  Okay.
12    Q.  Look on Page 3, October 6th, the day you
13 told employees that you weren't going to be able to
14 make payroll, a contract was signed with a customer
15 and a payment of $2,520 was made by a customer,
16 correct?
17    A.  Yes.
18    Q.  And that money was deposited into
19 Glasser Images' business account, correct?
20    A.  Correct.
21    Q.  Okay.  When you knew that you weren't going
22 to make payroll for the employees, why did you take
23 this money from the customer?
24    A.  Well, the customer had the ability to pay
25 online.  I don't know how this particular transaction

Page 87

1 transpired.  I certainly didn't personally call the
2 customer and take the payment.
3     Q.  Well, sir, you testified that in order for
4 a customer to enter into a contract, that somebody in
5 your staff had to be involved, right?  And somebody
6 had to sign the contract?
7     A.  Correct.
8     Q.  Okay.  So the day that you determined that
9 the company couldn't make payroll, a customer is
10 paying nearly full freight for a wedding package to
11 Glasser Images, correct?
12    A.  Well, that wedding could have booked
13 two weeks ago before that date, and they hadn't made
14 the payment yet.  It doesn't necessarily mean that
15 they talked to someone on that date and made the
16 payment that date.  Again --
17    Q.  I am asking you about the payment.  I'm
18 asking you about the payment, sir.  Focus on the
19 payment, okay?
20        $2,520 on October 6th, the day you said
21 you couldn't make payroll, did you tell that
22 customer when that money came in, "Hey, here's your
23 money.  We're shutting our doors.  We're -- you
24 know, we can't make payroll.  We're not going to
25 take your money because we're not going to be able

Page 88

1 to provide the service to you that you're
2 contracting for since weddings are usually 6 to
3 12 months out"?
4     A.  I don't even know if I was aware that that
5 payment was made.  Like I said, everything happened
6 so fast.  We obviously didn't intend for this to
7 happen.  There was so much going on.  Yeah.
8     Q.  No service was provided to this customer,
9 right?
10    A.  I don't know who the customer is.
11    Q.  Would you know if there was a refund
12 that that customer received from Glasser Images for
13 the 2520?
14    A.  I am assuming there wasn't a refund since
15 they did a pay or a chargeback.
16    Q.  Okay.  I'm looking on Page 4 now.
17        October, 2nd, 2021 for $371.25, correct?
18    A.  Correct.
19    Q.  And, in fact, sir, the employees of
20 Glasser Images were not paid their final paycheck,
21 correct?
22    A.  Correct.
23    Q.  So this money that came in, the day that
24 the money -- the payroll could not be made, or you
25 notified employees payroll could not be made, what

Page 89

1 happened to this money?
2     A.  A lot of them merchant -- the short-term,
3 high-interest loans were taking daily payments out of
4 the account.  And, so, most likely it went to one of
5 those high-interest loan payments.
6     Q.  Okay.  So if we get the bank statements for
7 Glasser Images during this period of time, you're
8 saying that all the money that came in, in October of
9 2021 from customers went to a merchant cash advance
10 companies?  It didn't go to you or Mr. Schacher,
11 personally?
12        MR. O'KEEFFE:  Mischaracterizes testimony.
13    A.  I don't know.  I don't know without
14 reviewing the bank statements where specifically it
15 went to.
16 BY MR. ELGIDELY:
17    Q.  Okay.  We'll look at them.
18        And you see on Page 5 of 15, October 1,
19 2021, for $1,130, correct?
20    A.  Correct.
21    Q.  On Page 6, October 1, 2021, for $284,
22 correct?
23    A.  Correct.
24    Q.  Page 7 of 15, the day that Glasser Images
25 closed, it took $800 from a customer, correct?

23 (Pages 86 - 89)

Page 90

1   A.   Correct.
2   Q.   October 2nd, 2021, it took $1,000 from a
3 customer, correct?
4   A.   Correct.
5   Q.   October 6th, again, the day that you
6 notified employees that you can't make payroll, $935
7 is paid by a customer to Glasser Images, correct?
8   A.   Correct.
9   Q.   October 1, 2021, $520 is paid by a customer
10 to Glasser Images, correct?  That's on Page 9 of 15.
11   A.   Correct.
12   Q.   Page 12 of 15, October 4, 2021, a customer
13 paid $3,537 to Glasser Images, correct?
14   A.   Correct.
15   Q.   October 7, another date where the business
16 closed, a customer paid $1,600 to Glasser Images,
17 correct?
18   A.   Correct.
19   Q.   Page 14 on October 3rd, 2021, a customer
20 paid $2,050 to Glasser Images, correct?
21   A.   Correct.
22   Q.   Again, that's 552 chargebacks, resulting in
23 my client coming out of pocket for $934,046.85,
24 correct?
25   A.   Correct.

Page 91

1   Q.   Were you aware, sir, that of this list,
2 31.6 percent of these -- the individuals listed here,
3 are included in the AG -- the North Dakota AG's
4 action against you and Mr. Schacher?
5   A.   I don't recall.
6   Q.   Do you recall that or do you know that out
7 of the individuals that are listed on this list, out
8 of the 31.6 percent of common customers, PayJunction
9 paid $402,885.17 to the same customers that were
10 included in the North Dakota Attorney General action?
11   A.   No, I don't recall.
12   Q.   In your answer to the complaint, you refer
13 to operational and logistical challenges following
14 the closure of Glasser Images.  Do you recall that?
15   A.   Yes.
16   Q.   What were you referring to, specifically?
17   A.   We had no employees, we had no staff
18 anymore.  You know, we had -- the phone was ringing
19 off the hook.  We had emails flooding the inboxes --
20 it was, yeah, I mean, obviously all hell broke loose.
21   Q.   Okay.  And you were served with a lawsuit
22 that my client filed against you and Glasser Images
23 in Federal District Court in Georgia in November of
24 2021, correct?
25   A.   Correct.

Page 92

1   Q.   And you were served with a preliminary
2 injunction that was entered by that court in November
3 2021 requiring you to cooperate with PayJunction in
4 relation to chargeback claims by former customers of
5 Glasser Images, correct?
6   A.   I believe so, yes.
7   Q.   Okay.  What, if any, efforts did you make
8 to communicate with my client concerning those
9 chargebacks after receipt of that preliminary
10 injunction?
11   A.   I don't recall the specifics.  Again, we
12 had no employees to help manage everything that we
13 needed to -- to take care of.  The business was
14 closed.  We were dealing with --
15   Q.   Sir, I'm not asking you about the
16 operational logistic challenge.  My question is
17 very -- I think it's very clear.
18       MR. O'KEEFFE:  Mischaracterizing.
19 BY MR. ELGIDELY:
20   Q.   My question is very clear and very
21 specific.  My question is:  What, if any, efforts did
22 you make to communicate with my client concerning
23 chargebacks by former customers of Glasser Images
24 after receiving the preliminary injunction issued by
25 the Georgia District Court?

Page 93

1   A.   I don't recall the specific amount of
2 communication that we had.  I know that there were
3 some communications back and forth trying to get some
4 information on the chargebacks.  I -- I don't recall
5 the specifics.
6   Q.   Okay.  Who did you speak with at
7 PayJunction after you received the preliminary
8 injunction concerning chargebacks?
9   A.   I don't recall.
10   Q.   Okay.  What emails have you produced to my
11 client in discovery, reflecting email communications
12 from you and your cooperation in addressing
13 chargebacks by customers?
14   A.   I don't recall the specific emails that
15 were produced.
16   Q.   Do you recall any emails being produced in
17 that regard?
18   A.   I know we produced emails.  I don't know
19 the -- I don't recall the specifics at this time.
20   Q.   Can you identify sitting here today any
21 emails from you to any representatives of PayJunction
22 reflecting your cooperation and addressing customer
23 chargebacks?
24   A.   Again, I don't recall the specifics.
25   Q.   So you can't -- you can't identify such

24 (Pages 90 - 93)

Page 94

1 emails sitting here today?
2     A.  I don't recall the emails.  I don't -- I
3 don't recall the specifics, no.
4     Q.  Okay.  When I asked you what you did to
5 prepare for your deposition, sir, you said you had
6 reviewed documents, correct?
7     A.  Correct.
8     Q.  Okay.  And you knew that one of the
9 allegations my client was making in this action is
10 that you failed to cooperate with PayJunction in
11 relation to customer chargebacks.  Do you remember
12 that that allegation is in the complaint?
13     A.  Yes.
14     Q.  Okay.  And what effort, if any, did you
15 make to be prepared to respond to that allegation
16 during your deposition today?
17     A.  Like I said, I reviewed some documents.  I
18 don't -- I didn't review things very extensively.  I
19 don't recall reviewing, you know, specific emails
20 or -- or specific documents that you are referring to
21 in these previous questions.
22     Q.  All right.  We're going to take a
23 five-minute break.  It is 11:59 a.m. here.  We will
24 go back at 12:05.  Thank you.
25   (Recess was held from 11:59 a.m. until 12:05 p.m.)

Page 95

1 BY MR. ELGIDELY:
2     Q.  Mr. Glasser, do you recall that in
3 March 2022, a Georgia District Court had entered a
4 judgment against you and Glasser Images in the amount
5 of $977,241.14?
6     A.  Yes, I believe so.
7     Q.  Okay.  And is that one of the judgments or
8 one of the debts you're trying to discharge in your
9 bankruptcy case?
10     A.  Yes, I believe it is.
11     Q.  Okay.  And you recall that shortly
12 thereafter on May 3rd, 2022, the State of
13 North Dakota filed an action against you and
14 Mr. Schacher, correct?
15     A.  Yes.
16     Q.  And they were alleging that you had
17 committed violations of North Dakota's Consumer Fraud
18 Law in relation to the operation of Glasser Images,
19 correct?
20     A.  Yes.
21     Q.  I'm going to mark another exhibit.
22         (Thereupon, marked as Exhibit 4.)
23 BY MR. ELGIDELY:
24     Q.  Mr. Glasser, I've put on the screen
25 Exhibit C to the complaint filed against you, which

Page 96

1 is the judgment in favor of the State of North Dakota
2 against you, Glasser Images, and Mr. Schacher.
3         Do you see that on the screen?
4     A.  Yes.
5     Q.  Okay.
6         And we'll mark this, I guess,
7 Ms. Rodriguez as 4.
8         THE COURT REPORTER:  That's correct.
9 BY MR. ELGIDELY:
10     Q.  So, in the judgment, Mr. Glasser, it states
11 that:  "It is ordered, adjudged and decreed as
12 follows."
13         And then in Paragraph Number 6, it states:
14 "Defendants Glasser Images and Jack Glasser admit
15 that, with the intent that others rely, they engaged
16 in acts or practices constituting violations of the
17 consumer fraud law."
18         Did I read that correctly?
19     A.  Yes, as it relates to the North Dakota
20 centric code.
21     Q.  Okay.  Well, this -- I know you put that
22 qualification on there, Mr. Glasser, but this
23 judgment relates to the operations of Glasser Images
24 in its dealings with customers, correct?
25     A.  Yes, I suppose.

Page 97

1     Q.  So you admit that with the intent that
2 others rely, and others is referring to customers of
3 Glasser Images, correct?  Referring to consumers,
4 right?  It's referring to consumers who were clients
5 of Glasser Images, correct?
6     A.  Yes, I suppose.
7     Q.  Okay.
8         In Paragraph 7, it says:  "Defendants
9 Glasser Images and Jack Glasser are adjudged in
10 violation of the consumer fraud law for engaging in
11 deceptive acts or practices, fraud, false pretense,
12 false promise, or misrepresentations."
13         Did I read that correctly?
14         MR. O'KEEFFE:  I am just going to object.
15 You left out part of it.
16         MR. ELGIDELY:  I left out the statute,
17 correct?  I left out the cite to the statute.
18         MR. O'KEEFFE:  In both questions, yeah.
19 BY MR. ELGIDELY:
20     Q.  Okay.  We're going to have the Court take
21 judicial notice of this.  So, you know, obviously the
22 document speaks for itself, but the portion that I
23 read in Paragraph 7, sir, did I read that accurately?
24     A.  Yes.
25     Q.  Mr. Glasser.

25 (Pages 94 - 97)

Page 98

1   A.  Yeah, with the exception of the part you
2 left out.
3   Q.  I'm sorry, with the exception of what?
4   A.  The statute.
5   Q.  Okay.  So the portion that I read in
6 Paragraph 6, did I read that accurately?
7   A.  Yes, with the exception of the statute.
8   Q.  That's what I said, the portion that I
9 read, right, the portion.  That doesn't mean all of
10 it, correct?
11   A.  Yes.
12   Q.  Okay.  Thank you.  And then it goes on to
13 say that -- down below, Number 14, Paragraph 14 on
14 Page 5 of 7:  "Pursuant to North Dakota Century Code
15 Section 51-15-11, Defendants Glasser Images and
16 Jack Glasser agree that the Attorney General shall
17 have Judgment against them, jointly and severally, in
18 the amount of $25,000 for civil penalties.
19 Glasser Images and Jack Glasser further expressly
20 agree that the civil penalty shall be
21 non-dischargeable under 11 U.S.C Section 523(a)(7)and
22 agree that this term is subject to the terms of
23 Paragraph 11, supra."  Did I read that correctly?
24   A.  Yes.
25   Q.  And down below in Paragraph 16, it states:

Page 99

1 "Pursuant to North Dakota Century Code
2 Section 51-15-07, Defendants Glasser Images and
3 Jack Glasser agree and consent to the entry of a
4 monetary judgment against them in the amount of
5 $767,188 as restitution for work not completed or
6 performed and unpaid amounts owed to independent
7 contractors."
8   Did I read that correctly?
9   A.  Yes.
10   Q.  In Paragraph 19, it says:  "Defendants
11 expressly agree that consumer restitution and
12 corresponding judgment awarded to the State as set
13 forth in Paragraph 14 through 17 shall be considered
14 non-dischargeable under 11 U.S.C Section 523(a)(2)(A)
15 and/or 523(a)(7)."
16   Did I read that correctly?
17   A.  Yes.
18   Q.  And that judgment was signed on
19 January 27,2023, correct?
20   A.  Correct.
21   Q.  Okay.  What, if any -- well, strike that.
22   Have you paid any portion or all of this
23 judgment since the date it was entered on
24 January 27th, 2023?
25   A.  No.

Page 100

1   Q.  Not a penny?
2   A.  Correct.
3   Q.  We'll mark this as Exhibit 5.
4   (Thereupon, marked as Exhibit 5.)
5 BY MR. ELGIDELY:
6   Q.  Mr. Glasser, I've put on the screen
7 Exhibit 5, which is a judgment entered by the United
8 States Bankruptcy Court for the District of
9 North Dakota against you personally.  And it states
10 in the judgment that the debt owed by you to the
11 State of North Dakota in the sum of $767,188 for
12 restitution for work not completed or performed is
13 excepted from discharge under Sections 523(a)(2)(A)
14 and 523(a)(7).  The debt that you owe to the State of
15 North Dakota for civil penalties in the sum of
16 $25,000 is excepted from discharge under 11 U.S.C
17 Section 523(a)(7)."
18   Did I read that correctly?
19   A.  Yeah, a few words were skipped, but
20 generally, yes.
21 BY MR. ELGIDELY:
22   Q.  Okay.  Tell me which words I've skipped,
23 sir, that are material to your response?
24   A.  Well, nothing material.  I'm just being
25 specific.

Page 101

1   Q.  Okay.  Thank you so much.
2   And this was entered by Judge Hastings on
3 February 17, 2023, correct?
4   A.  Correct.
5   Q.  Okay.  And what, if any, portion of this
6 judgment did you pay, sir?
7   A.  None.
8   Q.  Not a penny?
9   A.  Correct.
10   Q.  When you were operating Glasser Images and
11 Glasser Images needed money, you went to friends and
12 family to get loans, correct?
13   A.  On occasion, yes, correct.
14   Q.  Did you go to any friends and family to
15 help pay some of this judgment?
16   A.  No.
17   Q.  Did you ask any friends or family to give
18 you a gift of some money to, you know, cure up or
19 clear up your reputation that -- from this judgment?
20   A.  No.
21   MR. ELGIDELY:  I have no further questions.
22 Thank you for your time.
23   (The reading and signing of this deposition
24   was waived.)
25   (The proceedings concluded at 12:16 p.m.)

26 (Pages 98 - 101)

Page 102

```
 1
 2          CERTIFICATE OF OATH
 3
 4
 5
 6       I, GINA RODRIGUEZ, the undersigned
 7   authority, certify that JACK A. GLASSER appeared
 8   remotely and was duly sworn on the 12th day of
 9   April, 2024.
10       Signed this 19th day of April, 2024.
11
12
13
                    _____
14       GINA RODRIGUEZ, RPR, CRR
         Notary Public, State of Florida
15       My Commission No. HH 491402
         Expires March 23, 2028
16
17
18
19
20
21
22
23
24
25
```

Page 103

```
 1
 2          CERTIFICATE OF REPORTER
 3
 4
 5
 6       I, GINA RODRIGUEZ, Registered
 7   Professional Reporter, Certified Realtime
 8   Reporter do hereby certify that I was authorized
 9   to and did stenographically report the foregoing
10   deposition of JACK A. GLASSER; pages 1 through
11   101; that a review of the transcript was not
12   requested; and that the transcript is a true
13   record of my stenographic notes.
14       I FURTHER CERTIFY that I am not a
15   relative, employee, attorney, or counsel of any
16   of the parties, nor am I a relative or employee
17   of any of the parties' attorneys or counsel
18   connected with the action, nor am I financially
19   interested in the action.
20       Dated this 19th day of April, 2024.
21
22   _____
         GINA RODRIGUEZ, RPR, CRR
23
24
25
```



27 (Pages 102 - 103)

**[& - 2750]**

Page 104

| & | | | |
|---|---|---|---|
| **&** 22:17,17,19 65:21 | **13** 73:15 78:13 82:17 | 15:18 16:19,21 24:10 30:18 | 71:13 74:9 75:12 78:25 |
| **1** | **1350** 7:10 | **2007** 11:5 | 79:1 81:12 |
| **1** 3:7 51:8,11,13 | **14** 18:16,19,25 | **2008** 30:17,20 | 83:12,15,16 |
| 51:23 52:1 | 19:11 23:1 | 30:23 31:3 | 88:17 89:9,19 |
| 54:19 80:7 86:3 | 90:19 98:13,13 | **2009** 16:21,22 | 89:21 90:2,9,12 |
| 86:5,5 89:18,21 | 99:13 | 17:8 23:17 24:3 | 90:19 91:24 |
| 90:9 103:10 | **141** 82:17 | **2010** 15:18 16:3 | 92:3 |
| **1,000** 90:2 | **143** 83:7,20 | 16:8 24:5,7 | **2022** 18:17,20 |
| **1,130** 89:19 | **15** 10:5 52:22,24 | **2015** 12:22 15:6 | 18:25 19:11 |
| **1,600** 75:6 79:11 | 80:15 81:11 | 15:10 16:4,8,19 | 23:1 81:13 95:3 |
| 90:16 | 89:18,24 90:10 | **2016** 12:22 | 95:12 |
| **1,631.97** 74:11 | 90:12 | 17:14,15 | **2023** 50:5 99:24 |
| **1.2** 70:5,11 | **1554** 86:7 | **2017** 52:3,6 58:5 | 101:3 |
| **1.6** 70:8 | **16** 15:6 41:11 | 58:10,11,23 | **2024** 1:18 7:23 |
| **10** 55:10,21 | 48:24 98:25 | **2018** 33:14 34:3 | 83:17 102:9,10 |
| **10,000** 73:19 | **17** 99:13 101:3 | 34:9,13,20,23 | 103:20 |
| **100** 3:11 | **18** 41:5 | 36:2 50:23 67:6 | **2028** 102:15 |
| **101** 103:11 | **19** 68:2,15 69:10 | **2019** 17:8,14,16 | **21** 20:16 21:3 |
| **1099** 25:5,7 | 69:14,16 99:10 | 62:17 | 44:16 83:22 |
| **10:57** 60:17,21 | **19th** 102:10 | **2020** 24:22 | **22** 41:9 86:6 |
| **11** 20:21 53:17 | 103:20 | 39:21 67:16,21 | **22-30244** 1:2 |
| 98:21,23 99:14 | **2** | 68:3,15,21 | **23** 102:15 |
| 100:16 | | 69:10,13 70:2 | **23-07006** 1:8 |
| **11:02** 60:18,21 | **2** 3:8 25:1 52:1,8 | 70:16,16 71:1,7 | **235-8000** 2:10 |
| **11:59** 94:23,25 | 52:8,11,12,15 | 72:25 | **23rd** 83:12,16 |
| **12** 1:18 82:17 | 52:22 54:11 | **2021** 14:11 15:7 | **25** 16:12 30:17 |
| 88:3 90:12 | 70:2 86:5,6 | 18:24 24:22 | 31:3 |
| **120,000** 67:14 | 99:14 100:13 | 33:14 34:3,9,14 | **25,000** 98:18 |
| **12:05** 94:24,25 | **2,050** 90:20 | 34:20,23 36:2 | 100:16 |
| **12:16** 1:18 | **2,520** 86:15 | 39:21 44:8,16 | **2520** 88:13 |
| 101:25 | 87:20 | 44:20,20 48:18 | **25th** 30:22 |
| **12th** 83:17 | **2,800** 85:15 | 49:19 50:23 | **27,2023** 99:19 |
| 102:8 | **20** 21:2 41:4,9 | 58:5,12,23 61:8 | **2750** 2:4 |
| | **2005** 12:19 | 62:17 67:6 | |
| | 14:10 15:6,7,10 | | |

**27th**  99:24
**28**  69:13
**284**  89:21
**29**  71:13
**2nd**  88:17 90:2

**3**

**3**  3:9 79:25 80:1
  80:8 85:17,18
  86:3,12
**3,537**  90:13
**30**  10:5
**30,000**  73:23
**300,000**  20:4
  21:3,11
**31.6**  91:2,8
**3188**  102:13
  103:21
**33131**  2:5
**34**  11:10 27:6,8
  27:9
**35**  27:6
**371.25**  88:17
**3rd**  90:19 95:12

**4**

**4**  3:4,10 52:2
  58:11 71:1
  83:22 88:16
  90:12 95:22
  96:7
**4,150**  8:13
**400,000**  70:10
**402,885.17**  91:9
**4150**  8:12

**450**  74:10
**491402**  102:15
**4th**  52:6

**5**

**5**  3:11 20:16
  89:18 98:14
  100:3,4,7
**50**  15:19,23
  38:22,23,25
**500**  66:18
**500,000**  66:11
  66:15
**501-7381**  2:5
**507**  53:17
**51**  3:7
**51-15-07**  99:2
**51-15-11**  98:15
**52**  3:8
**520**  90:9
**523**  98:21 99:14
  99:15 100:13,14
  100:17
**552**  81:13 90:22
**58103**  2:10

**6**

**6**  20:16 53:17
  88:2 89:21
  96:13 98:6
**60**  68:5
**6th**  18:24 82:8
  82:10,20 83:3
  84:4,18,20,22
  85:3,7 86:12
  87:20 90:5

**7**

**7**  1:3 18:24
  20:18 58:12
  89:24 90:15
  97:8,23 98:14
  98:21 99:15
  100:14,17
**70**  24:25 27:14
**701**  2:10
**720**  2:9
**73**  41:4
**75**  16:13
**767,188**  99:5
  100:11
**786**  2:5
**79**  3:9
**7th**  81:25 82:6
  82:21 83:6
  84:18 85:1,8

**8**

**8,000**  65:14,16
  65:18 75:17,20
  79:15
**80,000**  24:25
  27:14
**800**  89:25
**85**  68:2

**9**

**9**  20:21 71:7
  90:10
**90**  51:1
**934,046.85**
  81:14 90:23

**935**  90:6
**95**  3:10
**977,241.14**  95:5
**9:30**  1:18

**a**

**a.m.**  1:18 60:17
  60:18,21,21
  94:23,25
**ability**  23:2
  86:24
**able**  17:25 38:21
  51:4,22 68:5,8,9
  71:4 82:7 84:9
  85:5 86:13
  87:25
**absolute**  54:23
**accepted**  50:19
**accommodate**
  9:9
**accomplish**  23:5
**account**  26:5
  28:21,25 29:11
  29:17,20,24
  30:13,14 41:21
  42:2,5,9,10,21
  43:3,15,24 44:1
  44:6 47:6,6
  57:10,16,22
  58:7,18,23 59:1
  59:7 63:5,6,24
  64:4,21 65:1,2,6
  65:17 71:12,14
  71:16,17,19,22
  71:25,25 72:1,5
  72:14,15,19

74:14 76:3,25
86:19 89:4
**accountant**
25:22 71:7
76:18
**accounts**  29:5
34:9 62:24
70:18
**accurate**  22:1
82:25
**accurately**  5:24
68:12 85:11
97:23 98:6
**acknowledged**
77:25
**acquired**  21:16
**action**  4:13 54:6
68:2 80:13 91:4
91:10 94:9
95:13 103:18,19
**actions**  78:1
**acts**  96:16 97:11
**actual**  33:7,11
53:20
**actually**  7:18
21:17 30:12
34:2 68:19
**add**  37:7
**adding**  69:21
**addition**  25:25
26:3 39:14
**additional**  69:4
69:22 70:3 71:3
**address**  7:8
56:23 78:1,2,3

**addressing**
93:12,22
**adjudged**  96:11
97:9
**adjust**  37:10
**adjustments**
36:20
**administrative**
16:1,16
**admit**  96:14
97:1
**advance**  89:9
**advances**  66:4
**adversary**  1:8
**advice**  41:24
**advised**  68:3
69:21 71:8
**afford**  27:17,18
38:23,23
**afloat**  70:25
74:17
**ag**  41:3 91:3
**ag's**  91:3
**age**  11:9 27:6
**ago**  87:13
**agree**  49:3
69:16 78:17
98:16,20,22
99:3,11
**agreeing**  40:8
**agreement**  3:8
7:25 52:20,23
54:12,16 58:1
58:11 59:2 61:7
72:2

**agreements**
17:4
**airbnb**  7:18
**alexander**  45:3
**allegation**  94:12
94:15
**allegations**  94:9
**alleging**  95:16
**amazon**  47:18
**amount**  18:22
21:5,10 22:7,23
37:22 38:4,20
57:11,20 66:19
80:17,24,25
81:20 93:1 95:4
98:18 99:4
**amounts**  66:17
99:6
**announcement**
83:5
**annual**  8:4,5
25:22
**answer**  6:18,22
6:23 7:1 91:12
**answers**  6:10
**anticipating**
64:12,12
**anybody**  9:24
45:9 47:24
**anymore**  91:18
**apologize**  55:4
**apparent**  84:14
**appearances**  2:1
**appeared**  38:19
102:7

**application**  3:7
51:17,20
**approach**  78:21
**approximate**
21:10,14 72:8
**approximately**
5:1 12:24 16:4
17:1,5,5 83:9
**approximation**
21:6
**april**  1:18 69:13
83:17 102:9,10
103:20
**area**  11:25
**aside**  70:21
**asked**  4:21
64:19 71:11
84:21,24 94:4
**asking**  6:8,15
60:1,2 87:17,18
92:15
**aspects**  34:16,18
35:2
**assert**  53:24
**asserted**  67:8
**asserting**  54:5
**assets**  19:22
20:18,22,24
21:2,3,10,15,25
22:2,7,9,9,10,20
**assistance**  34:6
36:15 49:21
**associate's**
11:22

assume  59:13
assuming  88:14
attached  80:12
attempted  63:5
    63:11
attend  11:13,19
attended  11:7
    11:11
attention  52:21
    83:21
attorney  4:13
    5:6,8,17 6:25
    9:14,16 10:10
    10:19 19:4,25
    20:13 21:9 36:6
    36:11,12,20
    38:17 39:2
    40:12,15 71:8
    82:2,14 83:8
    85:14 91:10
    98:16 103:15
attorneys
    103:17
attributable
    50:22
audi  75:12
august  18:16,19
    18:25 19:11
    23:1
authority  35:3
    37:17 102:7
authorization
    37:10
authorized  34:8
    37:3 44:9,17

45:13 103:8
auto  37:25
    38:10,13
available  43:4,7
    43:16,25
avenue  2:9
average  33:6
    85:14
awarded  99:12
aware  45:21
    88:4 91:1

## b

b  1:9 2:2 3:5
    7:15 30:22
back  15:12 17:4
    28:24 37:17
    40:9 54:19
    56:10 59:18
    69:13 80:25
    81:3 93:3 94:24
background
    10:23
bad  55:23
balance  8:22
    65:2
bank  21:16 22:8
    22:12,15,17,17
    22:19 28:21,25
    29:5,16,20,24
    30:13,14 34:9
    53:3,5,6,7,14,15
    53:24 57:10
    58:17,22 59:1,7
    62:24,25 63:24
    64:4 65:21

67:16 69:20
    71:2,14,21,24
    72:5 89:6,14
banking  34:5
bankruptcy  1:1
    18:16,19 19:1
    19:10,15 21:24
    22:5 23:1,4 71:8
    95:9 100:8
based  38:20
basically  78:16
basis  6:17 8:16
    8:19
bathroom  9:8
bear  18:15 20:9
    25:17 40:23,24
    50:15 51:2,11
    55:5 66:22
    79:22,24
began  31:1
    84:16,19
beginning  68:19
behalf  2:2,8
    35:5 44:14,18
    53:24,25 54:6
    54:10 55:18,24
believe  9:17
    12:21 15:14
    17:8 23:25 24:3
    24:5 29:2 30:10
    30:15 33:3,15
    36:16,19 38:21
    40:5 45:10 47:7
    47:9 48:13
    51:15 52:1

54:18 56:7
    57:24 58:24
    61:22 62:2 63:1
    68:17 70:23
    72:11 75:22
    76:5 81:18,22
    92:6 95:6,10
belt  78:8,12,15
benefit  54:24
benz  74:10
best  17:5 62:20
    69:24
better  20:10
    64:4 83:15
big  69:17
bigger  40:17
biscayne  2:4
bismarck  11:3
    11:14 16:23,25
    17:8,11,17,18
    17:19,22,23
    18:2,7,9,10
bk  1:2
black  62:16
blanks  37:16,17
    37:20
booked  45:10
    45:16 87:12
booking  38:12
    44:12 45:12,15
    46:9,11
bookkeeper
    34:7
books  26:8 30:8

**bother** 35:19
**bottom** 52:8
**boulevard** 2:4
**bounced** 64:8
64:15
**bowen** 7:14,17
8:1
**bravera** 71:13
**breadwinner**
24:18
**break** 9:9 60:15
60:23 94:23
**bridge** 28:4
**broke** 91:20
**brothers** 24:13
**bucks** 38:22,23
**burden** 74:22
**business** 12:2,23
15:21,24 16:9
16:17 24:15
26:7,19 27:24
30:18 31:6 43:4
43:9,10,16,19
43:23 45:25
50:21 63:5,6
64:25 65:2,5,7
65:17,18 69:15
69:18,23 70:10
70:21,25 72:22
75:4 76:3,24
77:9,12,19,23
78:2,2,12,15
79:12 86:19
90:15 92:13

**business's** 26:5
**busy** 46:16,20
46:21 49:1
**butterhorn**
75:25 77:3
**button** 5:21
**buy** 27:18

**c**

**c** 3:10 23:25
25:9 45:3 95:25
**cabin** 65:14
75:17 76:21
79:14
**call** 84:8 87:1
**camera** 4:22
13:2,4 15:3
21:18
**cameras** 20:22
21:18 22:13
**canterbury** 7:10
**capacity** 19:6
**capital** 68:6
69:4
**car** 74:20,21,24
74:25 75:10
76:15,16,19
79:5,9
**card** 3:8 20:17
30:4,4,5,6,7
41:6 50:22 51:3
56:10,10,13
57:9,25 58:4,15
61:10,19 65:24
82:17 83:23
84:21

**card's** 21:1
**cardholder**
53:24 54:6 58:1
**cardholders**
53:16,16,20,25
**cards** 50:19,20
70:8
**care** 92:13
**case** 1:2 6:17
25:4 53:11
64:14 81:8 95:9
**cash** 50:20
63:14 64:20
66:4 69:18,23
70:9 71:3,3,4
89:9
**cause** 84:6,11
**cease** 83:24
**central** 11:3
**centric** 96:20
**century** 98:14
99:1
**certain** 6:14
65:10
**certainly** 19:2
48:21 62:5
72:13 87:1
**certificate** 102:2
103:2
**certifications**
18:13
**certified** 103:7
**certify** 102:7
103:8,14

**cetera** 46:7
68:10,11
**challenge** 92:16
**challenges** 78:3
91:13
**change** 37:3
78:14
**changes** 78:19
**chantel** 73:18
**chapter** 1:3
**charge** 44:5
56:13 61:18
80:22 86:4,6
**chargeback** 3:9
53:4 56:8,12
57:17,22,24
58:6,8 61:13,16
80:8,17,17 81:2
88:15 92:4
**chargebacks**
56:6,24 57:2,5
57:11,19,23
60:8,10,25 81:5
81:13,17 90:22
92:9,23 93:4,8
93:13,23 94:11
**charged** 26:4
43:8 44:1 56:10
63:24 64:25
65:4,16 75:20
75:24 76:6
79:12 80:25
81:3
**charges** 27:24
76:2,3 85:21

**charging**  30:6
77:19,23
**check**  50:19
64:19,22
**checks**  63:4,7,16
63:19,22 64:4,5
64:8,15 71:16
**chevy**  74:20
**chiles**  23:23
**choose**  39:13
**choppy**  55:22
**chose**  79:10
**cite**  97:17
**civil**  98:18,20
100:15
**claim**  53:24
56:9 67:8,12
**claims**  3:9 52:25
54:5 80:9 92:4
**clarify**  29:23
**class**  54:1
**classes**  12:4
**clause**  37:8
**clear**  63:5 71:15
92:17,20 101:19
**clearing**  64:3
**clicked**  38:12
**client**  6:25
23:10 37:5
38:21 39:12
45:25 46:3
47:14 48:7 51:5
54:16 58:7,18
60:11 80:9
81:13,17,20

90:23 91:22
92:8,22 93:11
94:9
**clients**  19:5
37:12 41:8
84:25 97:4
**close**  71:21 82:5
82:10 83:5 85:8
**closed**  18:21,24
21:8 22:2 39:25
48:1,2,5 49:5,7
61:8 72:6,11,14
72:15,15,16,16
72:17,21,22
81:6,24 83:9
86:10 89:25
90:16 92:14
**closing**  19:2
24:20 48:21
71:18,25
**closure**  82:2
85:21 91:14
**clothing**  24:13
**code**  96:20
98:14 99:1
**collected**  10:18
**collectively**  55:2
**college**  11:1,11
11:13
**column**  80:16
85:23,23
**columns**  80:16
**come**  35:19 58:7
64:13

**coming**  37:13
68:22 72:23
90:23
**commercial**
13:15 31:11,20
44:13
**commission**
102:15
**committed**
95:17
**committee**  70:6
**common**  30:11
91:8
**communicate**
9:4 92:8,22
**communication**
93:2
**communicatio...**
93:3,11
**comp**  47:4
**companies**
13:11,15 39:18
89:10
**company**  13:17
14:2,7 15:1,4,6
18:21,23 19:16
26:9 28:7,13
29:22,24 33:17
33:20,21,22
34:2,16 37:14
38:5 40:17
44:14 46:9,12
46:13,19,24
47:2,5,21,24
48:21,23 57:9

62:6,20,24
63:21 64:21
65:6,17,20
66:11,14,25
67:17 72:25
73:12,20,24
74:8,22 75:6,21
75:24 76:6,10
79:9 87:9
**company's**  30:4
30:6,8,13 34:9
41:21 63:24
64:3,25 65:2,5
65:17 71:14
**compensation**
49:15,18
**complaint**  3:10
67:25 80:13
91:12 94:12
95:25
**completed**  99:5
100:12
**completely**
12:13,22 13:9
22:8
**computers**
20:23 21:18
22:14
**concerning**  92:8
92:22 93:8
**concluded**
101:25
**condition**  72:24
**confirm**  4:18
25:3

**[confirmation - correct]**                                    Page 110

| | | | |
|---|---|---|---|
| **confirmation** 46:4 | **contains** 51:21 | **contribute** 8:15 8:19 | 46:6 47:20,22 47:23 48:12,16 |
| **confusion** 60:24 | **contested** 61:18 | **contributes** 8:23 | 48:18,19 49:20 51:6,7 53:11,12 |
| **connected** 103:18 | **context** 14:1 | **control** 64:3 | 53:21,22 54:12 |
| **connection** 5:8 5:12 70:15 | **continue** 31:22 70:24 | **conversation** 67:19,20 | 54:13,17 55:17 55:20,25 56:1,6 |
| **consent** 99:3 | **continued** 15:14 70:10 73:2 78:16 | **conversations** 83:2 | 56:18,19,24 57:2,3,6,7,13,14 |
| **consideration** 19:14,20 | **continues** 71:18 | **cooperate** 92:3 94:10 | 58:8 59:19,20 60:13,14 61:4 |
| **considered** 99:13 | **continuing** 54:23 | **cooperation** 93:12,22 | 61:13,14 63:8,9 63:12,13,16,25 |
| **consistent** 72:1 | **continuously** 24:7 | **copy** 47:4 55:23 | 64:1,5,6,8,16,22 |
| **consisting** 20:2 | **contract** 33:7 36:7,12,13,16 | **corp** 25:9,10 | 64:23 65:2,7,18 65:19,22,23,24 |
| **consists** 80:15 | 37:3,14,16 38:24 41:16 | **correct** 7:16,24 8:14 9:19 10:2 | 65:25 66:2,3,4,5 66:6,7,9,10,12 |
| **consolidate** 69:1 69:4 | 45:20,21,25 46:1,5 47:11,13 | 11:12 13:20 14:17 15:25 | 66:13,15,16 67:2,3 68:15,16 |
| **consolidation** 70:5 | 47:15 48:10 51:5 86:14 87:4 | 16:18 20:19,24 21:3,11 22:1,3 | 68:21,22 71:9 71:10,19,20,22 |
| **constituting** 96:16 | 87:6 | 23:11 26:5,9,10 27:24 28:1,14 | 71:23 72:2,3,19 73:3,10,16,17 |
| **consult** 36:11 71:8 | **contracted** 32:22 | 29:25 30:9,14 31:4,16 32:4,8 | 73:20,21,24,25 74:2,11,12,14 |
| **consultant** 47:14 | **contracting** 33:1 35:5 47:22 88:2 | 32:12,13 33:9 34:12 35:21,25 | 74:15,17,18 75:2,3,7,8,10,11 |
| **consultation** 36:25 | **contractors** 99:7 | 36:8,9,25 37:23 37:24 39:9,11 | 75:14,18,19,21 75:22,25 76:1,3 |
| **consumer** 95:17 96:17 97:10 99:11 | **contracts** 35:4 36:23 37:11 44:9,14,17 | 39:17 41:17,21 42:17,18,22,23 | 76:5,8,9,11,12 79:1,12,16,20 |
| **consumers** 97:3 97:4 | 45:14 47:25 48:3 | 42:25 43:1,5,6,9 43:10,17,18,20 | 83:10,17 85:11 85:12,15,16 |
| **contact** 37:25 | | 43:21 44:2,3,6,7 44:25 45:1,4 | 86:7,10,16,19 |
| **contacted** 71:13 | | | |

**[correct - day]**                                              Page 111

86:20 87:7,11
88:17,18,21,22
89:19,20,22,23
89:25 90:1,3,4,7
90:8,10,11,13
90:14,17,18,20
90:21,24,25
91:24,25 92:5
94:6,7 95:14,19
96:8,24 97:3,5
97:17 98:10
99:19,20 100:2
101:3,4,9,12,13
**correctly** 41:13
53:8,18 54:1
66:21 69:7,25
70:13 71:5
82:23 96:18
97:13 98:23
99:8,16 100:18
**corresponding**
99:12
**cost** 35:18
**could've** 74:23
74:23,24,25
**counsel** 6:13
36:15,25 103:15
103:17
**couple** 19:21
24:14 45:23
46:16,18 85:22
**course** 12:6,8
13:7,24
**court** 1:1 4:17
5:18 6:4 80:2,3

91:23 92:2,25
95:3 96:8 97:20
100:8
**cousin** 73:19
**cousin's** 50:9
**cousins** 50:9
**cover** 4:21
57:22 65:10
**covering** 8:20
8:22
**covers** 57:25
**covid** 69:14,16
**cpa** 25:16
**created** 36:14
36:24
**credit** 30:4,6
50:19,20,22
51:3 53:4 56:9
56:13 57:8,25
58:4,15 61:9,19
65:24 70:3,8
**creditors** 23:8
**crr** 1:24 102:14
103:22
**cure** 101:18
**currently** 8:5,21
20:17 69:24
**cust** 60:11
**customer** 35:2
35:16,16 36:17
37:23,23 38:6
39:10,15 40:1
45:20 47:10
48:11 52:24
56:9,12,24 57:2

57:6,12,18,20
58:5,14,19 59:9
59:11,16,17,21
60:3,6 61:1,9,11
61:12 70:17
86:14,15,23,24
87:2,4,9,22 88:8
88:10,12 89:25
90:3,7,9,12,16
90:19 93:22
94:11
**customer's**
59:24
**customers** 32:1
32:22 34:21,25
35:4,6 36:7,23
37:13 40:7
41:15 42:1,20
44:10,18 47:25
48:4 50:17 51:3
53:21 54:6,11
60:8,12 67:2
73:3 80:10
81:20 89:9 91:8
91:9 92:4,23
93:13 96:24
97:2
**cut** 73:11
**cutting** 78:8

**d**

**d** 1:9 2:2 3:1
30:22
**daily** 46:16 47:3
89:3

**dakota** 1:1 2:10
5:6,7,17 10:9,18
19:4,25 20:13
21:9 31:3 36:6
38:17 39:2
40:12,15 41:3
69:20 82:2,14
83:8 91:3,10
95:13 96:1,19
98:14 99:1
100:9,11,15
**dakota's** 95:17
**date** 18:25,25
19:11 28:22,23
30:20 38:1
42:17 46:6
58:10 61:6,7
62:8,9,14 72:7,8
80:17,18,20,22
81:3,5,23 82:18
83:11 87:13,15
87:16 90:15
99:23
**dated** 81:5
103:20
**dates** 34:22
44:19 58:9
62:22
**dating** 24:2
**day** 32:24 33:5
34:19,19 46:18
46:22,24 63:23
84:13,14 85:21
86:12 87:8,20
88:23 89:24

90:5 102:8,10
103:20
**days** 45:23
46:16,25 64:20
68:5 72:10 82:3
82:21 84:17
85:21
**dba** 54:24
**deal** 19:3 47:13
47:16 48:22
**dealing** 92:14
**dealings** 96:24
**debit** 30:5,6
57:11
**debt** 18:22 23:2
23:6,10 69:19
69:22 100:10,14
**debtor** 1:6 2:8
**debts** 65:24
69:15 95:8
**december** 24:3
52:2,6 58:11
**deceptive** 97:11
**decided** 63:15
63:18
**decision** 82:5,10
83:5 84:20 85:8
**decisions** 35:4,7
35:11,11
**decreed** 96:11
**deemed** 57:6,8
**defendant** 1:13
2:8
**defendants**
96:14 97:8

98:15 99:2,10
**definitely** 25:7
66:19 78:18
**definition** 28:2
**degree** 11:22
**delay** 63:23
**deliver** 57:21
58:16
**delivering** 57:13
**demand** 21:20
**depend** 46:17
**dependent** 67:5
**depending**
46:15
**depends** 28:2
45:23
**deposed** 4:24
5:4
**deposit** 37:21,22
38:1,4,4,7,15,20
39:3 40:18 46:5
50:18 63:11,19
63:22 64:5
**deposited** 29:16
29:19 30:13
43:15,22,23
86:18
**deposition** 1:15
5:12 6:11 9:4,13
10:10,13 82:13
83:8 94:5,16
101:23 103:10
**deposits** 41:15
41:17,20,25
42:20 43:3,14

43:23,24 70:17
73:3
**described** 52:22
61:3
**desks** 20:2
**despite** 72:24
**detail** 76:7
**details** 35:19
46:6
**determine** 38:3
**determined**
87:8
**devoted** 15:16
**differed** 38:20
**difference** 56:5
**different** 39:3
**difficult** 48:25
**difficulties**
40:16 62:4
**dinners** 79:18
79:19
**diploma** 10:25
11:2
**dire** 68:14 69:5
73:1
**direct** 3:4 4:6
34:20 52:21
63:11,19,22
64:5 83:21
**directly** 14:9
15:17 29:24
**discharge** 23:6
95:8 100:13,16
**dischargeable**
98:21 99:14

**discharging**
23:7
**disclosure** 6:24
**discontinue**
82:18
**discount** 39:17
39:21 40:2,7
41:12
**discovery** 93:11
**discrepancy**
30:19
**discussed** 61:6
**discussing**
25:15
**discussion**
11:17 39:10
**discussions** 82:6
**dispute** 54:9
56:15 69:9
81:16,19
**disputes** 56:12
**disregarded**
25:11
**dissipation**
42:13
**distinction**
43:13
**district** 1:1
91:23 92:25
95:3 100:8
**document** 51:10
51:13,14 52:13
67:23 74:7
79:23 80:6,15
97:22

**[documents - excuse]**                                          Page 113

**documents**  9:15
  10:8,8,16,17
  94:6,17,20
**doing**  30:18
  31:9,14 62:19
  63:22 77:5
**dollars**  22:24
  27:14 65:21
**domestic**  26:13
  29:5
**doors**  87:23
**downtown**
  16:24,25 17:2
  17:11,19 18:7,9
**drawing**  27:2,22
  43:13
**drawn**  26:14
**drew**  26:1,3
**drive**  49:25 50:1
  50:2
**driving**  74:2
  75:12
**due**  64:11
**duly**  4:4 102:8
**duties**  34:13,15
  34:19

**e**

**e**  3:1,5 7:15
  23:25 45:7
**earlier**  9:17
  30:17 48:13
  65:22 71:11
  75:16 78:13
**early**  68:20

**earn**  26:17
**earns**  24:19
**ease**  74:21
**easier**  85:25
**edit**  36:19
**educational**
  10:23
**effort**  40:17
  94:14
**efforts**  92:7,21
**eidl**  66:11
**either**  12:4
  13:23 15:3
  56:16 57:9,12
  57:19 59:9,18
  66:17
**elgidely**  2:6 3:4
  4:7,12 11:18
  39:7 40:21 51:9
  52:16 60:22
  80:1,4,5 89:16
  92:19 95:1,23
  96:9 97:16,19
  100:5,21 101:21
**elicit**  6:23
**email**  9:5 46:4,7
  46:8,8,12,14,19
  46:24 47:3,6,6
  67:15 69:9,12
  73:1 84:7 93:11
**emails**  46:2 47:5
  91:19 93:10,14
  93:16,18,21
  94:1,2,19

**emotional**  48:25
**employed**  24:9
  48:18
**employee**  13:14
  13:16 15:12
  25:1 26:17
  35:17 48:9 84:6
  103:15,16
**employees**  18:1
  21:17 22:11
  35:1 37:2,15
  48:5 64:8,8
  78:14 82:6 83:3
  83:24 84:22
  85:3,7 86:13,22
  88:19,25 90:6
  91:17 92:12
**engaged**  32:16
  32:18 96:15
**engaging**  97:10
**enter**  37:14
  38:24 47:10,12
  48:10 87:4
**entered**  92:2
  95:3 99:23
  100:7 101:2
**entering**  36:23
  47:25 48:3
**entirety**  15:7
**entitled**  80:7
**entity**  25:11
**entrepreneur**
  62:13
**entry**  99:3

**equipment**
  20:22 68:8
**escrow**  42:5,8
  42:11,21 70:18
**especially**  67:20
  78:19
**esquire**  2:6,11
**establish**  17:24
**et**  46:7 68:10,11
**evening**  82:5
  83:6
**event**  32:24
  42:13 46:6
  56:20 69:19
**events**  19:9
  35:23 83:15
**everybody**  48:3
**exact**  50:24
**exactly**  10:14
  15:21 58:20
  59:6 60:1 83:4
**examination**  3:2
  4:6
**examined**  4:4
**example**  35:8
  41:8
**excepted**  100:13
  100:16
**exception**  98:1,3
  98:7
**exchange**  14:5
  39:16 40:2,7
  67:15
**excuse**  22:16
  51:19

[exhibit - fraud]                                                    Page 114

**exhibit**  3:7,8,9
  3:10,10,11 51:8
  51:11,13,23
  52:11,12,15,22
  54:11,19 79:25
  80:7,8 81:14
  85:17,18 86:3,5
  95:21,22,25
  100:3,4,7
**exhibits**  10:12
  10:15
**expanded**  31:23
**expanding**
  62:10
**expansion**  31:11
**expect**  59:24
**expense**  64:10
**expenses**  26:4,7
  26:12 27:1,11
  28:14 30:5,7,8
  43:8,25 44:5
  64:24 65:1,5,18
  73:7,12 78:9,20
**expensive**  74:21
  75:1 79:5,9
**experience**
  12:14 13:10
  27:6,9
**experienced**
  40:16
**experiencing**
  62:3 63:15
**expires**  102:15
**explain**  20:21
  30:19

**expressed**  60:24
**expressly**  98:19
  99:11
**extensively**
  94:18
**extent**  53:2

**f**

**f**  2:6
**face**  84:6,6
**facilitate**  51:4
**facing**  35:2
**fact**  44:4 88:19
**fail**  6:18
**failed**  61:10
  94:10
**failure**  67:18
  68:4
**fair**  56:11 67:4
**false**  97:11,12
**family**  24:14
  31:10,18 32:6,7
  66:6 101:12,14
  101:17
**far**  19:23 28:24
  42:3 64:10
**fargo**  2:10
**fast**  31:13 84:2
  88:6
**favor**  54:16 96:1
**february**  101:3
**federal**  66:12,15
  91:23
**feel**  66:17
**fictitious**  30:21

**fields**  12:12 13:6
**figure**  49:8
**figures**  22:3
**figuring**  49:1
**file**  18:16,19
  19:15 21:24
  22:5 25:12,18
**filed**  67:25 68:1
  80:13 91:22
  95:13,25
**files**  19:6 56:9
**filing**  19:1,2,10
  22:25 23:4
**fill**  37:16 73:7
**final**  82:5 88:20
**finances**  5:9
  28:17,18 34:17
**financial**  40:16
  62:3 70:22
  72:24 78:3
  79:10
**financially**
  103:18
**find**  78:22
**finish**  6:2
**first**  4:4 19:7
  22:16,17,17,19
  24:4 28:20
  30:24 53:7
  61:25 62:2
  65:21 67:16
  68:3 69:10,12
  69:21 70:3,6
  71:2 83:11

**five**  15:14,24
  60:15 94:23
**fixed**  36:1,1
  39:9
**flexibility**  36:3
**flipped**  10:21
**flooding**  91:19
**florida**  2:5 7:10
  102:14
**flow**  63:14
  69:23 71:3
**flowed**  82:21
**focus**  12:22 19:5
  87:18
**focused**  19:7
**following**  91:13
**follows**  4:5
  96:12
**foregoing**  103:9
**form**  6:14 40:18
  50:18
**formal**  33:22
**formed**  30:17
  30:20 31:2,6
**former**  81:20
  92:4,23
**forth**  93:3 99:13
**forward**  17:10
  62:12,20 69:5,5
**founder**  33:15
**fox**  2:3
**foxrothschild....**
  2:6
**fraud**  95:17
  96:17 97:10,11

freelance  49:13
freight  87:10
frequently  28:1
  28:3
friday  1:18
friend  23:19,20
  24:15
friends  66:6
  101:11,14,17
fulfill  68:10
full  6:4,5 39:16
  40:1,8,17 41:8
  41:12 73:13
  87:10
fully  29:13
funds  29:23
  41:22 42:13,16
  42:17 43:4,7,24
  63:6,20 71:17
  76:22,25 77:2,8
furniture  20:3
  20:23 22:13
further  69:21
  98:19 101:21
  103:14

**g**

gap  28:5 73:5,7
geez  55:4
general  5:6,8,17
  10:19 19:4,25
  20:14 21:9 36:6
  38:18 39:2
  40:12,15 41:21
  43:4 46:7 47:1,2
  54:22 65:7 82:2

82:14 83:8
85:14 91:10
98:16
general's  10:10
generally  43:14
  56:7 100:20
generate  41:7
generated  73:6
georgia  91:23
  92:25 95:3
getting  19:5
  77:11,13 79:8
gift  101:18
gina  1:24 102:6
  102:14 103:6,22
give  5:20 6:10
  28:12 35:8
  44:22 101:17
given  19:14 28:6
  28:8 39:15
  56:23
glasser  1:5,12
  1:16 2:8 3:3 4:3
  4:9,10,24 5:9
  7:4 8:9 9:3
  10:24 13:19,22
  14:10,14,21,23
  15:9 16:17,20
  18:13 19:15
  20:2,12,17 21:7
  21:21,24 22:6
  24:10,21 25:1,6
  25:8,18 26:1,4
  26:11,14 27:2
  27:23 30:4,16

30:19,22 31:1,6
31:25 32:22
33:14 35:5,16
35:23 37:13
39:16,25 40:15
41:3,6 42:1,20
43:3 44:6,9,18
47:11 48:14
49:5,6,8 50:18
50:22 51:4,12
52:2 53:10,21
54:7,11,15
55:19 58:6,14
58:15 59:17,19
59:22 60:3,13
60:18,23 61:8,9
61:10 62:1,3,16
63:12,15 67:4
67:23 68:3,4,15
68:25 69:13
70:4,21 71:12
71:22,25 72:11
73:2,6 74:14
80:6,10 81:6,21
81:23 82:18
83:9,24 85:22
86:9,19 87:11
88:12,20 89:7
89:24 90:7,10
90:13,16,20
91:14,22 92:5
92:23 95:2,4,18
95:24 96:2,10
96:14,14,22,23
97:3,5,9,9,25

98:15,16,19,19
99:2,3 100:6
101:10,11 102:7
103:10
gle  74:10
go  5:14 11:15
  17:4 20:11
  31:21 40:9 46:1
  46:4 47:12,17
  48:6,9,11,23
  52:10 54:19
  60:17 65:15
  81:11 83:7,20
  86:1 89:10
  94:24 101:14
goes  32:10
  57:24 98:12
going  5:17,19
  9:3 15:11 19:3,7
  20:10 27:16,18
  35:18 37:14,16
  38:12 40:25
  49:2,4 51:10
  52:10 60:16
  64:13 65:13
  69:23 78:22
  79:23 82:8 83:4
  84:10,15 85:5,6
  85:17 86:13,21
  87:24,25 88:7
  94:22 95:21
  97:14,20
gonna  84:9
good  4:10 11:15
  70:7

[gotten - images]                                                 Page 116

**gotten**  74:24,25
**government**
  66:12,15,25
**governmental**
  49:23
**graduated**  11:5
**graduation**
  31:10,15 32:3
**great**  25:25
  26:23 55:9
**grew**  15:14
**ground**  5:13
**grow**  15:15
**growing**  16:10
  62:10,12,19,20
  67:7
**guarantee**  23:8
**guaranteed**
  54:14
**guarantor**
  55:25
**guaranty**  54:22
  54:23 55:1,2,11
  55:12,22
**guess**  15:20
  16:12 17:6,7
  21:6,14 27:3
  28:2 50:25
  55:23 85:20
  96:6
**guys**  29:12

**h**

**h**  3:5 23:25
**hair**  76:11 77:21

**haircuts**  76:10
  77:21
**half**  39:5,14
  47:8 48:24 49:6
  60:17 73:13
  78:13
**hall**  34:6 45:10
**handle**  48:22
**handled**  28:17
  34:5 35:1
**happen**  58:25
  82:8 83:4 84:3
  84:10,15 85:6
  88:7
**happened**  21:15
  64:11 84:2 88:5
  89:1
**happens**  57:15
  57:16,23
**happy**  6:8 9:9
  81:7
**hardship**  79:10
**hastings**  101:2
**head**  5:22
**heavily**  67:5
**hectic**  83:19
**height**  68:16
**held**  42:10
  60:21 94:25
**hell**  91:20
**hellman**  24:13
**help**  15:13 20:8
  28:4 69:23
  92:12 101:15

**helped**  50:10
**hey**  84:8 87:22
**hh**  102:15
**high**  10:25 11:2
  11:3,6 12:4,20
  24:11 66:1 74:2
  89:3,5
**higher**  28:12
**hired**  13:15,18
  15:12
**historically**
  45:19
**hold**  4:22 33:25
  35:22 64:19
  66:23
**holder**  72:2
**home**  7:6,7,20
  7:21 16:22
  17:25 68:20
  84:5
**honda**  50:3
**honor**  71:16
**hook**  91:19
**hopeful**  84:11
**hopes**  62:13
**hoping**  85:25
**hour**  60:16
**hours**  84:17
**household's**
  28:18
**huge**  48:22 62:5
**husband**  50:10
**hypothetical**
  65:14,16 75:15
  75:16

**hyundai**  74:25
  79:5

**i**

**idea**  40:6
**identification**
  4:17
**identify**  93:20
  93:25
**identity**  4:18
**images**  5:9
  13:19,22 14:10
  14:14,21,23
  15:9 16:17,20
  19:15 20:2,17
  21:7,21,24 22:6
  24:10,21 25:1,6
  25:8,18 26:1,4
  26:14 27:2,23
  30:4,16,19,22
  31:1,6,25 32:22
  33:14 35:5,16
  35:23 37:13
  39:16,25 40:15
  41:6 42:1,20
  43:3 44:6,9,18
  47:11 48:14
  49:5,6 50:18,22
  51:4 53:10,21
  54:7,11,15
  55:19 58:6,14
  58:15 59:17,19
  59:22 60:3,13
  61:8,9,10 62:1,3
  62:16 63:12,15
  67:4 68:4,15

**[images - knew]**                                                    Page 117

69:13 70:4,21
71:12,22,25
72:11 73:2,6
74:14 80:10
81:6,21,23
82:18 83:9,24
85:22 86:9,19
87:11 88:12,20
89:7,24 90:7,10
90:13,16,20
91:14,22 92:5
92:23 95:4,18
96:2,14,23 97:3
97:5,9 98:15,19
99:2 101:10,11
**immediately**
43:4,16,25
45:22
**impairment**
49:11
**impala** 74:20
**implement**
63:11 70:17
**important** 6:9
32:3,7 35:4,7
**inbox** 46:7
**inboxes** 91:19
**incentive** 48:10
**include** 16:16
20:22
**included** 34:20
73:9 91:3,10
**including** 19:4,5
23:10 53:16
78:12

**income** 24:19
26:13,17,19,19
27:17,22 29:16
29:19 41:7
**independent**
99:6
**indirectly** 14:9
**individually**
53:25
**individuals** 44:8
44:15 91:2,7
**information**
37:25 38:14
51:21 93:4
**infuse** 73:24
**initially** 15:12
**initiate** 61:12
**initiated** 61:15
**injunction** 92:2
92:10,24 93:8
**inquired** 83:23
**inquires** 20:17
41:6 82:18
**inside** 17:25
**instance** 58:21
**instances** 6:25
60:9 63:2,3
**instruct** 7:1
**intend** 88:6
**intended** 5:13
6:15
**intent** 96:15
97:1
**interest** 66:1
89:3,5

**interested**
103:19
**interface** 34:20
**internal** 34:7
46:8
**international**
22:16
**intricacies** 59:4
**inventory** 21:13
**involuntarily**
71:22
**involved** 34:24
47:22 87:5
**irs** 67:8
**iso** 53:3,5,6,6,14
53:14,23
**issue** 69:17
**issued** 92:24
**issues** 63:14
**issuing** 64:4
**items** 21:16 63:4
64:3 71:11

**j**

**j** 45:7
**jace** 8:8 10:1
23:13 44:11
50:3,14 74:8
**jace's** 50:9
**jack** 1:5,12,16
2:8 3:3 4:3,9
96:14 97:9
98:16,19 99:3
102:7 103:10
**january** 7:22,23
44:16,20 99:19

99:24
**joan** 8:9
**job** 33:13
**jobs** 24:12,16
**joint** 28:21,25
29:11,16,20
**jointly** 98:17
**jones** 45:7
**judge** 101:2
**judgment** 3:11
95:4 96:1,10,23
98:17 99:4,12
99:18,23 100:7
100:10 101:6,15
101:19
**judgments** 95:7
**judicial** 97:21
**june** 71:13
**junior** 24:11
**justin** 7:14

**k**

**keep** 62:20
70:24
**keeping** 78:21
**kia** 74:25
**kind** 10:21
15:20 36:17
71:17 82:21
84:18
**kits** 76:3,4
77:17,18
**knew** 58:13,25
59:11,16 61:9
86:21 94:8

**[know - made]** Page 118

**know** 5:16 7:17
9:9,14 14:5 15:4
16:5,10,10 17:1
17:22,25 19:20
19:21 20:2 21:4
21:5,13 22:5,14
25:14,15 29:9
30:2,24,24
32:20 33:16,23
34:16 35:1,17
36:11 37:7
38:11,24 39:18
40:1 41:11 42:5
44:21 45:12,16
46:21 47:13
49:1,13 50:24
56:5 58:20 59:4
59:5,13,14 60:7
61:21 62:9,10
62:11,13,19
66:19,20 70:5
72:8 74:21
76:16,17,19,20
78:20 82:21
84:8,10,16,19
84:20 85:4,19
86:25 87:24
88:4,10,11
89:13,13 91:6
91:18 93:2,18
93:18 94:19
96:21 97:21
101:18
**knowledge** 29:4
29:15 42:25

47:11 57:17

**l**

**l** 23:25 45:3
**landlord** 18:9
18:10
**language** 55:22
**larger** 16:25
**largest** 64:10
**law** 95:18 96:17
97:10
**lawn** 24:15
**lawsuit** 91:21
**lead** 32:23 33:1
**leading** 34:17
**lease** 7:25 8:3,4
8:7,11 17:4 74:7
74:9,10,13,18
78:24 79:1,2,3,4
79:8,11
**leased** 50:6 74:3
74:4
**leases** 68:8
**left** 17:21 19:22
85:23 97:15,16
97:17 98:2
**legal** 41:24
**lessees** 8:6
**lessen** 78:20
**lesser** 74:21
**letter** 71:24
**letters** 55:14
**liabilities** 66:9
**liability** 23:8
33:20,22 67:10

**liable** 53:3,7
58:18 61:1
**licenses** 18:12
**life** 32:4 48:24
**lifestyle** 27:22
78:4,14,16
**likely** 89:4
**limaye** 73:18
**limited** 33:20,22
57:1
**line** 20:18 41:4
41:5 86:6
**lines** 20:16,21
21:2 41:9 82:17
83:22
**list** 3:9 21:13
80:7,8 91:1,7
**listed** 8:6 91:2,7
**live** 26:17,19
27:15 77:14
78:16
**lived** 7:21 78:17
**living** 27:10
**llc** 30:20
**llp** 2:3
**loan** 22:21,22
66:14 73:19,23
89:5
**loans** 26:8 28:7
28:13 29:22,23
30:8 66:1,6,12
66:25 67:5 70:6
73:7,10,14 89:3
101:12

**located** 7:5 8:25
16:20
**location** 17:2,24
18:2,3,6,7
**logistic** 92:16
**logistical** 91:13
**logistics** 77:5
**long** 7:21 9:10
10:3 11:19 12:8
13:7 49:4 68:11
**look** 17:4,10
40:10 46:13,19
57:10 85:17
86:3,12 89:17
**looked** 46:12
73:7,8,11
**looking** 21:12
24:24 30:2
46:23 50:15
79:22 88:16
**loose** 91:20
**lot** 15:21 89:2
**lots** 48:22
**lower** 75:5
**lyson** 2:9

**m**

**m** 45:3
**machine** 5:22
**madam** 80:1
**made** 35:11
36:19 40:16,17
41:15 58:5 67:1
74:13 78:18
82:4,10 84:20
85:8 86:15

**[made - money]** Page 119

87:13,15 88:5
88:24,25
**main** 2:9 43:13
**make** 5:13 6:13
35:3 40:25 46:6
68:5,9 69:18
71:15 76:15
82:7 84:9 85:6
86:14,22 87:9
87:21,24 90:6
92:7,22 94:15
**makes** 57:18
**making** 24:21
27:14 50:13
83:3 94:9
**manage** 92:12
**managed** 34:2,3
**management**
36:18 71:15,18
72:1
**manager** 33:21
**manually** 86:2
**march** 30:17,22
31:3 68:2,15,21
69:10 70:16
72:25 95:3
102:15
**mark** 51:10
95:21 96:6
100:3
**marked** 10:13
51:8,13 52:15
79:25 95:22
100:4

**markedly** 78:14
**marketing**
34:17 37:7
**marking** 79:23
80:8
**married** 32:14
32:19
**mary** 11:14,20
11:23 12:1,5,7
13:8
**mary's** 11:3
**material** 100:23
100:24
**materials** 38:19
**matter** 9:6
**mclauryn** 44:11
45:2,3
**meal** 76:2 77:17
**meals** 75:24
76:4 77:2,9,9
**mean** 10:14
13:14 15:19
16:9 19:19 20:5
26:16 28:3
32:25 33:10
34:15,18 35:7
35:10 37:5,19
38:8 40:19
44:11 45:22
46:15 47:1,12
48:1 59:4 62:5
62:18 64:9
73:11 78:18
84:2 85:24
87:14 91:20

98:9
**meaning** 24:19
25:12 62:16
**means** 28:23
60:10 78:8
**meant** 38:8
**meet** 9:16,20,22
10:3 23:16,18
**meeting** 5:7
9:25
**member** 53:3,5
53:6,7,14,15,23
**members** 73:15
**memory** 10:11
10:22 83:14
**men's** 24:13
**mental** 49:11
**mentioned** 10:7
11:11 44:24
45:2,5 78:13
79:19
**mercedes** 74:2,3
74:4,10 75:2,7
78:24 79:11
**merchant** 3:7,8
52:20,23 53:4
53:10,14 54:12
54:15 55:17,18
55:25 56:3,23
57:4,11,19
58:10,22 59:6
61:7 66:4 89:2,9
**merchant's**
57:10,16,22

**messiahic** 1:9
2:2
**met** 5:5 9:14
10:1
**method** 51:5
**miami** 2:5
**middle** 74:20,24
**million** 22:24,24
65:21 70:5,8,11
**mind** 40:10
**minor** 43:13
**minute** 60:15
94:23
**minutes** 10:5
**miscellaneous**
20:23 24:12
**mischaracteri...**
89:12
**mischaracteri...**
92:18
**misrepresenta...**
97:12
**missing** 55:14
**moment** 50:16
**monetary** 99:4
**money** 30:12,13
57:12,15,21
58:6,16,17,22
59:1,7,18,24
60:3,4 61:11
63:24 64:21
65:6,8,9 67:1
72:23 81:20
86:18,23 87:22
87:23,25 88:23

[money - occasionally]                                                    Page 120

88:24 89:1,8
101:11,18
**monies** 42:10
**month** 8:3,3
32:24 74:11
75:6 76:8 79:11
83:9
**monthly** 8:10,16
8:19 38:25
50:12 74:21
75:5
**months** 24:14
33:3,7 69:2
72:12,13 88:3
**monumental**
32:1,11
**morning** 4:10
4:11,18 7:5
**mother** 8:8,18
**move** 16:24
68:25 69:4,5
**moved** 17:16,17
17:18
**moving** 17:10
62:12,20
**mowed** 24:14
**mutual** 23:19

**n**

**n** 3:1 7:15 45:3
45:7
**name** 4:8,12
23:21,22 30:21
30:22 31:1
37:25 45:6

**national** 65:15
**nature** 31:5
**nearly** 87:10
**necessarily** 65:9
87:14
**necessary** 42:24
65:10
**need** 9:8 34:25
68:6 69:3 70:8
**needed** 92:13
101:11
**negotiate** 64:20
**negotiated** 38:5
**negotiation**
39:11
**neither** 59:9,22
60:4
**never** 13:16
21:17 48:6
61:18
**nevertheless**
31:2 72:17 74:1
79:10
**new** 78:25 79:3
**newspaper**
12:21
**nice** 32:7 75:10
**nod** 5:22
**non** 98:21 99:14
**nonrefundable**
41:17 42:19
43:2,14,22,23
50:17 73:3
**nope** 13:9 17:18

**normal** 26:16
27:9
**normally** 4:20
**north** 1:1 2:10
5:6,7,17 10:9,18
19:4,25 20:13
21:9 31:3 36:6
38:17 39:2
40:12,15 41:3
69:20 82:2,14
83:8 91:3,10
95:13,17 96:1
96:19 98:14
99:1 100:9,11
100:15
**notary** 102:14
**notes** 30:16
50:15 79:22
103:13
**notice** 97:21
**notification**
72:5
**notified** 46:10
62:23 88:25
90:6
**notifying** 46:8
**november** 23:17
71:7 83:12,16
91:23 92:2
**nsf** 71:11
**number** 24:23
44:21,22 50:25
64:7 81:17
85:20 96:13
98:13

**numbers** 66:21
67:14
**numerous** 67:2

**o**

**o** 7:15 45:7
**o'brien** 2:9
**o'keeffe** 2:9,11
7:1 9:18,20 10:2
10:4 89:12
92:18 97:14,18
**oath** 5:18 49:17
102:2
**object** 97:14
**objections** 6:14
6:15,16
**objective** 22:25
**objectives** 23:7
**obligated** 53:5
**obligations**
54:15
**obtain** 73:23
**obtained** 29:22
42:20
**obviously** 33:4
48:25 88:6
91:20 97:21
**occasion** 26:6
27:25 28:3 32:4
32:11 37:5,9
45:11,17 63:1
64:16,18 76:12
101:13
**occasionally**
50:20

**occasions** 32:1
64:9,11,17
**occur** 42:14
**occurred** 82:3
83:15
**occurs** 56:22
**october** 18:24
44:16,20 48:18
49:19 58:12,23
61:8 81:12,25
82:6,10,20
83:15 84:4
85:18 86:12
87:20 88:17
89:8,18,21 90:2
90:5,9,12,15,19
**offer** 39:18
**offered** 40:7
41:11
**office** 16:22,25
17:23 18:1 20:2
20:23
**offices** 16:20
**official** 83:5
**officially** 33:16
**oh** 10:5 50:24
55:4
**okay** 4:16 6:2,5
6:6,11,12,21 7:4
7:17 8:24 9:10
9:11 10:23 13:1
13:5,21,25
14:12,16,19
15:8,16 16:3,15
18:12 19:24

20:9,12,16 21:7
21:15,20 22:12
24:17 25:8 26:7
26:24 27:5,14
27:21 28:6
29:19 30:11
31:2,5,13,19
32:6,14 33:13
34:13 35:15,22
36:10,13,22
37:2,12,21 38:3
38:16 39:8,14
39:20,23 40:6
40:11,22 41:2
41:15 42:12
43:2,12,22 44:4
44:24 45:8,19
45:24 46:10
47:10,17 48:2
49:3 50:6,12
51:2,10,16
52:10,17 53:13
54:3 55:6,16,21
56:4,15,20 57:1
57:4,15 58:3
59:2,21 60:18
60:20 61:5,15
61:18,21 62:15
63:3,18 64:2,7
64:15,18 65:4
66:22,23 67:15
67:22,25 69:9
69:12 70:2,20
72:17,24 73:9
73:15 74:9

75:20 76:6,21
77:1,11,17,25
78:7,11 79:4,23
80:4,23 81:1,4
81:11 82:1,9,12
83:7,14,20 85:9
85:13 86:21
87:8,19 88:11
88:16 89:6,17
91:21 92:7 93:6
93:10 94:4,8,14
95:7,11 96:5,21
97:7,20 98:5,12
99:21 100:22
101:1,5
**okeeffeattorn...**
2:11
**old** 79:2
**once** 5:2 76:7
**online** 46:4
47:12,18 86:25
**open** 28:20
**operate** 71:4
**operating** 41:21
42:2 43:3,15,24
44:1,6 74:14
101:10
**operation** 25:19
43:5 82:19
95:18
**operational**
91:13 92:16
**operations** 5:9
43:11,16,19
65:7 67:6 70:24

83:25 96:23
**opposed** 17:14
26:18 46:24
55:21 64:5 75:6
77:19,23 79:8
**optimistic** 78:21
**option** 39:16
**options** 39:4,12
**ordeal** 48:22
**order** 5:20
47:14,18 73:23
87:3
**ordered** 96:11
**orders** 68:20
**original** 80:22
**outliers** 33:4
**outside** 14:20
**overall** 78:19
**overdrafts**
62:24 72:18,21
**overdrawn**
71:14
**oversaw** 35:10
**overseeing**
34:16
**owe** 100:14
**owed** 23:10
65:20 99:6
100:10
**own** 18:3,7
25:12 47:6
76:22
**owned** 20:1 50:6
50:7

**owner** 7:11
33:16

**p**

**p.m.** 1:18 94:25
101:25
**pace** 69:14
**package** 35:17
38:13 40:8
85:15 87:10
**page** 3:2,6 20:16
40:22 41:4
51:25 52:1,1,5,8
52:10 81:11
82:17 83:7,11
83:20 85:10
86:3,5,5,6,12
88:16 89:18,21
89:24 90:10,12
90:19 98:14
**pages** 80:15
103:10
**paid** 14:16
26:12,25 39:4,4
39:6 48:14 51:3
53:3 56:16,17
57:12,20,23
59:16,21 60:3
60:11 61:9
76:10 80:9
81:13,17,20
88:20 90:7,9,13
90:16,20 91:9
99:22
**painful** 41:1

**painless** 5:14
**pandemic** 39:24
62:5 68:16,18
68:20 69:16
78:19 79:15,20
**paper** 63:16,19
63:22 64:5
**paperwork** 16:1
16:16
**paragraph** 68:2
85:5 96:13 97:8
97:23 98:6,13
98:23,25 99:10
99:13
**pardon** 18:18
**parents** 16:22
**park** 7:10 65:15
**part** 57:25
97:15 98:1
**particular**
19:10 76:17
86:25
**parties** 13:22
14:14 55:2,12
103:16,17
**partner** 26:13
**partners** 29:6
**party** 55:2 67:9
**pay** 27:10,17
30:5 38:21,22
39:16 40:1,8
41:12 46:5
50:17 58:8,18
59:11 63:7
64:22 68:8

69:15 75:5
76:13,23 77:2
77:18,22 86:24
88:15 101:6,15
**payable** 8:10
**paycheck** 88:20
**paying** 75:7
87:10
**payjunction** 1:9
2:2 4:13 23:11
51:6,18 54:5,16
54:25 68:1 80:9
91:8 92:3 93:7
93:21 94:10
**payjunction's**
58:4
**payment** 38:25
39:5 40:17
50:18 51:4 75:5
76:19 86:15
87:2,14,16,17
87:18,19 88:5
**payments** 41:8
50:12,20,23
67:1 69:19
74:10,13 76:15
76:16 89:3,5
**paypal** 70:9
**payroll** 63:12,21
64:4,10 65:11
66:8 67:9 68:9
82:7 83:3 84:10
85:4,6 86:14,22
87:9,21,24
88:24,25 90:6

**pays** 53:6
**penalties** 98:18
100:15
**penalty** 98:20
**pending** 9:10
68:24
**penny** 100:1
101:8
**people** 9:1 27:10
39:4,4,5,5 44:17
68:9 77:14 84:4
**percent** 15:19
15:23 16:12,13
51:1 91:2,8
**percentage** 16:4
34:19 39:21
40:6 50:21,24
**perception**
29:12
**perform** 14:19
**performed** 99:6
100:12
**period** 14:12
16:7,19 56:23
57:1 67:5,16
74:1,16 75:9
79:9 81:12 82:3
89:7
**periods** 46:18
**person** 9:5,20
84:7,12
**personal** 20:1
23:8 26:4,12
27:1,10 28:14
28:17,18 30:5,7

[personal - protected]                                          Page 123

30:8,14 43:8,25
44:5 64:24 65:1
65:5 76:4,22,25
77:1,7 78:3
**personally**
13:21 14:7 15:5
16:13 19:16
54:14 67:9 84:4
84:5 87:1 89:11
100:9
**personnel** 62:25
**phone** 9:23 84:7
91:18
**photo** 4:16
45:16
**photographer**
12:15 13:12
14:2
**photographers**
15:8,13 16:11
**photography**
12:3,6,12 13:6
13:13,15,23
14:5,13,19,24
15:17 31:7,8,11
31:12,20,23,25
32:10,21,23
33:2 35:24
49:14
**photos** 19:5
37:7,8
**phrase** 78:7
**physical** 17:24
49:10

**physically** 7:5
38:10
**pictures** 12:20
16:5,13
**pirogue** 75:24
77:2
**plaintiff** 1:10
2:2
**plan** 39:5
**plans** 32:18
**please** 4:8,22
6:2,8 9:9 23:24
50:16
**plus** 26:19
**pocket** 58:8
60:11 90:23
**point** 31:9 57:5
73:12,18,22
**populate** 37:25
38:10,13
**portion** 97:22
98:5,8,9 99:22
101:5
**portraits** 31:10
31:10,15,18
32:6,7 44:13
45:10
**positive** 62:17
84:11
**possible** 5:14
68:7
**possibly** 10:14
59:5
**ppp** 66:14

**practice** 41:25
**practices** 96:16
97:11
**preliminary**
92:1,9,24 93:7
**prepare** 9:12
94:5
**prepared** 25:22
36:10 94:15
**present** 4:17 9:1
9:24
**presented** 33:15
63:7
**preserve** 6:16
**preserving**
42:16
**president** 33:16
**pressure** 62:6
**pretense** 97:11
**pretty** 25:3
38:15 68:14
75:10
**prevents** 49:11
**previous** 94:21
**pricing** 35:9,10
35:12 36:1,4
**primarily** 28:17
29:10 31:9,14
35:11
**prior** 17:2 30:22
69:19
**privilege** 6:25
**probably** 10:6
12:9 49:6 77:20
77:24

**proceed** 54:10
**proceeding** 1:8
**proceedings**
1:19 6:16
101:25
**process** 5:14
38:12 45:24
47:22
**processing** 3:8
57:9 58:4
**produced** 10:18
93:10,15,16,18
**product** 56:17
57:13,21 58:16
59:10 76:11
77:22
**professional**
13:12 103:7
**professionally**
12:16 13:1
**profit** 14:4
**program** 69:14
69:20
**programs** 49:23
**promise** 97:12
**promised** 58:17
**promoting** 40:1
**promotions**
39:25 40:3,4
**property** 20:1
21:21
**proprietor**
30:25
**protected** 6:24

**protecting** 42:12,17

**provide** 6:18 13:21 14:13 61:10 88:1

**provided** 31:25 35:24 36:18 59:10 73:19 83:1 88:8

**providing** 13:13 14:24 15:17 17:23 38:25

**provision** 33:1

**public** 49:21 102:14

**pull** 20:7 40:22 84:13 85:17

**purposes** 25:11

**pursuant** 54:11 98:14 99:1

**put** 20:12 38:2,9 41:20 42:10,21 52:12 62:5 67:22 80:6 82:13 95:24 96:21 100:6

**putting** 41:25 43:2 51:12 70:18

**q**

**qualification** 96:22

**qualify** 69:14

**quattro** 75:12

**question** 6:3,4,7 6:18,23 7:2 9:10 21:1 26:15,20 43:12 59:25 68:24 78:5 79:7 92:16,20,21

**questions** 4:20 5:18 6:9,11,14 6:22 94:21 97:18 101:21

**quickly** 68:23

**r**

**r** 45:3

**rachel** 44:11 45:5

**rachel's** 45:6

**raise** 28:8

**ran** 86:1

**range** 39:20

**rare** 37:9

**rarely** 46:20

**rather** 28:12

**read** 41:13 53:7 53:17 54:1 59:2 68:12 69:7,25 70:13 71:5 82:23 85:9,10 85:12 96:18 97:13,23,23 98:5,6,9,23 99:8 99:16 100:18

**reading** 85:9 101:23

**reality** 84:15

**realize** 61:25

**really** 10:20 19:19 22:1,4 29:9 75:16 82:22

**realtime** 103:7

**reason** 17:21 21:23 26:11 63:18 81:16,19

**recall** 10:14 12:9,23 15:11 16:23 17:3 19:12,20,23,24 20:5 22:5,23 24:23 25:5,14 28:22,23 30:1 30:25 39:1,20 39:22 40:2,9,10 40:11,14,18,20 44:22 45:11,18 61:17 62:21 66:16,21 67:15 67:19 71:12 72:4,7,9,10,14 72:20 74:6 76:24 77:4 80:12 82:1,9,11 91:5,6,11,14 92:11 93:1,4,9 93:14,16,19,24 94:2,3,19 95:2 95:11

**receipt** 53:4 66:24 92:9

**receive** 11:22 13:5 41:24 46:8 59:18,18 60:12 60:13

**received** 26:1 59:22,23 60:4 66:11,14 72:4 88:12 93:7

**receiving** 25:5 49:21 92:24

**recess** 60:21 94:25

**recognize** 51:14 51:16 52:17,19

**recollection** 20:8 82:12

**recommended** 76:18

**reconciled** 60:5 60:9

**record** 4:8 5:19 5:23 11:15,17 103:13

**recorded** 26:8

**recording** 15:4 30:7

**records** 15:12 18:23 26:8 30:9

**recover** 22:10

**recovery** 69:14

**reduce** 65:1

**refer** 91:12

**references** 55:22

**referred**  85:4
**referring**  9:18
  15:1 41:3 74:5
  91:16 94:20
  97:2,3,4
**refers**  54:22
  55:11,11
**reflect**  5:24 52:2
  52:6
**reflected**  25:13
**reflecting**  93:11
  93:22
**refresh**  10:10,21
  20:8 82:12
**refund**  56:16
  57:19 58:15
  59:10,23 61:11
  67:1 88:11,14
**refunding**  57:12
**refunds**  60:12
**refuse**  6:17
**regard**  35:23
  60:25 93:17
**regardless**
  69:22
**registered**  103:6
**regulation**
  42:23
**reimburse**  53:5
  53:14 59:9 61:1
**relates**  96:19,23
**relation**  92:4
  94:11 95:18
**relationship**
  23:13 24:19

**relative**  103:15
  103:16
**relgidely**  2:6
**rely**  96:15 97:2
**remedies**  53:16
**remember**
  28:25 45:5
  94:11
**remote**  1:19
**remotely**  102:8
**remuneration**
  14:5,21
**render**  26:18
**rendition**  33:7
  33:10
**renewed**  78:25
**rent**  8:10,15,18
  18:3,7 68:8
  75:17
**rented**  18:5,8
**renting**  7:12,13
**repay**  23:2
**repeat**  44:19
  59:25
**repeatedly**
  62:25
**rephrase**  6:8
  26:21,22 57:18
**replied**  20:18
**reply**  21:2 57:4
**report**  103:9
**reported**  1:24
**reporter**  4:18
  5:19 6:4 80:2,3
  96:8 103:2,7,8

**represent**  63:21
  81:4,7
**representatives**
  93:21
**reputation**
  101:19
**request**  37:6
  70:3,4
**requested**
  103:12
**required**  6:22
**requirement**
  42:4
**requirements**
  42:24 78:4
**requires**  69:20
**requiring**  92:3
**reserve**  70:20
**reserves**  70:22
**resided**  24:6
**residence**  7:11
**residing**  24:4
**respond**  6:3
  57:2 82:20
  94:15
**responded**  41:9
  84:1
**response**  6:5,24
  21:1 100:23
**responses**  5:19
  5:21,24
**responsibilities**
  45:15
**responsible**
  67:9

**responsive**  6:10
**rest**  22:10
**restaurants**
  79:19
**restitution**  99:5
  99:11 100:12
**restructured**
  73:12
**resulting**  90:22
**retrievals**  56:6
**return**  21:20
  25:12,13
**returned**  21:17
**returns**  25:18
  25:23
**revenue**  25:13
  73:6
**review**  10:8,12
  10:17 36:20
  67:13 94:18
  103:11
**reviewed**  9:15
  10:7,16 36:12
  38:17 94:6,17
**reviewing**  47:2
  89:14 94:19
**right**  27:13 28:8
  28:11 30:4,5
  37:18 40:24
  47:19 48:15
  49:4 54:10 55:5
  55:9,18 61:2,12
  68:19,20 74:23
  75:13 76:15
  77:12 78:9 79:7

Case 23-07006   Doc 33-1   Filed 04/30/24   Entered 04/30/24 17:50:30   Desc Exhibit
1: Deposition Transcript of Jack A. Glasser   Page 51 of 60

[right - share]                                                                    Page 126

81:11 85:23
87:5 88:9 94:22
97:4 98:9
**rights** 53:15,17
**ringing** 91:18
**road** 7:10 74:20
74:24
**robert** 2:6 4:12
**rodriguez** 1:24
96:7 102:6,14
103:6,22
**role** 33:25
**room** 8:25
**rothschild** 2:3
**roy** 23:21,22
**roy's** 23:22
**rpr** 1:24 102:14
103:22
**rules** 5:13
**run** 71:4 85:18
**running** 12:23
15:21,24 34:15

**s**

**s** 3:5 23:25 25:9
25:10 45:7
**s5** 75:12
**safeguards**
70:17
**salary** 24:25
25:25 26:3 27:1
27:11 28:9,13
48:14 76:13,14
76:23 77:11,13
77:14,18,22

**sales** 34:17
**saw** 68:22
**saying** 17:13
19:17 32:11
38:8 43:13 68:4
69:16 89:8
**says** 51:25 53:13
53:23 54:20
55:10,17 68:2
97:8 99:10
**sba** 68:11
**schacher** 8:8,22
11:7 23:14 24:1
24:17 26:14
28:8,16,20 29:1
29:4 32:14
39:23 43:8 44:1
44:4,24 48:17
61:21 64:19,25
65:13 73:22
75:10,18,23
77:25 78:11
82:13 89:10
91:4 95:14 96:2
**schacher's**
29:16 38:18
73:19
**schedule** 46:15
46:21
**school** 10:25
11:2,3,6,15 12:5
12:20 24:12
**screen** 20:10,14
41:2 51:12
52:12 55:3 56:4

67:22,23 80:6
82:15 95:24
96:3 100:6
**scroll** 51:19,22
81:7
**search** 85:18
86:1
**second** 11:16
18:15 20:9
25:17 40:23
51:2,11,25 52:1
55:6 66:22
**section** 52:22,24
53:2,17 54:20
55:10,16,21
56:2 98:15,21
99:2,14 100:17
**sections** 100:13
**see** 20:14 22:1
51:20,22 52:13
52:24 54:20,21
54:22 55:1,7,10
55:15,16,23
67:23 80:18
81:12,14 82:15
83:11 85:2,19
86:4,6 89:18
96:3
**seeing** 21:13
**selected** 18:25
**self** 12:13 13:9
**semester** 12:8
13:7
**sending** 69:9

**senior** 31:10,14
32:3
**sent** 71:24
**sentence** 53:8
53:13,23
**separate** 29:5
**september** 70:2
70:16 71:1
81:13
**served** 65:1
91:21 92:1
**service** 56:18
57:13,21 59:10
88:1,8
**services** 13:13
13:22 14:14,20
14:25 15:18
17:23 26:18
33:2,8,10 35:24
58:5,10,16
59:17,19,22,23
60:3,4,13 61:7
61:11
**sessions** 31:24
31:25
**set** 70:20 99:12
**seven** 17:9,12
17:13
**several** 21:16,18
22:9 28:4 62:24
63:23 64:20
**severally** 98:17
**share** 20:10
41:2 50:3 67:22

**shared**  55:3
**sheet**  35:12
**sheq**  36:17
**shooting**  12:16
  14:7 15:2 16:5
  16:10
**shoots**  44:13
  45:12,16
**short**  66:1 89:2
**shortly**  21:8
  95:11
**shot**  13:1
**shoulders**  5:23
**show**  85:22
**shrug**  5:22
**shutting**  87:23
**side**  12:23
**sierra**  34:6
  45:10
**sign**  44:9,17
  45:13 46:5 87:6
**signature**  52:2,6
  55:12,17,24,25
  56:3 102:13
  103:21
**signatures**
  54:21 55:10
**signed**  45:20,25
  47:15 55:18,23
  59:3 61:7 86:14
  99:18 102:10
**signers**  34:8
**significant**
  18:22 23:15
  66:8

**signing**  44:13
  101:23
**similar**  39:19
**single**  84:5
**sink**  84:16
**sir**  11:9 14:3
  42:6 43:12
  49:17 51:23
  52:5,13 54:3
  55:13 56:5,22
  58:3 65:12
  76:14 79:7 81:4
  85:2,18 87:3,18
  88:19 91:1
  92:15 94:5
  97:23 100:23
  101:6
**sitting**  54:4
  93:20 94:1
**situation**  18:4
  23:5 30:12
  63:20 68:14
  73:2
**six**  15:14 22:3
  33:3,6 44:22,25
  45:8
**skipped**  100:19
  100:22
**slightly**  65:8
**smoothie**  76:2,4
  77:17
**snowball**  84:19
**software**  36:18
**sole**  30:25

**soliciting**  41:8
**solidify**  84:19
**solution**  73:8,9
**somebody**  47:14
  47:21 59:8,11
  87:4,5
**someone's**  32:4
**soon**  45:19 68:6
**sorry**  6:23 27:7
  31:13 40:24
  48:7 52:11 55:4
  55:9 78:2,25
  86:5 98:3
**sort**  32:25 37:16
  63:2,4 74:19
**sorts**  21:6 22:14
**south**  2:4 16:23
  17:8,17,18,22
  17:23 18:2,10
**span**  15:10,24
**speak**  93:6
**speaks**  68:14
  97:22
**specific**  7:8
  10:20 12:24
  16:24 21:5
  22:23 24:23
  28:22,23 37:6
  38:14 44:21,22
  47:5 62:9,13,21
  65:12 66:17,19
  66:20 67:13,19
  72:7 92:21 93:1
  93:14 94:19,20
  100:25

**specifically**  12:9
  17:3 19:12,19
  20:5 21:13 22:6
  25:15 30:25
  39:22 40:20
  45:18 48:6 58:2
  76:19 89:14
  91:16
**specifics**  15:11
  30:1 58:21
  72:20 74:6
  92:11 93:5,19
  93:24 94:3
**specified**  41:16
**spell**  23:24
**spend**  14:24
**spent**  15:24 16:5
  65:14
**spinning**  69:18
**spoke**  31:13
**st**  11:3
**staff**  16:11
  36:22 38:10
  45:11 63:11,12
  73:13,15 78:13
  87:5 91:17
**staff's**  45:14
**standardized**
  36:4 38:7,15
  39:3
**start**  24:1,4
  68:18 79:15,20
**started**  12:19,19
  12:22 17:22,22
  30:18,24 77:5

**starting** 41:4
72:25
**state** 4:8 95:12
96:1 99:12
100:11,14
102:14
**stated** 19:25
**statement** 5:16
**statements**
21:12 89:6,14
**states** 1:1 53:2
96:10,13 98:25
100:8,9
**statute** 97:16,17
98:4,7
**stay** 62:16,16
68:20 74:17
**stayed** 7:18
**stenographic**
103:13
**stenographica...**
1:24 103:9
**step** 49:2
**stephanie** 25:21
**steps** 41:7
**stop** 47:25 48:3
48:6
**strike** 26:1
40:12 41:19
48:8 56:20 62:1
99:21
**structure** 25:4
**struggle** 62:15
69:24

**struggling**
74:17
**studio** 16:22
22:13
**study** 11:25
**subject** 98:22
**sucking** 70:9
**suffering** 49:10
**sufficient** 63:6
**suite** 2:4
**sum** 100:11,15
**summer** 24:15
24:16 68:10
**sums** 53:6
**supplement**
28:14
**supplemented**
27:23
**supported**
27:21
**suppose** 23:9
27:20,25 83:18
96:25 97:6
**supra** 98:23
**sure** 15:20,23
20:6 22:4,8 25:3
25:16 26:15,24
27:3,4,12 29:10
30:2 36:4 46:6
58:1 60:1 67:20
69:6 72:16 82:7
83:4 85:6
**survive** 70:12
**switch** 63:16,18

**sworn** 4:4 5:16
102:8
**system** 37:24
38:1,3,9,9,11
39:9

**t**

**t** 3:5
**take** 6:4 9:8
12:3,6 22:12,19
37:15 44:23
56:4 60:15
68:11 73:2
86:22 87:2,25
92:13 94:22
97:20
**taken** 60:23
78:1
**talk** 37:21 58:11
**talked** 73:1
75:15 87:15
**talking** 13:3,18
14:1 63:4 69:2
**tangible** 20:1
**taught** 12:13
13:9,10
**tax** 25:11,12,13
25:18 66:8 67:9
**taxed** 25:8
**team** 34:18 35:3
35:12 37:15
44:12
**teammates** 37:2
**technically** 25:2
50:10

**tell** 6:8 47:24
84:7,8,24 87:21
100:22
**template** 36:7
36:10,13,16,18
37:4,15
**ten** 12:17 13:2
13:12 15:6,10
17:9
**term** 66:1 89:2
98:22
**terminating**
78:13
**terms** 32:21
37:3 69:22
98:22
**testified** 4:5
20:6 21:23
30:17 36:6
38:21 39:23
65:22 78:11
81:6 85:14 87:3
**testifying** 40:11
40:14 82:1,9
**testimony** 19:24
20:8,13 21:8,25
36:5 38:16 39:1
41:4 48:13
49:17 82:25
85:13 89:12
**text** 9:5
**thank** 17:20
60:20 80:4
94:24 98:12
101:1,22

[thing - under]                                                    Page 129

**thing**  49:1
**things**  10:11,21
  10:22 12:23
  15:22 16:14,15
  19:3,3,7,9 22:14
  22:15 45:16,17
  48:22 49:8
  65:10 76:14
  94:18
**think**  10:5 12:17
  12:25 17:7 25:2
  32:10 51:17
  58:25 76:16
  78:18 80:1
  92:17
**third**  13:22
  14:14 39:4,15
**thorp**  25:21
**thought**  62:19
  64:2 84:3,12
**thoughts**  9:15
**three**  45:8 49:5
  80:16
**throw**  50:25
**tighten**  78:8
**tightened**  78:12
**tightening**
  78:15
**tim**  2:11
**time**  5:3 6:13,13
  6:21 7:19 9:8
  11:23 14:12,23
  15:10,16,19,24
  16:4,7 21:7 22:2
  32:24 33:1

39:24,24 42:22
  44:5,5 48:24
  49:4 55:5,5
  56:23 57:1
  58:14,25 60:16
  60:17 61:3,5,6
  63:7,10 70:17
  73:13,22 74:2
  74:16 75:9 79:9
  82:25 83:19
  84:11 89:7
  93:19 101:22
**timeframe**  36:2
  44:16 57:5
  58:13 70:15,22
**times**  5:1 28:4
  64:7
**timing**  64:3
**timothy**  2:11
**title**  33:13,22
  50:8,10
**titled**  52:24
**today**  9:13 54:4
  83:16 93:20
  94:1,16
**together**  24:4
  32:8
**told**  48:2 71:14
  83:24 84:21
  85:3,7 86:13
**took**  13:7 22:9
  22:15 28:13
  41:7 89:25 90:2
**top**  40:10

**topic**  39:10
**total**  63:21
  81:14
**towards**  40:12
**town**  46:21
**training**  12:11
  13:5
**transacted**
  58:14
**transaction**
  53:4 80:17,20
  86:25
**transcript**  10:9
  20:7,12 40:25
  82:14 83:21
  85:10 103:11,12
**transferred**
  29:24
**transitioning**
  7:19
**transmit**  63:20
**transpire**  59:6
**transpired**  87:1
**trigger**  46:2
**triggered**  19:10
**trip**  79:14
**true**  35:22 54:3
  56:22 62:15,23
  73:5 78:24
  103:12
**trust**  22:17,18
  22:19 29:13
  42:21 65:21
**try**  40:22

**trying**  14:3 49:7
  62:11 93:3 95:8
**turned**  84:14
**twelve**  33:7
**twice**  76:7
**two**  2:4 11:1,21
  15:13 23:16
  33:4 46:25 47:8
  49:6 82:3,21
  87:13
**type**  13:5 16:1
  20:23 31:8
**typical**  32:25
**typically**  30:3
  32:5 33:3 34:24
  35:1 57:10 73:9

**u**

**u**  45:3
**u.s.c**  53:17
  98:21 99:14
  100:16
**ultimately**  39:11
  61:1 66:25
  71:21
**um**  41:10,11
**unable**  69:15
**unacceptable**
  71:16
**unconditional**
  54:23
**under**  5:18 8:11
  49:17 53:17
  54:15 55:9
  98:21 99:14
  100:13,16

**undersigned**
54:24 102:6
**understand**
4:14 5:10,25 6:7
6:9,19 7:2 9:6
14:6 26:15,20
33:11 54:4 56:8
58:2,20 59:5
60:7 71:2 78:4,7
80:10,20,23
81:1,8
**understanding**
42:8,19
**understood**
42:3 54:4 58:3
58:24 59:8
**united**   1:1 100:7
**university**   11:14
11:19,23,25
12:5,7 13:8
**unpaid**   99:6
**upfront**   39:6
**upstart**   73:23
**use**   27:17 29:9
30:21 37:8
42:11,14 65:13
76:13,14,22
77:1
**used**   29:10 31:1
35:13 36:14,22
37:7 43:10,19
76:24 77:18,22
**using**   15:3 26:18
30:3 70:23

**usually**   88:2
**utilizing**   58:4

**v**

**vacation**   76:23
**vaguely**   58:2
**valid**   57:6,8
**value**   21:2
**valued**   20:3
21:10
**varied**   46:15
**various**   20:22
34:15 40:4
**vary**   37:22
**vast**   65:10
**vehicle**   49:25
50:1,2,11,13
**vehicles**   76:7
**verbal**   5:21
**verge**   67:17
68:4
**version**   36:22
36:24,24
**versus**   19:16
76:25
**vide**   14:13
**video**   15:4 19:6
**videographers**
15:9
**videography**
12:4,12 13:3,6
13:23 14:6,13
14:20,24 15:17
32:23 33:2
35:24 49:14

**videos**   16:6
**view**   46:5
**violation**   97:10
**violations**   95:17
96:16
**virtue**   51:5
**vs**   1:11

**w**

**w**   7:15 25:1
**wages**   14:4
63:11
**wait**   6:2
**waived**   101:24
**want**   5:23 24:24
26:21 35:17
37:6 52:21
71:15 83:21
**wanted**   39:13
84:6,8
**way**   42:12,16
76:17 78:20,22
85:19,20
**we've**   60:16
69:2
**wedding**   31:12
31:23 32:10,21
32:22 33:11
35:17 38:1
47:14 85:15
87:10,12
**weddings**   44:12
45:17 68:10
88:2
**week**   9:17 32:25
68:6

**weeks**   86:9
87:13
**went**   10:25 17:2
47:5 68:7 84:5
84:13,17,17
89:4,9,15
101:11
**western**   22:16
22:17,17,19
65:21 67:16
68:3 69:10,12
69:21 70:3,6
71:2
**whatnot**   9:15
62:22
**whatsoever**
13:6
**winter**   7:10
**withdrew**   30:12
**withstanding**
66:24
**words**   100:19
100:22
**work**   13:11 14:4
14:6,16,20 16:1
16:16 18:1
24:10 46:2
49:13 58:21
59:14,15 60:25
69:17 99:5
100:12
**worked**   13:16
24:13 25:6
35:20

**[working - yesterday]**                              Page 131

| | |
|---|---|
| **working**  16:13 | **yearbook**  12:21 |
| 16:21 17:22 | **years**  11:1,21 |
| 49:11 68:6 84:4 | 12:17,18,24 |
| **worth**  22:3 | 13:2,12,25 15:6 |
| **writing**  38:10 | 17:1,9,13 19:21 |
| **written**  7:25 | 25:6,19 27:6 |
| **wyoming**  65:14 | 33:4 41:11 47:8 |
| 75:17 76:21 | 48:24 49:5,6 |
| 79:14 | **yellowstone** |
| | 65:15 |
| **x** | **yep**  4:23 60:19 |
| **x**  3:1,5 | 74:18 |
| | **yesterday**  20:11 |
| **y** | 77:25 |
| **y**  45:3 | |
| **yeah**  4:19 10:2 | |
| 10:15 17:15 | |
| 19:23 20:6 21:4 | |
| 21:14,19 25:2 | |
| 26:16 28:3,23 | |
| 29:2 32:2 34:18 | |
| 35:9 36:3,16 | |
| 37:9 38:1,14 | |
| 40:4,5 41:10 | |
| 46:3,16 47:3,16 | |
| 56:11 60:2,10 | |
| 62:7 63:1 64:10 | |
| 68:22 76:20 | |
| 83:2 88:7 91:20 | |
| 97:18 98:1 | |
| 100:19 | |
| **year**  11:4 15:10 | |
| 15:24 16:24 | |
| 24:22,25 27:15 | |
| 32:25 33:4 50:4 | |
| 67:21 | |

North Dakota Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e)  Review by Deponent; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party made before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

    (A)  to review the transcript or recording; and

    (B)  if there are changes in form or substance,
to sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period. If the deposition
is not signed by the deponent within 30 days after
its submission to the deponent, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the deponent
or the fact of the refusal to sign together with
the reason, if any, given therefor; and the

deposition may then be used as fully as though signed unless on a motion to suppress under Rule 32(d)(4) the court holds the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.